THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EMANUELA BARZI,                                  )
                                                 )
                    Plaintiff,                   )        No. 25 C 9247
            v.                                   )
                                                 )        Chief Judge Virginia M. Kendall
                                                 )
FERMI RESEARCH ALLIANCE, LLC,                    )
et al.,                                          )
                                                 )
                    Defendants.                  )

**MEMORANDUM OPINION & ORDER**

Plaintiff Emanuela Barzi brings this employment discrimination action against Fermi
Research Alliance, LLC ("FRA"), Fermi Forward Discovery Group, LLC[1], and several FRA
employees—Lia Merminga, Bonnie Fleming, Sam Posen, Stephen Gourlay, George Velev,
Alexander Romaneko, and Beth Fanscali (the "Individual Defendants"). She alleges gender,
national origin, age, and disability discrimination and retaliation in violation of state and federal
laws, as well as various state law breach of contract claims. Defendants now move to dismiss for
failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons below,
Defendants' Motion to Dismiss [32] is granted in part and denied in part.

**BACKGROUND**

The following facts are set forth in the Amended Complaint ("Complaint"), except where
noted, which the Court accepts as true for purposes of a motion to dismiss. *See Lavalais v. Village
of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). Barzi and Defendants attach several exhibits

---

[1] Barzi asserts claims against Fermi Forward Discovery Group, LLC as a successor-in-liability to Fermilab. (Dkt. 8 ¶¶ 3, 91).

1

to their briefs. (Dkts. 33-1, 35). The Court may consider documents attached to a complaint or a plaintiff's response to a Rule 12(b)(6) motion without converting the motion into one for summary judgment. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012) (citing Fed. R. Civ. Pro. 10(c)); *Geinosky v. City of Chicago,* 675 F.3d 743, 745 n. 1 (7th Cir. 2012) ("[A] party opposing a Rule 12(b)(6) motion may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove"). Since the documents are referenced in the Barzi's pleadings and are central to her claims, the Court will consider them in its analysis.

## I. Barzi's Employment at Fermilab

Barzi is a 57-year-old woman of Italian national origin. (Dkt. 8 ¶¶ 1, 113). She is an internationally recognized scientist in superconducting materials and magnet technology, with over 270 peer-reviewed publications. (*Id.* ¶ 26). In 1997, she was hired as a Guest Engineer at Fermi National Accelerator Laboratory ("Fermilab"). (*Id.*). Defendant FRA was the management-and-operations contractor for Fermilab until 2025 and was formed by the University of Chicago and the Universities Research Association, Inc. (*Id.* ¶¶ 2-3). FRA operated Fermilab through a contract with the United States Department of Energy ("DOE") and received federal funding assistance. (*Id.* ¶ 2), (Dkt. 35 at 85-101).

From 1997 onward, Barzi asserts that she experienced gender- and national-origin-based harassment and discrimination at Fermilab by being paid less, denied promotions, excluded from projects, and subjected to demeaning treatment despite her exceptional job performance. (*Id.* ¶ 29). When she was hired in 1997, male colleagues with similar or lesser credentials were hired into scientific-track roles like Associate Scientist or Scientist. (*Id.* ¶ 30). Barzi claims that her efforts to be reclassified into a scientific-track role were "blocked" until 2017. (*Id.*). Between 1997 and 1998, a Division Head at Fermilab sexually harassed her through unwanted physical contact and

sexual assault. (*Id.* ¶ 32). He spread rumors about her and damaged her professional reputation after she rejected his advances. (*Id.*). She also asserts that, between 1998 and 1999, she was stalked by another Fermilab male colleague who was married. (*Id.* ¶ 33). Sometime before 2008, a different Fermilab male colleague sexually assaulted her in her office. (*Id.*). She resisted and suffered no physical injury. (*Id.*). Between 2008 and 2013, a senior male colleague sent Barzi 300 "lewd emails." (*Id.*). In 2016, she was groped at Fermilab by a Physics Nobel Laureate. (*Id.*). Barzi also alleges that, during the entire period of her employment, she was subjected to unwelcome sexual advances and at least one instance of sexual assault by colleagues from other laboratories during work-related travel to conferences. (*Id.* ¶ 34).

Barzi further claims that she was denied leadership roles, research funding, and recognition. (*Id.* ¶¶ 35, 38). For instance, in 2003, she was made Group Leader of a research group she formed through independent funding only after the original leader, a younger male engineer, resigned. (*Id.* ¶ 35). In 2007, Barzi received "little recognition" internally for a scientific development, which lead DOE managers to credit the achievement to other laboratories. (*Id.* ¶ 36). In 2010, after Barzi won an academic prize, the Fermilab Department Head and Division Head denied Barzi's request to be reclassified into the scientific track, stating that "she was not doing any science," and dismissing her foreign academic background. (*Id.* ¶ 37). In 2011, after Barzi and her team broke a Fermilab record, Barzi's research group was reassigned to a new department led by Lance Cooley and public credit for the achievement was attributed to a younger male in the group. (*Id.* ¶ 38).

Between 2011 and 2014, Cooley repeatedly disparaged Barzi's laboratory, showed no interest in its capabilities, and occasionally yelled "Eih, lady!" at her. (*Id.* ¶ 39). Barzi reported this behavior to Human Resources and was told that the behavior was permissible. (*Id.*). Cooley also

gave Barzi a low performance rating, micromanaged Barzi's lab in ways that created safety risks, and harassed individuals associated with Barzi's lab. (*Id.* ¶ 40). In 2013, after Barzi objected to Cooley's effort to blame a safety incident on one of Barzi's team members, Cooley issued Barzi a written reprimand for "inappropriate behavior." (*Id.* ¶ 41). Barzi's lab operations were halted for months during safety reviews, which ultimately confirmed that her lab was not at fault for the incident. (*Id.*). Barzi alleges that no one else involved in the incident was disciplined. (*Id.*).

Beginning in 2014, Barzi was excluded from Laboratory Directed Research Funding while male and younger colleagues with "weaker" track records were supported. (*Id.* ¶ 42). In the summer of 2014, Barzi's group was removed from her after a new Division Head, Hasan Padamsee, dissolved Cooley's department. (*Id.* ¶ 43). In 2015, Padamsee suppressed one of Barzi's developed techniques by impeding access to funding, preventing her from presenting her results, obstructing a patent application, and undermining support among colleagues. (*Id.* ¶ 44). Barzi claims that, at that time, Fermilab was pursuing an alternative to her approach developed by Padmsee's former Ph.D. student, Sam Posen. (*Id.*). Padamsee's efforts impaired Barzi's efforts to advance her work. (*Id.*).

After Padamsee left in 2015, Barzi could not apply for the Division Head position because Fermilab did not publicly post it. (*Id.* ¶ 45). Instead, the role was assigned to Sergey Belomestnykh, one of Padamsee's colleagues and friends. (*Id.*). From 2015 onward, Belomestnykh and others harmed her candidacy for external executive roles by keeping her at the bottom of the organizational chart and withholding formal titles. (*Id.* ¶ 46). In 2016, after Fermilab's Director acknowledged systemic gender-based workplace issues, Barzi conducted a gender-equity analysis showing systemic disparities at Fermilab. (*Id.* ¶ 47). Barzi's colleague, Chrstine Ader, used the analysis to support a successful Equal Employment Opportunity Commission ("EEOC") case.

4

(*Id.*). Barzi alleges that, shortly after she released the analysis, she was marginalized, excluded from meetings, and stripped of responsibilities. (*Id.*).

From 2016 to 2024, Defendant George Velev, then a Department Head, disparaged Barzi's qualification and leadership readiness to the Director. (*Id.* ¶¶ 48, 51). He also orchestrated a campaign of defamation, harassment, and professional isolation against Barzi through false accusations of plagiarism, undermining her authorship, and spreading false rumors about her mental health. (*Id.* ¶ 51). Barzi claims that this resulted in Velev getting promoted to a leadership position in 2018 that Barzi had expected to obtain, despite Velev's minimal compared to Barzi's. (*Id.*). This, Barzi alleges, displaced her expected progression and materially impaired her advancement opportunities. (*Id.*). Velev also demeaned Barzi in meetings and emails. (*Id.* ¶ 49). At one meeting in August 2018, Velev refused to let Barzi ask questions, told her she had "been a scientist for only one year," threatened to remove her if she spoke, and reported her to HR after. (*Id.*). Around the same time, Velev and Belomestnykh "engaged in a months-long administrative campaign of harassment" against Barzi, including unfounded allegations of financial dishonesty. (*Id.* ¶ 50). Barzi was forced to divert substantial time from her work to deal with this. (*Id.*). In 2019, based on their allegations, Velev and Belomestnykh reduced a positive annual evaluation Barzi received from her supervisor. (*Id.*). Belomestnykh also did not internally publicize news of Barzi's elections to several prestigious committees. (*Id.* ¶ 54).

Barzi reported bullying, discrimination, and retaliation to multiple individuals at Fermilab in 2018 and 2019, including HR, the former Chief Operations Officer, and the former General Counsel. (*Id.* ¶ 52). No action was taken in response, and exclusion and defamation escalated. (*Id.*). In 2020, Defendant Alexander Romanenko, a younger male, was selected over Barzi for a senior technical leadership role despite Barzi's superior qualifications and expressed interest in the role.

(*Id.* ¶ 53). In 2021, Romanenko, then-Division Head, blocked the publication of a feature about Barzi's recent award in an internal bulletin. (*Id.* ¶ 54). Romanenko and Defendant Sam Posen, then-Deputy Division Head, harassed Barzi over grant budgeting, filed retaliatory HR complaints against her, excluded her from meetings, denied her authorship, and publicly disparaged her. (*Id.* ¶ 55). Barzi alleges that this conduct was "driven by retaliatory animus" based on their resentment of her greater experience and professional standing and her critiques of management practices. (*Id.*).

On November 7, 2021, Barzi filed a charge with the EEOC alleging discrimination and retaliation for acts occurring between January 11, 2021 and November 7, 2021. (*Id.* ¶ 16). Defendant FRA was subsequently served with a Notice of Charge. (*Id.*). Barzi received a Notice of Right to Sue on August 3, 2023. (*Id.* ¶ 17). Barzi did not file suit because she had "good-faith anticipation that internal remedies and reforms might occur." (*Id.*). After filing the 2021 charge, the alleged retaliatory conduct Barzi was experiencing intensified. (*Id.* ¶ 55).

In March 2022, after a colleague from another DOE lab presented partial data at a meeting, Barzi raised concerns about potential academic misconduct. (*Id.* ¶ 56). Cooley, who was then working at the other DOE lab, accused Barzi of defamation even though DOE policy required employees to report potential research misconduct. (*Id.*). Fermilab's General Counsel then suggested to Barzi via email that she was a "defendant." (*Id.*). That same month, Barzi co-authored a paper published on arXiv[2] titled recommending best practices for selecting effective scientific leaders. (*Id.* ¶ 57). She claims that her recommendations were not reflected in Fermilab's appointment of Defendant Merminga in April 2022. (*Id.*). After Barzi published another article on arXiv in October 2022 addressing systemic barriers and discrimination in scientific workplaces,

---

[2] arXiv is an open-acces archive and free distribution service for scholarly articles. *See* https://arxiv.org/ (last accessed April 10, 2026).

she was barred from participating in DOE grant proposals and prohibited from giving invited talks by Defendant Fleming, a Deputy Director at Fermilab. (*Id.* ¶ 58).

In March 2023, Barzi emailed Fleming with a written analysis critiquing a presentation about reporting misconduct and proposing improvements to protect victims, but Fleming did not respond. (*Id.* ¶ 59). On April 24, 2023, Barzi told Fleming that she had authored an anonymous editorial titled "One Woman's Struggle with Harassment in Physics," and offered to serve as the interim Associate Lab Director. (*Id.* ¶ 60). Fleming declined to consider Barzi for the role and told Barzi that such experiences "are not uncommon for a woman in STEM." (*Id.*). In June 2023, after an accident at Fermilab, Barzi met with Defendant Merming and urged her to address the systemic "culture and ineffective manager selection" issues, which she believed negatively affected safety. (*Id.* ¶ 61). When Barzi was later asked to provide proof of her concerns, she asked leadership to get involved because she did not have the resources for an investigation. (*Id.*).

Barzi launched a "voluntary think-tank initiative" in November 2023 on cronyism, inequitable manager selection, safety violations, financial waste, and insolvency. (*Id.* ¶ 65). In compliance with lab policies, she emailed an invitation to approximately 2,000 Fermilab employees. (*Id.*). Defendant Beth Fanscali, Interim General Counsel at Fermilab, notified Merminga and other senior leadership about the initiative. (*Id.*). Barzi alleges that Merminga "expressed displeasure" and discouraged participation. (*Id.*). In January 2024, Fleming declined to authorize Barzi's participation in a talk about Fermilab's work, citing funding and suggesting that someone involved in Fermilab's strategic planning should speak instead. (*Id.* ¶ 66). Fleming maintained her decision even when the talk's organizers offered a remote presentation at no cost and to add a separate segment for an "official perspective." (*Id.*).

Barzi was diagnosed with post-traumatic stress disorder ("PTSD") in November 2019. (*Id.* ¶ 62). She disclosed her condition to HR, requesting confidentiality. (*Id.*). Defendant Velev discussed Barzi's PTSD with others without Barzi's consent, which Barzi alleges cast doubt on her credibility and professional reliability. (*Id.*). When Barzi requested to continue working from home in September 2023 as a "reasonable accommodation," HR requested a certification from her current provider. (*Id.* ¶ 63). Based on a note Barzi submitted from her former provider, HR declined her request. (*Id.*). Barzi submitted the same note in September 2024, and she was permitted to work from home. (*Id.*).

## I.    Barzi's Termination

Barzi applied for the Associate Lab Director position in February 2024. (*Id.* ¶ 67). The posting required capability to develop a vision to accomplish Fermilab's mission and experience in magnets, "SRF", and cryogenics. (*Id.* ¶ 68). Barzi had approximately 28 years of experience in the listed areas. (*Id.*). She interviewed with the selection committee on March 7, 2024. (*Id.*). Around June 4, 2024, Defendant Posen, a "substantially younger male (under 40)" who had only recently met the eligibility criteria, was selected for the position. (*Id.* ¶ 67). Barzi alleges that the decisionmakers were aware of her "protected activity" and that no "legitimate, non-discriminatory reason was provided for not selecting her. (*Id.* ¶ 68).

In July 2024, Barzi and several colleagues anonymously released an "independent whistleblower report" on arXiv titled discussing gender discrimination, retaliation, misuse of public funds, and safety violations at Fermilab. (*Id.* ¶ 69). Barzi alleges that, shortly after this publication, the same decisionmakers who promoted Posen over her "escalated adverse actions against her." (*Id.*). For instance, Defendant Gourlay excluded Barzi from presenting her research at a DOE review despite the fact that she was the principal investigator on the project. (*Id.* ¶ 71).

On July 31, 2024, Barzi emailed Merminga and Fleming, along with several others, objecting to the Associate Lab Director selection criteria, describing her exclusion from DOE reviews, and requesting a promotion to Distinguished Scientist. (*Id.* ¶ 72). She did not receive a response. (*Id.*). The same day, Barzi participated in an inter-laboratory DOE program meeting via Zoom. (*Id.* ¶ 73). Barzi claims that, during the meeting, a scientist from a different lab made inaccurate statements about her and her team. (*Id.*). Gourlay was in the meeting but did not support Barzi. (*Id.*). The meeting ended after approximately 20-30 minutes, and the chair of the program described it as a "very productive meeting." (*Id.*). On August 5, 2024, during another meeting, Barzi provided "good-faith, professional critiques" of Gourlay's slides. (*Id.* ¶ 74). Velev then "publicly demeaned" Barzi, and Gourlay admonished a colleague who objected to Velev's comments. (*Id.*). Barzi responded by reminding Gourlay of the lab's code of conduct. (*Id.*).

On August 8, 2024, Barzi's supervisor notified her of a meeting set for August 13 regarding Barzi's alleged misconduct during the July 31 meeting. (*Id.* ¶ 75). Barzi was not told that HR would be in attendance. (*Id.*). The next day, Barzi emailed Merminga and reported ongoing harassment by management, requested intervention, and stated that she would pursue legal remedies if the conduct continued. (*Id.* ¶ 76). Barzi separately informed Gourlay and Posen that she opposed her unfair treatment and viewed the August 13 meeting as retaliatory. (*Id.*).

On August 13, 2024, Barzi met with Gourlay and HR Senior Manager Heather Sidman. (*Id.* ¶ 77). They told Barzi that she had been disruptive during the July 31 meeting and had made student attendees uncomfortable during her exchange with the external scientist. (*Id.*). They criticized her for "offering a candid scientific assessment of a junior colleague's research." (*Id.*). Barzi acknowledged that the exchange may have been awkward but explained that she was correcting inaccurate statements that risked misleading the meeting participants and harming

9

Fermilab's reputation. (*Id.*). She further stated that "candid, evidence-based critique is central to research integrity and professional ethics." (*Id.*). Barzi asserts that she did not concede any wrongdoing during the meeting. (*Id.*).

Barzi presented research at a conference during the first week of September 2024 using her own grant funds, and emailed Merminga afterwards that her discovery was "transformative", but Fermilab management had not advanced it for over a year. (*Id.* ¶ 78). On September 10, 2024, following an internal investigation, Gourlay and Sidman issued Barzi a Final Written Warning citing "inappropriate verbal communication and behavior toward a colleague" during the July 31 meeting. (*Id.* ¶ 79). They stated that the meeting had been abruptly ended due to Barzi's conduct. (*Id.*). Barzi asserts that this is inaccurate, and that the Warning relied on the external scientists' account while "disregarding contrary accounts and context." (*Id.*). Barzi immediately emailed Sidman and Merminga contesting the Warning. (*Id.* ¶ 80). At 2:36 P.M. that day, Sidman emailed Barzi stating that FRA was accepting her resignation "effective immediately." (*Id.*). Barzi had not resigned and had no intention to do so. (*Id.*). Barzi informed Sidman via email that she had not resigned. (*Id.*). HR subsequently "corrected the record." (*Id.*).

On November 12, 2024, Barzi was terminated in an announced laboratory-wide Reduction in Force ("RIF") affecting 53 employees. (*Id.* ¶¶ 81, 83). The separation memo Barzi received stated that her position was being eliminated due to "mission priorities and budget realities." (*Id.* ¶ 81). Defendant FRA did not identify any objective selection criteria explaining why Barzi was selected instead of other Senior Scientists. (*Id.*). FRA has a Reduction in Force Termination Procedure that specifies the procedure for terminating scientists in an RIF. (*Id.*); (Ex. 5, Dkt. 35 at 81-82). According to this policy, upon receiving a request from the Director for a reduction in force, a "D/S/C head" can propose a specific scientist for termination. (Ex. 5, Dkt. 35 at 81). The

proposal is then reviewed by the Director, the "WDRS", and the Fermilab Committee for Scientific Appointments ("FCSA"). (*Id.*). The review includes an analysis of the scientist's job function, performance, knowledge, skills, and abilities needed for the future mission of Fermilab. (*Id.*). Termination is approved only if there is unanimous concurrence. (*Id.*). Barzi alleges that her termination departed from this procedure. (Dkt. 8 ¶ 81).

FRA offered Barzi a one-time severance payment conditioned on her signing a waiver and release of claims, which Barzi declined to do. (*Id.*). Barzi alleges that the core functions of her position continued after her termination and were redistributed to other employees. (*Id.* ¶ 81). On November 15, 2024, Gourlay sought to replace Barzi as principal investigator on a grant with a junior engineer who had not been part of the core team. (*Id.* ¶ 82). The role was ultimately given to one of Barzi's long-standing colleagues. (*Id.*). She claims that her other projects and responsibilities were similarly redistributed. (*Id.*).

Barzi asserts that the DOE's Fermi Site Office reviewed and/or approved the RIF. (*Id.* ¶ 84). Barzi further alleges that deputies from the Kane County Sheriff's Office were at Fermilab to escort selected employees off the premises during the RIF period. (*Id.* ¶ 85). Barzi was working remotely on the day of her separation. (*Id.* ¶ 89). According to Barzi, government authorities further coordinated with FRA in access-control and badging actions for the selected employees. (*Id.* ¶ 86). She further asserts that DOE officials maintained "day-to-day" oversight of FRA operations, including in the RIF. (*Id.* ¶ 87).

Barzi was the only female Senior Scientist who was selected for termination in the RIF, and she claims that she was the "most productive" in her cohort. (*Id.* ¶ 81). Most of the employees who were terminated were "individual contributors" who were over 40 years old, women, individuals with disabilities, or members of racial or ethnic minority groups. (*Id.* ¶ 83). No

11

management-level employees with direct reports were selected. (*Id.*). After her termination, Barzi obtained her most recent performance evaluation, which indicated that Gourlay gave her the lowest rating of "1." (*Id.* ¶ 90). Barzi's supervisor had originally rated Barzi a "2-3," but then changed it to a "2" at management's request based on the Final Written Warning. (*Id.*). Barzi asserts that she was qualified and remained positively rated by her supervisor, but upper management over-rode those evaluations and then relied on them in the lead-up to her November 2024 termination. (*Id.* ¶ 64).

## II.     Barzi's Second EEOC Charge

On June 8, 2024, Barzi submitted a Complainant Information Sheet to the Illinois Department of Human Rights ("IDHR"). (*Id.* ¶ 17); (Ex. 2, Dkt. 35 at 55-62). Barzi alleged that she was discriminated and retaliated against due to her sex, age, marital status, and disability. (Ex. 2, Dkt. 35 at 56). Barzi described how she had been subjected to "gender discrimination" since she started at Fermilab, and alleged that she was passed over for promotions to Distinguished Scientist in favor of younger males. (*Id.* at 60). She also alleged that a younger male colleague was given the Associate Lab Director position over her. (*Id.* at 59). Barzi later supplemented her complaint with additional details about Fermilab's alleged failure to promote her and information and her November 2024 termination. (Ex. 3, Dkt. 35 at 64-720); (Ex. 4, Dkt. 35 at 73-76).

On February 4, 2025, the IDHR and EEOC cross-filed Barzi's perfected charge. (Dkt. 8 ¶ 17); (Dkt. 33-1). Defendant FRA is listed as the only Respondent. (Dkt. 33-1 at 4). Barzi alleged harassment, intimidating, hostile or offensive work environment due to her sex, age, and disability. (*Id.* at 5-7). She listed the following as harassment: Fanscali reporting her for starting a think-tank in November 2023; Fleming prohibiting her from giving a presentation in November 2024; Gourlay prohibiting her from giving a talk in August 2024; and Gourlay reporting her to HR

regarding the July 2024 meeting in September 2024. (*Id.*). She also alleged retaliation for participating in several protected activities from November 2016 to June 2024. (*Id.* at 8, 10, 12, 14). Additionally, Barzi claimed that FRA failed to promote her, issued her a Final Written Warning, and discharged her due to her sex, age, and disability. (*Id.* at 9-14).

Barzi timely opted out of the IDHR investigative and administrative process. (Dkt. 8 ¶ 19). On May 5, 2025, IDHR issued Barzi a Notice of Dismissal and Right to Sue. (*Id.*); (*Id.* at 41-44). The EEOC issued Barzi a Notice of Right to Sue on July 25, 2024. (Dkt. 8 ¶ 20); (*Id.* at 38-39). On August 1, 2025, Barzi filed her Original Complaint with this Court. (Dkt. 8 ¶ 21). In her Amended Complaint, Barzi alleges sex and national origin discrimination in violation of Title VII and the Illinois Human Rights Act ("IHRA") (Counts I-III); age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") and IHRA (Count IV); disability discrimination in violation of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and the IHRA (Count V); retaliation in violation of Title VII, the ADA, the ADEA, and the IHRA (Count VI); retaliation for protected speech in violation of 42 U.S. § 1983 (Count IX); and civil rights conspiracy and equal protection violations under 42 U.S. §§ 1981, 1983 (Count X). (*Id.* ¶¶ 94-151, 174-191). She also brings various state law claims: aiding and abetting discrimination and retaliation in violation of the IHRA (Count VII); retaliation in violation of the Illinois Whistleblower Act ("IWA") (Count VIII); breach of implied contract and, in the alternative, promissory estoppel (XI); and breach of DOE's prime contract and, in the alternative, retaliatory discharge (Count XII). (*Id.* ¶¶ 152-173, 192-217). The Defendants now move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 33).

13

**LEGAL STANDARD**

To survive a motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Kaminski v. Elite Staffing*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)). Specifically, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). At the same time, "allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). As such, "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Further, the moving party bears the burden of establishing the insufficiency of the plaintiff's allegations.

**DISCUSSION**

In her 12-count Complaint, Barzi alleges that Defendants subjected her to decades of harassment because of her gender; failed to promote her and then terminated her because of her gender, age, national origin, and disability; and retaliated against her for reporting this mistreatment. (Dkt. 8). Defendants argue that most of Barzi's claims should be dismissed as time-barred or because Barzi failed to exhaust them. (Dkt. 33 at 12-15, 20-22). They assert that the rest of Barzi's claims warrant dismissal because they are not adequately plead. (*Id.* 15-39).

**I.     Local Rule 7.1**

14

Before addressing the merits of Defendants' Motion, the Court must address the parties' respective violations of Northern District of Illinois Local Rule 7.1. Local Rule 7.1 imposes a 15-page limit on all briefs. L.R. 7.1. Any party seeking to exceed that limit must seek prior approval of the Court. *Id.* Here, neither Defendants nor Barzi sought leave to file a brief exceeding 15 pages. Yet Defendants' opening and Reply briefs are 24 pages and 5 pages over the limit, respectively. (Dkts. 33, 36). Barzi's opposition brief exceeds the page limit by 26 pages.

Barzi's egregiously long brief may be excused given she is proceeding *pro se. See Cesal v. Moats*, 851 F.3d 714, 720 (7th Cir. 2017) (holding that *pro se* litigants are held to less stringent standards than lawyers). Defendants, however, are represented and have no excuse for their flagrant violations of the page limit. While Local Rule 7.1 allows the Court to strike any brief that does not comply with its requirements, the Court will not take that step here. Instead, Barzi and counsel for Defendants are admonished to be mindful of the Local Rules for any future filings in this District.

## II.     Failure to Exhaust Administrative Remedies

In Count III, Barzi alleges that Defendant FRA violated Title VII and the IHRA by discriminating against her based on her national origin. (Dkt. 8 ¶¶ 112-117). In Count VII, she claims that Individual Defendants aided and abetted discrimination and retaliation in violation of the IHRA. (*Id.* ¶¶ 152-165). Defendants argue that Barzi failed to administratively exhaust both claims, so they must be dismissed. (Dkt. 33 at 20, 22). Title VII and the IHRA require a plaintiff to exhaust administrative remedies by bringing an EEOC charge before filing suit. *See* 42 U.S.C. § 2000e-5(f); 775 ILCS 5/7A-102(B); *see also Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019) ("In general, a plaintiff can only bring claims under Title VII or the IHRA that he has included in the original charge filed with the Equal Employment Opportunity Commission

("EEOC") or the IDHR."). Failure to exhaust is an affirmative defense that usually would not be determined on a motion to dismiss. *Mosely v. Bd. of Educ.*, 434 F.3d 527, 532-33 (7th Cir. 2006). Dismissal at this stage is warranted, however, if the face of the plaintiff's complaint "compels a conclusion that she failed to exhaust." *Id.* at 533.

### A. National Origin Discrimination (Title VII and IHRA)

In her Count III, Barzi alleges that FRA discounted her foreign credentials, dismissed her non-U.S. training as inadequate, and bypassed her for advancement in favor of similarly situated employees outside of her Italian national origin. (Dkt. 8 ¶ 114). Defendants argue that Barzi did not administratively exhaust this claim because she did not assert a national origin discrimination claim in her IDHR and EEOC charges. (Dkt. 33 at 20). On the EEOC charge, Barzi checked the boxes for race, sex, disability, and retaliation. (Dkt. 33-1 at 29). In the IDHR charge form, which was cross-filed with the EEOC charge, Barzi claims that she experienced harassment, received a final written warning, and was discharged due to her age, sex, and disability. (*Id.* at 5-14). She did not indicate anywhere on the charges that she was discriminated against based on her national origin.

Even if not explicitly listed in a charge, a claim may be exhausted if it is "like or reasonably related to the EEOC charge, and can be reasonably expected to grow out of an EEOC investigation of the charges." *Cervantes*, 914 F.3d at 565 (cleaned up). To be considered "reasonably related" to the original charge, "the claims should involve the same conduct and implicate the same individuals." *Miller v. Am. Airlines, Inc.*, 525 F.3d 520, 525 (7th Cir. 2008). The same standard applies to exhaustion of claims under the Illinois Human Rights Act. *Cervantes*, 914 F.3d at 565. This broader understanding of exhaustion does not help Barzi. She does not mention anything about discrimination based on her national origin or even identify what country she is from in her

16

charges. *See Rao v. Abbott Molecular, Inc.*, 2026 WL 686539, at *2 (N.D. Ill. Mar. 11, 2026) (dismissing national origin discrimination claim for failure to exhaust where allegations in plaintiff did not mark boxes on EEOC charge form for national origin or mention anything about discrimination based on her national origin). While Barzi checked the box for race on the EEOC form, she does not describe any racial discrimination. Even if she did, "claims of national origin discrimination do not relate to or grow out of claims based on race." *Goodlet v. City of Chicago*, 2023 WL 2499862, at *3 (N.D. Ill. Mar. 14, 2023).

Barzi argues that her national origin claim is reasonably related to her EEOC and IDHR charges because her IDHR narratives identified her as "foreign-born," specified Italy as her country of origin, and alleged that her foreign academic credentials were discounted in advancement decisions. (Dkt. 35 at 40). Several courts have held that pre-charge information sheets and intake forms are not equivalent to charge forms themselves. *See Herrera v. Di Meo Bros., Inc.,* 529 F. Supp. 3d 819, 828 (N.D. Ill. 2021) (dismissing discrimination claims for failure to exhaust after declining to consider allegations in the pre-charge inquiry form); *Carlson v. Christian Bros. Servs.*, 840 F.3d 466, 467 (7th Cir. 2016) (a pre-charge screening form is not the equivalent of a charge because it does not prompt the IDHR to notify the employer, launch an investigation, or sponsor mediation). Even if the Court considered Barzi's pre-charge screening forms, the references to her Italian national origin and sparse allegations relating to her foreign credentials do not express an intent for the EEOC or IDHR to investigate national origin discrimination or put Defendants on notice of such a claim. *See Goodlet*, 2023 WL 2499862, at *3 (dismissing national origin discrimination claim for failure to exhaust). The face of the Complaint makes clear that Barzi did not administratively exhaust her national origin discrimination claim, so Count III is dismissed without prejudice. *See Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1008

(7th Cir. 2019) (dismissals for failure to exhaust should be without prejudice to allow plaintiffs to refile their claims when and if they exhaust administrative remedies).

## B. Aiding and Abetting Discrimination and Retaliation (IHRA)

In Count VII, Barzi claims that Individual Defendants aided and abetted discrimination and retaliation against her, in violation of the IHRA, based on her sex, age national origin, and disability, and in response to her internal complaints and "whistleblower publications." (Dkt. 8 ¶ 155). Defendants argue that Barzi failed to administratively exhaust this claim because she did not name Individual Defendants as Respondents or allege an aiding and abetting claim in her IDHR charge. (Dkt. 33 at 22). The IHRA and Title VII exhaustion requirement serve two purposes: facilitating an opportunity to settle and providing notice of the conduct at issue to the employer. *See Mahran v. Cnty. of Cook*, 2022 WL 11169418, at *2 (N.D. Ill. Oct. 19, 2022). As a result, a party who was not a respondent in an IHRA charge cannot be sued in a private civil action. *Id.* (citing *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013)); *see also Black v. Jeevanandam*, 2022 WL 17166248, at *5 (Ill. App. Ct. 2022) (dismissing discrimination claims for failure to exhaust where civil defendant was not named in IHRA charge). The only respondent named on the IDHR charge form is Defendant FRA. (Dkt. 33-1 at 4).

Barzi argues that it does not matter that Individual Defendants are not named as respondents because she identified Individual Defendants by name and described their roles in the charge, giving them notice of the allegations. (Dkt. 35 at 14-15). A plaintiff may sue a defendant not named in the charge of discrimination if that defendant (1) "knew or should have known of the charge and that [its] conduct would be subject to [EEOC or IHDR] inquiry," and (2) the defendant had "been given an opportunity to participate in conciliation proceedings aimed at voluntary compliance with [Title VII or the IHRA]". *Godinez v. Episcope Companies, LLC*, 2025 WL

18

1591311, at *5 (N.D. Ill. June 5, 2025) (citing *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 906 (7th Cir. 1981)). This exception does not apply here because there are no allegations that Individual Defendants knew an administrative proceeding was proceeding. *See Palackdharry v. CVS Health Corp.*, 2025 WL 438202, at *3 (N.D. Ill. Feb. 7, 2025) (dismissing discrimination claims for failure to exhaust where plaintiff did not name defendant as respondent in IHRA charge or allege any evidence that he knew of the IDHR proceedings). Moreover, Barzi opted out of the IDHR process, effectively denying Individual Defendants from becoming aware of or moving through the administrative process. (Dkt. 8 ¶ 19); *see Godinez*, 2025 WL 1591311, at *5 (defendants who were not named in IDHR complaint did not have notice of the administrative process where plaintiff submitted opted out of the process). Additionally, the fact that FRA, Individual Defendants' employer, was named as the respondent does not satisfy exhaustion as to Individual Defendants. *Parker v. Illinois Hum. Rts. Comm'n*, No. 12 C 8275, 2013 WL 5799125, at *8 (N.D. Ill. Oct. 25, 2013) (dismissing discrimination claims against individual defendant where the individual defendant's employer was the only respondent named in IDHR charge). Accordingly, Count VII is dismissed without prejudice for failure to exhaust administrative remedies.

### C. Wage Discrimination

In the Complaint, Barzi states that she "seeks relief consistent with" the Lilly Ledbetter Fair Pay Act ("Equal Pay Act") "to the extent that discriminatory pay-setting, denial of raises/bonuses, manipulation of performance ratings affecting pay, or other practices affecting compensation continued into the limitations period or were carried forward into paychecks." (Dkt. 8 ¶ 25). In her Response, Barzi argues that each paycheck she received from August 12, 2023 through November 12, 2024, constitutes a separate violation of the Equal Pay Act. (Dkt. 35 at 13).

She further asserts that her Equal Pay Act claim must proceed because Defendants failed to address it in their Motion. (*Id.*). The Court finds that Barzi failed to plead any claim under the Equal Pay Act, so it is irrelevant that Defendants failed to address one. To the extent that she did assert a wage discrimination claim, it is dismissed because it was not administratively exhausted.

It would not matter that Barzi did not bring a wage discrimination claim as a distinct Count if she included in her Complaint sufficient factual allegations that state a plausible claim for relief under the Equal Pay Act. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (a plaintiff does not need to plead legal theories); *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("[T]he question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief."). To state a claim under the Equal Pay Act, the plaintiff must allege that (1) different wages are paid to employees of another gender; (2) that the employees of the other gender do equal work that requires equal skill, effort, and responsibility; and (3) that the employees have comparable working conditions. *Markel v. Bd. Of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 912-13 (7th Cir. 2002). The only allegation Barzi makes with respect to pay is that she was consistently paid less despite outperforming her peers. (Dkt. 8 ¶ 29). She does not allege that she was less than men for equal work, so she fails to state an Equal Pay Act Claim. *See, e.g. Williams v. Illinois*, 2022 WL 952745, at *4 (N.D. Ill. Mar. 30, 2022) (dismissing Equal Pay Act claim where there were no allegations that men were paid more for equal work).

Even if this allegation was enough to state a wage discrimination claim, it would be dismissed for failure to exhaust. As discussed above, a plaintiff may only bring a Title VII claim if it was included in the original EEOC charge or can be reasonably expected to grow out of an EEOC investigation of the charge. Barzi did not check the Equal Pay Act box on the EEOC charge

20

form or include any allegations regarding unequal pay in the narrative of the IDHR charge. (Dkt. 33-1). Accordingly, to the extent that Barzi asserts a claim under the Equal Pay Act, it is dismissed without prejudice for failure to exhaust administrative remedies. *Smith v. CNA Fin. Corp.*, 2011 WL 1557871, at *8 (N.D. Ill. Apr. 25, 2011) (dismissing Equal Pay Act claim for failure to exhaust where plaintiff's EEOC charge did not contain a pay disparity claim or describe any conduct regarding unequal pay).

### III.     Statute of Limitations

Defendants argue that the Court should not consider most of the conduct alleged in Counts I-VII because it is time-barred by applicable statutes of limitations. (Dkt. 33 at 12-15). "A limitations defense is not often resolved on a Rule 12(b)(6) motion because a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 492 (7th Cir. 2017) (internal quotation marks omitted). "But dismissal at this early stage is appropriate when the complaint alleges facts sufficient to establish that the suit is indeed tardy." *Id.*

Barzi filed an EEOC charge on February 4, 2025. (Dkt. 33-1 at 29). The charge was cross-filed with the IDHR, effective on the same date. (Dkt. 33-1); (Dkt. 8 ¶ 18); 775 ILCS 5/7A-102(A-1)(1) ("If a charge is filed with the [EEOC] . . . the charge shall be deemed filed with the [IDHR] on the date filed with the EEOC."). To bring claims under Title VII, the ADEA, and the ADA, a plaintiff must file charges with the EEOC within 300 days of the alleged discrimination. *See* 42 U.S.C. § 2000e-5(e)(1) (Title VII); 29 U.S.C. § 626(d)(1)(B) (ADEA); 42 U.S.C. § 12117(a) (incorporating Title VII's limitations period into the ADA). Under these statutes of limitations, any claims based on conduct that occurred before April 10, 2024 are time-barred.

The IHRA was recently amended to extend the statute of limitations. Effective January 1, 2025, an IHRA charge must be filed within two years after the date that a civil rights violation allegedly has been committed. 775 ILCS 5/7A-102(A)(1) (2026). Prior to this amendment, the statute of limitation was 300 days. 775 ILCS 5/7A-102(A)(1) (2024). Under Illinois law, where an amendatory act lengthens a limitations period, the amendment governs all actions not previously barred. *Arnold Eng'g, Inc. v. Indus. Comm'n*, 72 Ill. 2d 161, 165 (1978); *Sargent & Lundy v. Sweet*, 207 Ill. App. 3d 888, 890 (1990). An amendment extending a statute of limitations cannot be applied retroactively to revive a time-barred claim unless the legislature indicates otherwise. *See In re Marriage of Kramer*, 253 Ill. App. 3d 923, 928 (1993) (citing *Arnold Eng'g Inc.*, 72 11.2d at 163). Accordingly, when the amendment to the IHRA went into effect on January 1, 2025, any allegations that arose before March 6, 2024 were time-barred under the previous 300-day statute of limitations. Nothing in the 2025 amendment indicates that the Illinois legislature intended for the new statute of limitations to apply retroactively. Thus, any of Barzi's claims based on conduct that occurred before March 6, 2024 are time-barred under the IHRA.[3]

Barzi argues that June 8, 2024, the date she filed a Complainant Information Sheet ("CIS") with the IDHR, is the operative charge date. (Dkt. 35 at 11-12, 53, 55). Using this date, the cut-off date for her federal discrimination claims would be August 12, 2023. (*Id.* at 12). The cases Barzi cites in support of her argument are outdated. *See Edelman v. Lynchburg Coll.*, 535 U.S. 106, 112-13 (2002); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 863 (7th Cir. 1985); *Dandy v. United Parcel*

---

[3] While Illinois law controls here, the conclusion is the same under Supreme Court and Seventh Circuit precedent. *See Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 950 (1997) ("[E]xtending a statute of limitations after the pre-existing period of limitations has expired impermissibly revives a moribund cause of action."); *Banas v. Am. Airlines*, 969 F.2d 477, 484 n.9 (7th Cir. 1992) ("[A]n amendment expanding a statute of limitations cannot revive a claim already barred by the statute of limitations as of the amendment's effective date); *United States v. Kimberlin*, 776 F.2d 1344, 1347 (7th Cir. 1985) ("For example, if a statute of limitations sets a period of two years, a subsequent statute setting a period of five years presumptively would not apply to a claim that became barred under the old law before the new one was enacted.").

*Serv.*, Inc., 388 F.3d 263, 270 (7th Cir. 2004). The Supreme Court has more recently recognized that a filing may be deemed a charge if it contains the information required by the regulations (an allegation and the name of the charged party) and is "reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 402 (2008). In *Holowecki*, the *pro se* plaintiff submitted an EEOC Intake Questionnaire and a signed affidavit describing alleged discriminatory practices in greater detail. *Id.* at 394. Based on the new test it promulgated, the Supreme Court held that these documents constituted the equivalent to a formal EEOC charge. *Id.* at 404.

Barzi's CIS does not include any request for remedial action. (Dkt. 35 at 55-62). Additionally, the CIS states in bolded, capital letters at the top of the first page, "THIS IS NOT A FORMAL CHARGE." (Dkt. 35 at 55). Given this language and the lack of any request for remedial action, the CIS is not a charge for purposes of determining the statute of limitations. *See Carlson*, 840 F.3d at 467 (a CIS stating "THIS IS NOT A CHARGE" that did not request remedial action was not a charge); *McGhee v. Nw. Med./Cent. DuPage Hosp.*, 2023 WL 6606104, at *2 (N.D. Ill. Oct. 10, 2023) (holding that the relevant date for determining statute of limitations issue was the date the formal IDHR was filed because the CIS did not include a request for relief); *Herrera v. Di Meo Bros., Inc.*, 529 F. Supp. 3d 819, 828 (N.D. Ill. 2021) (expressing doubt that an EEOC intake form with language specifying that it was not a charge of discrimination could constitute a charge)

In sum, based on the applicable statutes of limitations, any conduct that occurred before March 6, 2024 cannot serve as the basis for Barzi's IHRA claims and any conduct that occurred before April 6, 2024 cannot serve as the basis for her Title VII, ADA, and ADEA claims. As

23

discussed below, this holding does not apply to Barzi's hostile work environment and retaliation claims.

## IV. Gender Discrimination (Title VII and IHRA)

In Count I, Barzi alleges that Defendant FRA discriminated against her based on her sex in violation of Title VII and the IHRA by denying her promotions, recognition, leadership opportunities, and fair evaluation and selecting for termination in the RIF. (Dkt. 8 ¶¶ 94-99). Title VII makes it unlawful for an employer to "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The IHRA prohibits discrimination in employment. 775 ILCS 5/2–101 *et seq.* Employment discrimination claims under the IHRA are analyzed using the same framework as claims under Title VII. *Hoffelt v. Illinois Dep't of Human Rights,* 367 Ill.App.3d 628, 634 (Ill. App. Ct. 2006).

Defendants argue that Barzi fails to plead sufficient facts to establish all required elements of a sex discrimination claim. (Dkt. 33 at 15-16). They rely on *Mercer v. Cook Cnty., Ill.*, which cites the requirements for establishing a *prima facie* case of discrimination at summary judgment under the *McDonnell Douglas* framework. 527 F. App'x 515, 522 (7th Cir. 2013) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, (1973)). The Supreme Court has made clear that those requirements are not pleading standards that a plaintiff must satisfy to survive a motion to dismiss. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11 (2002). The pleading standard for a sex discrimination claim is low; Barzi must assert that her employer took an adverse employment action against her on the basis of her sex. *See Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014) (internal citation omitted); *Tate v. SCR Med. Transp.*, 809 F.3d 343, 346

24

(7th Cir. 2015) (the pleading standard for employment discrimination claims is "undemanding"); *Clark v. L. Off. of Terrence Kennedy, Jr.*, 709 F. App'x 826, 828 (7th Cir. 2017) (to survive a motion to dismiss, "[a] plaintiff need only identify the type of discrimination, when it occurred, and by whom."). As discussed above, given the applicable statute of limitations, the Court may only consider alleged discriminatory conduct that occurred after March 6, 2024.

Barzi has sufficiently plead that she was discriminated against based on her sex. She claims that, on June 4, 2024, Defendant Posen, a man, was chosen over her for a promotion to Associate Laboratory Director despite her superior qualifications. (Dkt. 8 ¶¶ 67-68, 97). This enough on its own to state a claim of sex discrimination. *See, e.g., Sroga v. City of Chicago*, 2020 WL 2112373, at *6 (N.D. Ill. May 4, 2020). Barzi's allegations about her termination are also sufficient at this stage to state a claim of sex discrimination. She claims that her November 12, 2024 termination in the RIF was based on her sex. (*Id.* ¶¶ 81, 96). In support, she asserts that she was the only female Senior Scientist selected for termination in the RIF despite her being among the most productive in that cohort. (Dkt. 8 ¶ 81). This is enough as this stage; Barzi does not need any to allege that a similarly situated male was also terminated. *See Carson*, 758 F.3d at 819 ("The plaintiff is not required to include allegations—such as the existence of a similarly situated comparator" to survive a motion to dismiss).

Barzi includes additional claims that further establish a plausible inference of sex discrimination. She claims that, in September and August 2024, she was disciplined orally and in a written warning for correcting a colleague from another lab during a meeting, even though her conduct was in line with lab expectations. (*Id.* ¶¶ 73-79). She also alleges that she was told that her position was being eliminated due to "mission priorities and budget realities," but that her was redistributed to one of her colleagues after she left. (*Id.* ¶¶ 81-82). These allegations, viewed with

25

those discussed above, are more than enough to survive a motion to dismiss. *See, e.g., Garrett v. Fam. First Ctr. of Lake Cnty.*, 2024 WL 1858863, at *2 (N.D. Ill. Apr. 29, 2024) (denying motion to dismiss sex discrimination claim where plaintiff alleged that she was terminated because of her sex, her supervisors referenced her sexual orientation several times, and she met or exceeded performance expectations); *Ridenour v. Colectivo Coffee Roasters, Inc.*, 2025 WL 2930795, at *3 (N.D. Ill. Oct. 15, 2025) (same where plaintiff alleged that she was told to stop reporting concerns and was terminated for "insubordination" after helping a coworker filed an incident report even though a male colleague who reported similar concerns was not). Accordingly, Defendants' Motion is denied as to Count I.

### V. Hostile Work Environment (Title VII and IHRA)

In Count II, Barzi asserts a hostile environment sex discrimination claim. (Dkt. 8 ¶¶ 100-110). She claims that she was subjected to a decades-long pattern of "sex-based misconduct and gender denigration" from the late 1990s through 2024. (*Id.* ¶¶ 102-03). First, Defendants argue that the Court should only consider allegations from July and August 2024. (Dkt. 33 at 18). Barzi invokes the continuing-violation doctrine to argue that alleged instances of harassment that occurred outside the limitations period can n form a basis for relief under Title VII and the IHRA. (Dkt. 8 ¶¶ 28, 104); (Dkt. 35 at 12). In *Nat'l R.R. Passenger Corp. v. Morgan*, the Supreme Court recognized that the statute of limitations is more lenient for hostile work environment claims because they involve the accumulation of repeated conduct over time. 536 U.S. 101, 115-17 (2002). It held that a court may consider acts occurring outside of the statutory filing period if (1) at least one act contributing to the claim occurs with the filing period and (2) the acts falling outside the filing period are part of the same unlawful employment practice. *Id.* at 117, 122. Barzi's hostile

work environment claim rests in part on post-March 2024 conduct, (Dkt. 8 ¶¶ 67, 73-81), so the Court may consider the earlier conduct she alleges.

To state a hostile work environment claim under Title VII or the IHRA, Barzi must show "(1) [she was] subject to unwelcome harassment; (2) the harassment was based on [her sex]; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018). A court addressing whether harassment is "severe or pervasive" must consider "factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). While "simple teasing, offhand comments, and isolated incidents (unless extremely serious) are not enough to meet this standard, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), "the [work] environment need not reach the point of 'hellishness'" to be actionable. *Johnson*, 892 F.3d at 901.

Barzi alleges that she was subjected to unwelcome sexual advances and at least one occasion of sexual assault from 1997 onward. (Dkt. 8 ¶ 34). She also claims that, for over a decade, she was excluded from research funding while male colleagues were supported; held back from advancing; publicly disparaged; prohibited from giving talks; denied authorship and publicity; subjected to false accusations; and passed over for promotion. (*Id.* ¶¶ 42-80). While Defendants argue that Barzi has not alleged sufficient severity, the Seventh Circuit has held that "it is premature at the pleadings stage to conclude just how abusive [Plaintiff]'s work environment was." *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 834 (7th Cir. 2015);

27

*see also Johnson*, 892 F.3d at 901 ("Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury."). Barzi's allegations are enough at this stage. Thus, Defendants' Motion is denied as to Count II.

## VI.    Age Discrimination (ADEA and IHRA)

Barzi also alleges in Count IV that Defendant FRA discriminated against her based on her age in violation of the ADEA and IHRA. (Dkt. 8 ¶¶ 118-129). The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *See* 29 U.S.C. § 623(a)(1). The statute's protections apply only to employees who are at least 40 years old. *Id*. Age discrimination claims are cognizable under the IHRA. *See Hirsch v. Cognizant Tech. Sols. U.S. Corp.*, 2023 WL 3320285, at *5 (N.D. Ill. May 9, 2023). Courts apply the same methods when analyzing age discrimination claims under the ADEA and IHRA. *David v. Bd. of Tr. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017).

The pleading standards for age discrimination and sex discrimination claims are the same. *David*, 846 F.3d at 225. Barzi only needs to allege "enough facts to allow for a plausible inference that the adverse action suffered was connected to her [age]." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022). As discussed above, given the applicable statute of limitations, the Court may only consider alleged discriminatory conduct that occurred after March 6, 2024. Barzi relies on the same conduct discussed in Count I as the basis for her age discrimination claim: the promotion of Posen over her in June 2024 and her termination in November 2024. (Dkt. 8 ¶¶ 124-25). She claims that she was 56 years old when Posen, under 40 years old at the time, was selected for the Associate Lab Director role over her despite her superior classifications. (*Id.* ¶ 124). She

28

also claims that substantially younger employees were retained when she was terminated on November 12, 2024. (*Id.* ¶ 125). Additionally, Barzi asserts that FRA's proffered reason for selecting her in the RIF—that her position was being eliminated—was pretextual. (*Id.* ¶ 126).

Barzi's allegations more than adequately state a claim for age discrimination. *Corral v. Pooh Bah Enters., Inc.*, 2025 WL 2306762, at *7 (N.D. Ill. Aug. 11, 2025) (denying motion to dismiss age discrimination claim where plaintiffs alleged that they were over 40 years old when they were fired, they were fired because of their age despite being qualified employees who received positive customer feedback, and the employer's stated reasons for termination were pretextual); *Galbreath v. Help at Home, LLC*, 2025 WL 919574, at *9 (N.D. Ill. Mar. 26, 2025) (same where plaintiff alleged she was terminated when she was 73 years old and that her supervisors and coworkers made disparaging comments about her age); *Garza v. Illinois Inst. of Tech.*, 2018 WL 264198, at *2 (N.D. Ill. Jan. 2, 2018) (same where plaintiff alleged he was terminated when he was 61 or 62 years old because of his age).Contrary to Defendants' assertions, Barzi does not have to plead anything more specific at this stage, including any detailed allegations about Posen or other comparators. *See Clark v. L. Off. of Terrence Kennedy, Jr.*, 709 F. App'x 826, 829 (7th Cir. 2017) (rejecting defendant's argument that plaintiff was required to plead more than that she was mistreated at work while comparable, younger coworkers were not). Accordingly, Defendants' Motion is denied as to Count IV.

## VII.     Disability Discrimination (ADA, Rehabilitation Act, IHRA)

In Count V, Barzi alleges that Defendant FRA violated the ADA, IHRA, and the Rehabilitation Act by discriminating against her based on her disability (PTSD), disclosing her PTSD diagnosis to third parties without her consent, and failing to provide her with a reasonable accommodation by delaying approval of her remote work request. (Dkt. 8 ¶¶ 130-43). The ADA

and the Rehabilitation Act prohibit an employer from discriminating against a qualified individual with a disability because of the disability. *Garg v. Potter,* 521 F.3d 731, 736 (7th Cir. 2008); 29 U.S.C. § 794(a); 42 U.S.C. § 12112(a). Discrimination in this context "includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. . . unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business." *DiFranco v. City of Chicago*, 589 F.Supp.3d 909, 915 (N.D. Ill. 2022) (quoting 42 U.S.C. § 12112(b)(5)) (cleaned up). Courts use the same standards when analyzing discrimination claims under the ADA, Rehabilitation Act, and IHRA. *Dyrek v. Garvey*, 334 F.3d 590, 597 n.3 (7th Cir. 2003) ("In determining whether a violation of the Rehabilitation Act occurred in the employment context," courts use "the standards set out in the ADA.); *Williams v. Chicago Transit Auth.*, 2024 WL 3455022, at *4 (N.D. Ill. July 18, 2024) (disability discrimination claims under the ADA and the IHRA are analyzed under the same standards).

Defendants argue that any allegations that are not time-barred are too conclusory to state a claim. (Dkt. 33 at 16-17). To successfully plead disability discrimination, Barzi must allege that "(1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and (3) she suffered from an adverse employment action because of her disability." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838–39 (7th Cir. 2012). As discussed above, given the applicable statute of limitations, the Court may only consider alleged discriminatory conduct that occurred after March 6, 2024 when evaluating Barzi's ADA and IHRA claims. Illinois' two-year statute of limitations for personal injury actions, 735 ILCS 5/13–202, applies to Rehabilitation Act claims. *Rutledge v. Ill. Dep't of Human Servs.*, 785 F.3d 258, 260 (7th Cir. 2015). Barzi filed her suit on August 1, 2025, (Dkt. 1),

30

so any Rehabilitation Act claim arising before August 1, 2023 is time-barred. Accordingly, Barzi's allegations that her disability was disclosed without her consent in 2021 cannot be considered. (Dkt. 8 ¶ 62, 136).

It is not contested that Barzi is disabled due to her PTSD diagnosis. (Dkt. 33 at 16-17). Nonetheless, Barzi fails to state a claim for intentional discrimination under the ADA, IHRA, and Rehabilitation Act. Barzi alleges that upper management manipulated her performance evaluations to give her a low rating, excluded her from opportunities, and terminated her based, in part, on her disability. (Dkt. 8 ¶¶ 138-140). These conclusory allegations are not enough to plead a disability discrimination claim. *See, e.g., Pillow v. McDonough*, 2024 WL 4213216, at *9 (N.D. Ill. Sept. 16, 2024) (dismissing disability discrimination claim where plaintiff failed to connect alleged adverse employment actions to her alleged disability); *Finch v. Hous. Auth. of Cook Cnty.*, 2019 WL 3766113, at *5 (N.D. Ill. Aug. 9, 2019) (allegations that defendants "discriminated against plaintiffs solely on the basis of disability" were insufficient to state a claim of disability discrimination). Barzi's intentional discrimination claims in Count V are dismissed.

Barzi's Rehabilitation Act failure to accommodate claim may proceed. Upon notification by employees that they have a disability, "the ADA [and the Rehabilitation Act] obligate[ ] the employer to engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000) (quotations and citation omitted). To plead a claim for failure to accommodate under the Rehabilitation Act, "a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *DiFranco*, 589 F.Supp.3d at 915 (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)). Barzi claims that, in 2023, she requested to continue

working remotely, but her request was declined because the medical letter she provided was from a former provider, not a current one as requested by HR. (Dkt. 8 ¶¶ 63, 137). She made the request again in September 2024 using the same provider letter, and it was accepted. (*Id.* ¶ 137). Barzi contends that this delay constitutes a failure to accommodate.

"An unreasonable delay in providing an accommodation for an employee's known disability can amount to a failure to accommodate [her] disability that violates the Rehabilitation Act." *McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020) (citing *Jay v. Intermet Wagner*, 233 F.3d 1014, 1017 (7th Cir. 2000)). Whether an employer's delay qualifies as unreasonable "turns on the totality of the circumstances, including, . . . such factors as the employer's good faith [attempt] to accommodate the disability, the length of the delay, the reasons for the delay, the nature, complexity, and burden of the accommodation requested, and whether the employer offered alternative accommodations." *Id.* At this stage, Barzi has sufficiently alleged that Defendant FRA unreasonably delayed providing her with a reasonable accommodation to continue working remotely. While she may not be able to ultimately prove that the delay qualifies as unreasonable, that is a question better left for summary judgment or trial. *See McCray*, 966 F.3d at 622. Accordingly, Defendants' Motion is denied as to Barzi's failure to accommodate claim under the Rehabilitation Act in Count V.

## VIII.    Retaliation (Title VII, ADA, ADEA, and IHRA)

In Count VI, Barzi alleges that FRA retaliated against her in violation of Title VII, the ADA, the ADEA, and the IHRA. (Dkt. 8 ¶¶ 144-151). Defendants argue that this claim must be dismissed because Barzi fails to allege sufficient facts to demonstrate that her protected activity was the but-for cause of any adverse action. (Dkt. 33 at 17). Retaliation is a cognizable claim under the IHRA. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 887 (7th Cir. 2016) (citing

775 ILCS 5/6-101(A)). Courts analyze Title VII, IHRA, ADEA, and ADA retaliation claims under the same framework. *See Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (federal district courts analyzing claims under the IHRA may rely on Title VII case authority); *Kuhn v. United Airlines*, 63 F. Supp. 3d 796, 801 (N.D. Ill. 2014), *aff'd sub nom. Kuhn v. United Airlines, Inc.*, 640 F. App'x 534 (7th Cir. 2016) (Title VII and ADEA); *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) (Title VII and ADA).

To state a claim for retaliation, Barzi must allege she engaged in protected activity, she suffered an adverse employment action, and there exists a causal connection between the protected activity and the adverse employment action. *Freelain v. Village of Oak Park*, 888 F. 3d 895, 901 (7th Cir. 2018). Defendants argue that all of Barzi's retaliation claims are untimely except those arising from her July 2024 article, her August 2024 email, and her November 2024 termination. (Dkt. 33 at 14). The statute of limitations for purposes of a retaliation claim begins to run from the date of the alleged retaliatory act (adverse employment action), not the date of the alleged protected activity. *See Morgan*, 536 U.S. at 110. Barzi invokes the continuing violation doctrine to argue that any alleged retaliatory conduct that occurred outside of the applicable statutes of limitations is actionable. (Dkt. 8 ¶ 23). Barzi asserts continuing and escalating retaliation that includes post-March 2024 conduct, (Dkt. 8 ¶¶ 67, 73-81), so the Court may consider the earlier conduct she alleges. *See Carlson*, 758 F.3d at 829 ("[Plaintiff] has described an ongoing campaign of retaliation, and her claims must be viewed through that lens.").

Barzi alleges the following protected activities: her 2016 gender equity analysis; 2018-2019 internal complaints to management, HR, and counsel; the November 7, 2021 EEOC charge; her October 2022 arXiv publication addressing workplace discrimination; 2023 internal critiques and meetings with leadership; the November 2023 think-tank email; her July 2024 arXiv report;

33

her September 2023 ADA accommodation request; and her August 9, 2024 email to Defendant Merminga. (Dkt. 8 ¶ 147). She alleges that FRA retaliated against her by blocking talks and leadership opportunities beginning in late 2023, convening an "ambush" HR meeting in August 2024, issuing her a written warning in September 2024, and terminating her in November 2024. (*Id.* ¶ 148). She also alleges that, in 2021 after she filed the first EEOC charge, she was harassed over grant budgeting, subjected to "retaliatory HR complaints," excluded from meetings, denied authorship, and publicly disparaged." (*Id.* ¶ 55).

The 2021 EEOC charge and 2023 request for accommodation are protected activities. *See Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012) (holding that "formal EEOC charges [are] the most obvious form of statutorily protected activity."); *Paul v. Chicago Transit Auth.*, 2017 WL 1178222, at *4 (N.D. Ill. Mar. 30, 2017) (requesting a reasonable accommodation is a protected activity for an ADA retaliation claim). Barzi's other actions, however, are not. "Paradigm examples of protected activities include filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes; or opposing an unlawful employment practice." *Carol B. v. Waubonsee Cmty. Coll.*, 2024 WL 3069974, at *5 (N.D. Ill. June 20, 2024) (internal citation omitted). A report of discrimination must include that the discrimination occurred because of the employee's protected characteristic. *Grady v. DM Trans, LLC*, 2024 WL 4581476, at *3 (N.D. Ill. Oct. 25, 2024). "Merely complaining in general terms of harassment or discrimination, without specifying a connection to a protected class or providing facts to create such an inference, is insufficient." *McHale v. McDonough*, 41 F.4th 866, 872 (7th Cir. 2022). Additionally, "vague and obscure" complaints do not constitute protected activity. *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013).

Barzi does not allege that she complained of or described any acts of discrimination based on her protected characteristics in the publications, emails, requests, and meetings. Instead, she asserts that she described systemic disparities, gender discrimination, and retaliation at Fermilab (Dkt. 8 ¶¶ 47, 69); bullying, harassment, and retaliation (*Id.* ¶ 52); systemic discrimination in "scientific workplaces" (*Id.* ¶ 58); cronyism, inequitable manager selection, safety violations, and financial waste (*Id.* ¶ 65), and "ongoing harassment by management" (*Id.* ¶ 76). These allegations are not enough for these actions to constitute statutorily protected activities. *See, e.g., Grady*, 2024 WL 4581476, at *4 (plaintiff's allegations that she reported to HR that she suffered "discriminatory harassment" were not enough to allege a statutorily protected activity); *Garza*, 2018 WL 264198, at *4 (plaintiff failed to plead a protected activity because she did not allege that she communicated alleged discriminated conduct to her employer).

Barzi also sufficiently pleads that she suffered material adverse employment actions. A materially adverse employment action is an act that "would dissuade a reasonable employee from engaging in the protected activity," *Williams v. Bd. of Educ. of City of Chi.*, 982 F.3d 495, 509 (7th Cir. 2020) (citation omitted), and "produce[ ] an injury or harm," *Lewis v. Wilkie*, 909 F.3d 858, 868 (7th Cir. 2018) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)). Termination and failure to promote are adverse employment actions for purposes of a retaliation claim. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465-466 (7th Cir. 2002) (termination); *Volovsek v. Wisconsin Dep't of Agr., Trade & Consumer Prot.*, 344 F.3d 680, 687 (7th Cir. 2003) (failure to promote). "Harassment or mistreatment by management, supervisors or co-workers may also constitute an adverse employment action if sufficiently severe. *Straub v. Jewel Food Stores, Inc.*, 2018 WL 4512060, at *4 (N.D. Ill. Sept. 20, 2018). At this stage, Barzi's allegations about her other mistreatment at work are sufficient—disparaging comments, false reports against her,

harassment, exclusion from grants and meetings, etc. *See, e.g., Huri*, 804, F.3d at 832 (plaintiff alleged a "litany of malfeasance" that constituted adverse employment actions, including that she was subject to screaming, false disciplinary reports, and exclusion from social events).

Barzi also sufficiently alleges causation. "At the pleading stage, a plaintiff may allege causation in a Title VII retaliation claim by demonstrating a temporal proximity between the protected activity and the adverse employment action." *Raul A. Vasquez, Plaintiff, v. City of Chicago, Defendant.*, 2022 WL 23035219, at *9 (N.D. Ill. Sept. 22, 2022) (internal citation omitted). A plaintiff may also establish causation by pleading that an adverse employment action was part of an "ongoing campaign of retaliation" against her, even if the adverse action was years removed from the protected activity. *Id.* (citing *Carlson*, 758 F.3d at 829). Barzi alleges that she was subject to harassment various adverse actions after filing her 2021 EEOC charge. For example, she claims that throughout 2021 and 2022 Defendants harassed her over grant budgeting, brought retaliatory HR complaints against her, excluded her from meetings, denied her authorship, publicly disparaged her, and prohibited her from giving invited talks. (*Id.* ¶¶ 55, 58). She alleges that the conduct continued after her 2023 request for accommodation, culminating in her being passed over for a promotion and getting terminated. (*Id.* ¶¶ 65-81). This is enough for her retaliation claim to survive a motion to dismiss. Accordingly, Defendants' Motion is denied as to Count VI.

## IX.    Retaliation (Illinois Whistleblower Act)

In Count VIII, Barzi asserts that Defendant FRA retaliated against her in violation of the IWA by removing her from leadership opportunities and talks, issuing her with a written warning, and selecting her for termination in the RIF after she made several protected disclosures. (Dkt. 8 ¶¶ 166-173). Defendants argue that this claim must be dismissed because Barzi did not make any protected disclosures and failed to plausibly allege a retaliatory motive. (Dkt. 33 at 25-26). The

36

IWA prohibits an employer from retaliating against an employee "who discloses or threatens to disclose to a public body conducting an investigation, or in a court, an administrative hearing, or any other proceeding initiated by a public body, information related to an activity, policy, or practice of the employer." 740 Ill. Comp. Stat. 174/15(a). To state a claim under the IWA, an employee must allege: "(1) an adverse employment action by his or her employer, (2) which was in retaliation, (3) for the employee's disclosure to a government or law enforcement agency, (4) of a suspected violation of an Illinois or federal law, rule, or regulation." *Phelps v. Illinois Dep't of Corr.*, No. 22 C 932, 2023 WL 4029896, at *10 (N.D. Ill. June 15, 2023). The requirement that an employee brought concerns about illegal activity to a government body is "iron clad." *Ruiz v. Lab'y Corp. of Am.*, 2024 WL 4825777, at *2 (N.D. Ill. Nov. 19, 2024) (citing *Riedlinger v. Hudson Respiratory Care, Inc.*, 478 F. Supp. 2d 1051, 1055 (N.D. Ill. 2007)).

Barzi alleges that the following constitute protected disclosures: her November 7, 2021 EEOC charge; her October 2022 and July 2024 arXiv articles; her November 2023 email to her colleagues regarding her think-tank initiative; and her August 2024 complaint to the Lab Director. (Dkt. 8 ¶ 168). Barzi published her October 2022 and July 2024 reports on a public repository of scholarly articles, she did not submit them to a government agency. Posting an article online is akin to disclosing information to the media, which is not covered by the IWA. *See, e.g., Hernandez v. Rhee*, 2021 WL 3408510, at *19, n.7 (N.D. Ill. Aug. 4, 2021). Further, Barzi does not claim that she submitted the reports or any of the information therein to any government agency. Thus, the articles do constitute protected disclosures under the IWA. *See Bello v. Vill. of Skokie*, 151 F. Supp. 3d 849, 865 (N.D. Ill. 2015) (holding that, to state a claim under the IWA, "the employee must do more than merely voice his suspicion of unlawful conduct–[s]he must actually report the suspected violation of state or federal law to authorities."). Barzi's email to her colleagues and complaint to

37

the Director also do not support her IWA claim because there is no cause of action under the IWA where an employee reveals information only to her employer. *See Kenese v. Cath. Charities of Archdiocese of Chicago*, 2021 WL 1192555, at *10 (N.D. Ill. Mar. 30, 2021); *see also Rufus v. City of Chi.*, 2018 WL 1911799, at *4 (N.D. Ill. Apr. 23, 2018) ("The IWA normally does not protect employees who merely make internal disclosures to their own employers.").

Barzi's 2021 EEOC charge does, however, create a cause of action under the IWA. Barzi claims that her 2021 EEOC charge alleged discrimination and retaliation that occurred between January 11, 2021 and November 7, 2021. (Dkt. 8 ¶ 16). In doing so, she complained to a government body (the EEOC) about violations of federal anti-discrimination laws. These allegations are sufficient to satisfy the disclosure requirement at the pleading stage. *See Phelps*, 2023 WL 4029896, at *10 (plaintiff adequately plead protected disclosure under IWA by alleging he filed a complaint with the EEOC alleging discrimination); *Stieglitz v. City of Chicago*, 2025 WL 2084143, at *6 (N.D. Ill. July 23, 2025) (holding that plaintiff's complaint to city's Equal Employment Office and Office of the Inspector General about alleged sexual harassment was sufficient to allege an IWA violation).

Defendants also argue that Barzi's IWA claim fails because she does not plausibly allege causation. (Dkt. 33 at 25). A plaintiff is not required to prove causation at the pleading stage to state a claim for retaliation under the IWA; plausibly alleging a causal connection between protected conduct and adverse actions is enough. *See Logan v. City of Chicago*, 2018 WL 5279304, at *6 (N.D. Ill. Oct. 24, 2018); *Bello*, 2014 WL 4344391, at *5. Barzi alleges that Defendant FRA had notice of her 2021 EEOC charge because FRA's Human Resources department and Office of General Counsel received and tracked the complaint. (Dkt. 8 ¶ 16). This is enough to show knowledge at this stage. *Logan*, 2018 WL 5279304, at *6 (rejecting argument that plaintiff had to

38

show defendant's knowledge of internal complaints to plead IWA claim and noting "[i]f [plaintiff] is unable to show that Defendants had knowledge of his internal complaints, then perhaps he will lose on summary judgment.").

Furthermore, contrary to Defendants' contentions, alleging temporal proximity is sufficient to establish causation for an IWA claim where, as here, a plaintiff alleges an ongoing pattern of harassment. *Stieglitz*, 2025 WL 2084143, at *6-7. As discussed in the Court's analysis of Barzi's federal retaliation claims, Barzi alleges that the harassment she experienced escalated after she filed the charge. (*Id.* ¶¶ 55, 58). With these allegations, Barzi has adequately plead causation. Whether Barzi can ultimately establish enough evidence to prove that Defendants took any adverse actions against her because she filed the 2021 EEOC charge is a question for summary judgment. *See Bello*, 2014 WL 4344391, at *5 ("It is perhaps true that if [Plaintiff] ends up with nothing more to establish causation than an argument about temporal proximity, he will lose on summary judgment."); *Stieglitz*, 2025 WL 2084143, at *7 (holding that plaintiff adequately plead an IWA retaliation claim where he alleged that he was ostracized by coworkers, threatened with discipline, falsely accused of misconduct, and transferred to a different position after complaining about sexual harassment). Defendants' Motion to Dismiss is denied as to Count VIII.

## X.    First Amendment Retaliation (42 U.S. § 1983)

In Count IX, Barzi brings a First Amendment claim under Section 1983 against the Individual Defendants, alleging that they retaliated against her for making protected speech. (Dkt. 8 ¶¶ 174-82). Defendants argue that this claim must be dismissed because Barzi is not a public employee and she has failed to plead state action or personal involvement by any Individual Defendants. (Dkt. 33 at 26-31). To state a claim under Section 1983, a plaintiff must plead "(1) the deprivation of a right secured by the Constitution or federal law and (2) that defendants were acting under color of state law." *Wilson v. Warren Cnty.*, 830 F.3d 464, 468 (7th Cir. 2016); *see*

39

*also Costa v. Ramaiah*, 689 F. Supp. 3d 553, 584 (N.D. Ill. 2023). "The under-color-of-state-law element means that § 1983 does not permit suits based on private conduct, no matter how discriminatory or wrongful." *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019) (internal citation omitted). A private entity or person may qualify as a state actor under Section 1983 in limited circumstances, including "(i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." *Manhattan Comm. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019) (citations omitted).

Individual Defendants are employees of Defendant FRA, which is a private corporation that operates Fermilab under a DOE contract and receives federal funding. (Dkt. 8 ¶¶ 2, 5-11). Barzi concedes that Individual Defendants are not state actors by virtue of Fermilab's connections to the DOE. (Dkt. 35 at 16). Instead, she argues that Individual Defendants acted under the color of state law by "jointly participating" with the Kane County Sheriff's Office in administering and enforcing the RIF. (Dkt. 8 ¶¶ 178, 186); (Dkt. 35 at 7). To proceed under a joint action theory, a plaintiff must allege "(1) a state official and private individual(s) reached an understanding to deprive the plaintiff of [her] constitutional rights, and (2) those individual(s) were willful participants in joint activity with the State or its agents." *Holderman v. Walker*, 2021 WL 1192441, at *12 (N.D. Ill. Mar. 30, 2021) (citing *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1016 (7th Cir. 2000)). There must be "evidence of a concerted effort" between the State and private actors, *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019), and "allegations that defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding." *Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204, 1206 (7th Cir. 1980) (internal quotation omitted).

40

Barzi has not alleged that the state was involved in the unconstitutional conduct at the core of her First Amendment claim. Barzi asserts that Individual Defendants violated the First Amendment by excluding her from leadership roles, blocking her from speaking opportunities, issuing a warning against her, and terminating her. (Dkt. 8 ¶¶ 177, 189). With respect to the state's conduct, she claims that Kane County Sheriff's deputies assisted with escorting individuals selected in the RIF from Fermilab and with the subsequent "access/badging actions". (*Id.* ¶¶ 85-88, 178, 186). Barzi does not allege that she was escorted from Fermilab by any deputies; she asserts she was working remotely on the day that she was terminated. (*Id.* ¶ 89). There are no allegations that any deputies or other state employees were involved with the adverse employment actions Barzi claims the Individual Defendants took against her. Without such allegations, Barzi has not plead any joint action that could transform the Individual Defendants into state actors under Section 1983. *See, e.g., Holdermann*, 2021 WL 1192441, at *13 (allegations of joint action must be supported by factual allegations suggesting a "meeting of the minds"); *L.P. v. Marian Cath. High Sch.*, 852 F.3d 690, 697 (7th Cir. 2017) (holding that plaintiff failed to allege state action where there were no allegations that the state "had anything to do with" the alleged unconstitutional conduct).

Even considering the RIF execution as the constitutional violation at issue in Count IX, the state's "mere approval of or acquiescence in" a private action is not enough to hold a private party liable as a state actor. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). The fact that some Kane County Sherriff's deputies were present at Fermilab during the RIF period to escort selected employees off-site and remove their badge access does not turn Individual Defendants into state actors. *See, e.g., Miller v. Vohne Liche Kennels, Inc.*, 600 F. App'x 475, 477 (7th Cir. 2015) ("[While delegation of a state's entire police power to a private entity may turn that entity into a

41

state actor, that is not what happened here."); *Obi v. Chase Home Fin., LLC*, 2010 WL 4810609, at *6 (N.D. Ill. Nov. 19, 2010) (plaintiff failed to plead state action where he alleged that a sheriff participated in plaintiff's eviction with the defendant, a private actor); *Motykie v. Motykie*, 2025 WL 2160719, at *5 (N.D. Ill. July 30, 2025) ("Private actors do not act under the color of law merely by requesting the assistance of the law. . .") (internal citation omitted).

There are no allegations that would support a finding that Individual Defendants "acted with a badge of authority from the state" in taking the alleged unconstitutional actions against Barzi. *L.P.*, 852 F.3d at 697 (internal quotation omitted). Accordingly, Count IX is dismissed. *See Lewis v. Metro Enf't*, 2016 WL 861295, at *4 (N.D. Ill. Mar. 7, 2016) (a Section 1983 claim must be dismissed if the plaintiff fails to allege state action).

## XI. Equal Protection Violations, Conspiracy, and Discrimination (42 U.S. §§ 1981, 1983)

### A. Section 1983 Claims

In Count X, Barzi brings two additional Section 1983 claim (equal protection violations and a civil-rights conspiracy[4]) and a Section 1981 discrimination claim against all Defendants. (*Id.* ¶¶ 185-87, 189, 191). Barzi's Section 1983 claims in this Count are dismissed for the same reasons that Count IX is dismissed—Barzi's allegations that Kane County Sheriff's Office assisted with the RIF execution are not enough to establish that Defendants acted under the color of state law.

### B. Section 1981 Claim

In her Section 1981 claim, Barzi asserts that Defendants discriminated against her based on her "Italian ethnicity/ancestry" in making and enforcing her employment contract and retaliated against for opposing such conduct. (*Id.* ¶¶ 184, 188). Section 1981 prohibits racial discrimination in the making and forming of contracts. *DJM Logistics, Inc. v. FedEx Ground Package Sys., Inc.*,

---

[4] Barzi does not include Defendant Romanenko in her Section 1983 equal protection claim. (Dkt. 8 ¶ 190).

42

39 F.4th 408, 411 (7th Cir. 2022). The statute prohibits discrimination based on race or ethnicity, but not national origin. *Arevalo-Carrasco v. Middleby Corp., Inc.*, 851 F. App'x 628, 630 (7th Cir. 2021) ("For purposes of § 1981, 'national origin' is not protected, but 'ethnicity,' ... is."); *see also Gibbs v. Abt Elecs., Inc.*, 2022 WL 1641952, at *4 (N.D. Ill. May 24, 2022) (citing *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987)). Barzi alleges that she was discriminated against based on her Italian ancestry and ethnicity, which is enough to bring her claim under § 1981.[5]

To state a claim under § 1981, Barzi must allege that (1) she is member of a racial or ethnic minority, (2) Defendants intended to discriminate against her on the basis of her race or ethnicity, and (3) the alleged discrimination relates to the making and forming of a contract. *See Shebley v. United Cont'l Holdings, Inc.*, 357 F. Supp. 3d 684, 691–92 (N.D. Ill. 2019) (citing *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996)). Defendants first argue that this claim must be dismissed because Barzi, as an at-will employee, fails to sufficiently allege a contractual relationship with Defendants. (Dkt. 33 at 32-33). This argument is belied by clear Seventh Circuit precedent that an "at-will employment relationship . . . is sufficiently contractual in nature to maintain a § 1981 action for discrimination in promotion and pay." *Walker v. Abbott Lab'ys*, 340 F.3d 471, 478 (7th Cir. 2003).

Nonetheless, Barzi's claim must be dismissed because she fails to adequately allege causation. A plaintiff must allege but-for causation to successfully plead a § 1981 claim. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020) (To prevail on

---

[5] *See Saint Francis*, 481 U.S. at 613 (construing "race" to include "identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics" and recognizing that Italians were considered a "race" when § 1981 was enacted); *Bisciglia v. Kenosha Unified Sch. Dist. No. 1*, 45 F.3d 223, 229–30 (7th Cir. 1995) (granting plaintiff leave to amend § 1981 discrimination claim based on Italian ancestry); *Abdullahi v. Prada USA Corp.*, 520 F.3d 710, 712 (7th Cir. 2008) (recognizing that Iranians can be a "race" for § 1981 purposes); *Arevalo-Carrasco*, 851 F. App'x at 630 (ethnicity under § 1981 includes Mexican heritage); *PD Logistics, LLC v. BMO Bank N.A.*, 2026 WL 608544, at *7 (N.D. Ill. Mar. 4, 2026) (plaintiffs sufficiently alleged § 1981 claim by asserting discrimination based on their Eastern European ethnicity); *Vindel v. Medline Indus., Inc.*, 2010 WL 4625478, at *4 (N.D. Ill. Nov. 4, 2010) (plaintiff could bring § 1981 claim based on being Honduran).

43

a § 1981 claim, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."). This is a higher standard than the "motivating factor" test used for Title VII claims. *See Peaster v. McDonald's Corp.*, 2023 WL 5387573, at *3 (N.D. Ill. Aug. 22, 2023) (citing *Comcast*, 589 U.S. at 331-32, 336-37). Here, Barzi asserts not one but five causes of Defendants' alleged misconduct—sex discrimination, national origin discrimination, age discrimination, disability discrimination, ethnicity-based discrimination. A plaintiff cannot allege multiple discrimination theories as the but-for cause for a § 1981 violation. *See Arora v. Nav Consulting Inc.*, 2022 WL 7426211, at *2 (N.D. Ill. Oct. 13, 2022) (dismissing § 1981 claim where plaintiff alleged discrimination based on ethnicity and national origin); *Hill v. Target Corp.*, 2025 WL 919614, at *5 (N.D. Ill. Mar. 26, 2025) (plaintiff failed to allege that race was but-for cause of discrimination where she plead the same allegations in support of her gender discrimination claim). Since Barzi fails to allege that her Italian ethnicity was the but-for cause of the discrimination, her § 1981 must be dismissed.[6]

## XII.    Breach of Implied Contract and Promissory Estoppel

In Count XI, Barzi alleges that Defendant FRA breached an implied contract when it terminated her in the RIF. (Dkt. 8 ¶¶ 192-99). In the alternative, Barzi asserts that FRA's conduct constitutes promissory estoppel. (*Id.* ¶¶ 200-07). Both claims are dismissed.

### A.  Breach of Implied Contract

---

[6] In *Peaster* v. *McDonald's Corp.*, the court held that the § 1981 but-for causation standard is "not necessarily inconsistent with pleading that an adverse employment action had two but-for causes, or that either of two factors was the only but-for cause, provided that the complaint properly pleads in the alternative." 2023 WL 5387573, at *4. Barzi does not properly plead in the alternative—she claims that she was discriminated against because of her sex, age, national origin, ethnicity, *and* disability. *See Arora*, 2022 WL 7426211, at *3 ("Furthermore, Arora does not really plead *in the alternative*; rather, he asserts that race, ethnicity, national origin, and citizenship-status all motivated Defendants' actions, causing violations of various state and federal civil rights laws."); *Hill*, 2025 WL 919614 at *6 n.9 (plaintiff did not plead but-for causation in the alternative where she brought the same allegations in support of her § 1981 claim and her gender discrimination claim).

To bring a breach of contract claim, Barzi must plead (1) the existence of a valid and enforceable contract; (2) substantial performance; (3) breach; and (4) damages. *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018). Under Illinois law, employment relationships of indefinite duration are presumed to be "at will," unless the facts suggest a contractual relationship. *Long v. Tazewell/Pekin Consol. Communication Ctr.*, 574 N.E.2d 1191, 1192 (Ill. App. Ct. 1991) (citing *Duldulao v. St. Mary's of Nazareth Hospital*, 505 N.E.2d 314, 318 (1987)). An employee may overcome that presumption based on an employer's handbook or policy if the traditional elements of contract formation are present. *Thomas v. Pearle Vision, Inc.*, 251 F.3d 1132, 1136 (7th Cir. 2001); *Duldulao v. St. Mary of Nazareth Hosp. Ctr.*, 115 Ill.2d 482, 490 (1987). To establish that an employee handbook or policy created a valid implied contract, the employee must show: (1) the language of the policy statement contains a promise clear enough that an employee would reasonably believe that an offer has been made; (2) the statement was disseminated to the employee in such a manner that the employee was aware of its contents and reasonably believed it to be an offer; and (3) the employee accepted the offer by commencing or continuing to work after learning of the policy statement. *Duldulao*, 115 Ill.2d at 490.

Barzi alleges that her employment was governed in part by "implied-in-fact contractual terms" arising from official policies, manuals, performance evaluation criteria, and long-standing institutional practices. (Dkt. 8 ¶ 193). She points specifically to FRA's Reduction in Force Termination Procedure. (Dkt. 8 ¶ 194); (Dkt. 35 at 38-39); (Ex. 5, Dkt. 35 at 81-82). A scientist may be terminated under this policy if a review panel reaches a unanimous decision following an evaluation of the individual's role, performance, and the knowledge, skills, and abilities required to support the Laboratory's future mission. (Ex. 5, Dkt. 35 at 81). Defendants argues that FRA's policy did not create an implied contract because it includes a disclaimer. (Dkt. 33 at 34-35).

Illinois courts have held that where a policy or manual "contains a disclaimer indicating that the manual promises nothing and does not act as a contract, no enforceable contractual rights will be conferred on the employee based on that manual." *Ivory v. Specialized Assistance Servs., Inc.*, 365 Ill. App. 3d 544, 546 (2006); *see also Sutula-Johnson v. Office Depot, Inc.*, 893 F.3d 967, 972 (7th Cir. 2018) (holding that when an employer manual "states expressly that it does not create contractual rights, there simply is no promise that an employee can reasonably interpret as an offer to be bound"); *Duldulao*, 115 Ill.2d at 491 (employee handbook create enforceable right to disciplinary procedures where it did not contain disclaimers negating "the promises made").

The RIF Termination Procedure states: "These procedures are not a contract or guarantee of any kind and are not intended to create any obligations on the Laboratory. These procedures may be terminated or changed by the Laboratory at any time, with or without notice, in the Laboratory's sole discretion." (Dkt. 35 at 82). This unambiguous disclaimer is sufficient to show that the RIF Termination Procedure does not create an implied contract. *See, e.g., Katz v. Nw. Orthopaedics & Sports Med. Ltd.*, 2020 WL 1986965, at *11 (N.D. Ill. Apr. 27, 2020) (employee handbook's mention of "job protection" did not create implied contract where handbook contained disclaimer stating the employer reserved the right to revise or terminate policies with or without notice and that the manual was not an employment contract); *Fox v. DuPage Twp.*, 2024 WL 4835902, at *5 (N.D. Ill. Nov. 20, 2024) (employee handbook's discipline policy did not create implied contract where the handbook stated that it did not create any contractual rights).

Barzi asserts that FRA's policy created an implied contract notwithstanding the disclaimers because of it's "specific promises and consistent practices." (Dkt. 8 ¶ 193). She does not, however, point to any promises or practices that could overcome the disclaimer in the RIF Termination Procedure. Given the disclaimer in the policy, Barzi could not have reasonably believed that that

46

procedure it referenced was an offer. *See Katz*, 2020 WL, at *11. Thus, no contract existed for FRA to breach. Barzi also alleges that FRA breached an implied contract by failing to apply performance and advancement policies fairly and consistently. (Dkt. 8 ¶ 197). Barzi does not plead sufficient facts to show the existence of any enforceable contract relating to performance and advancement evaluations. Accordingly, Barzi's breach-of-implied-contract claim is dismissed.

### B. Promissory Estoppel

In the alternative, Barzi asserts a claim of promissory estoppel against Defendant FRA on the grounds that it made clear and definite promises on which she relied. (Dkt. 8 ¶ 201). Defendants argue that Barzi failed to plead sufficient facts to establish an unambiguous promise. (Dkt. 33 at 35). To state a claim for promissory estoppel under Illinois law, a plaintiff must allege (1) an unambiguous promise, (2) reliance on this promise, (3) that the reliance was expected and foreseeable, and (4) some injury resulting from this reliance. *Wigod*, 673 F.3d at 566. Barzi claims that FRA promised that termination of Senior Scientists would be reviewed and approved by the FCSA, any RIF or termination would follow procedures that were aligned with DOE guidance, and performance and advancement policies would be applied fairly and consistently. (Dkt. 8 ¶ 201). Barzi contends that she reasonably relied on those promises by continuing her employment, foregoing other opportunities, and "organizing her professional activities in accordance with FRA's stated policies and procedures." (*Id.* ¶ 204).

Barzi does not allege any facts indicating that FRA made any promises to her. To the extent that Barzi is referencing the RIF Termination Procedure, this policy does not constitute an unambiguous promise because it contains a clear disclaimer. A disclaimer that is effective against a breach of contract is also effective against a claim of promissory estoppel. *Workman v. United Parcel Serv., Inc.*, 234 F.3d 998, 1001 (7th Cir. 2000). Additionally, "[l]anguage stating that an

47

issuer has the discretion to revise a policy manual or code of conduct means that the policy does not create sufficiently definite promises for the purpose of promissory estoppel. *Ruiz*, 2024 WL 4825777, at *4. As explained above, the RIF Termination Procedure contains a disclaimer stating that it does create any contractual rights and can be revised at any time with or without notice. Given this disclaimer, Barzi cannot establish that the RIF Termination Procedure contained a clear promise that termination of Senior Scientists would be reviewed and approved by the FCSA or any RIF or termination would follow procedures that were aligned with DOE guidance. *See, e.g.*, *Katz*, 2020 WL 1986965, at * 13; *Talanda v. KFC Nat. Mgmt. Co.*, 863 F. Supp. 664, 670 (N.D. Ill. 1994).

In sum, Barzi does not allege facts indicating any other oral or written promises made to her by FRA regarding performance evaluation or termination procedures. As such, Barzi fails to plead a claim of promissory estoppel. *Young v. Associated Bank Nat'l Ass'n*, 2025 WL 1282747, at *7 (N.D. Ill. May 3, 2025) (dismissing promissory estoppel claim where plaintiffs failed to plausibly allege that defendant made a promise to them). Count XI is dismissed.

## XIII. Breach of DOE Prime Contract and Retaliatory Discharge

Finally, in Count XII, Barzi claims that her termination constitutes a breach of FRA's Prime Contract with the DOE, of which she was a third-party beneficiary. (Dkt. 8 ¶¶ 209-14). To the extent the Court finds that this claim fails, Barzi pleads a claim of retaliatory discharge in the alternative. (*Id.* ¶¶ 215-17). Both claims are dismissed.

### A. Breach of DOE Prime Contract

Barzi claims that she is an intended beneficiary of the Prime Contract between FRA and the DOE. (Dkt. 8 ¶¶ 210, 212). Appendix A of the Prime Contract sets out the procedures to be used by Fermilab's Human Resources department, including policies for employee compensation,

employee training and development, and reductions in employment. (*Id.* ¶ 210); (Dkt. 35 at 85-101). Barzi contends that FRA breached obligations imposed by these policies by terminating her without required FCAS review, manipulating her performance evaluations to justify her termination, failing to investigate the research misconduct she reported, and initiating disciplinary actions against her for her "protected disclosures." (Dkt. 8 ¶ 213). FRA argues that this claim must be dismissed because Barzi fails to identify any DOE Prime Contract provision that names or scientific staff as intended beneficiaries. (Dkt. 33 at 37-38).

In Illinois, if a contract "is entered into for the direct benefit of a third person who is not a party to the contract, that person may sue on the contract as a third-party beneficiary." *City Of Yorkville ex rel. Aurora Blacktop Inc. v. Am. S. Ins. Co.*, 654 F.3d 713, 716 (7th Cir. 2011) (citing *Carson Pirie Scott & Co. v. Parrett*, 346 Ill. 252, 257 (1931)). Courts do not recognize third-party beneficiary claims "unless the beneficiary is identified or the third-party benefit is clearly intended by the contracting parties." *Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 820 (7th Cir. 2018) (citing *L.K. Comstock & Co. v. Morse/UBM Joint Venture*, 505 N.E.2d 1253, 1257 (Ill. App. Ct. 1987)). There is a "'strong presumption against conferring contractual benefits on noncontracting third parties.'" *Sosa v. Onfido Inc.*, 8 F.4th 631, 639 (7th Cir. 2021) (quoting *Marque Medicos Farnsworth, LLC v. Liberty Mut. Ins. Co.*, 427 Ill.Dec. 218, 223 (2018)). This presumption "can only be overcome by a showing that the language and circumstances of the contract manifest an affirmative intent by the parties to benefit the third party." *Estate of Willis v. Kiferbaum Const. Corp.*, 830 N.E.2d 636, 642-43 (Ill. App. Ct. 2005) (citing *Bates & Rogers Constr. Corp. v. Greeley & Hansen*, 486 N.E.2d 902 (Ill. 1985).

Barzi claims that FRA "knew or should have known" that the provisions of Appendix A benefitted and protected the scientific staff. (Dkt. 8 ¶ 212). Yet, the fact that contracting parties

49

knew that a third party would benefit from their agreement does not mean that they intended to directly benefit the third party. *See Coatney v. Ancestry.com DNA, LLC*, 93 F.4th 1014, 1022 (7th Cir. 2024) ("Showing that the parties know, expect, or even intend that others will benefit from the agreement will not suffice to overcome the presumption against third-party beneficiaries.") (internal citation omitted); *see also Balmoral Racing Club, Inc.* 2011 WL 6009610, at *2 (citing *Barney v. Unity Paving, Inc.,* 266 Ill.App.3d 13, 19 (Ill.App.Ct.1994).

More importantly, the DOE Prime Contract[7] contains a "No Third-Party Beneficiaries" Provision which states:

> This contract is for the exclusive benefit and convenience of the parties hereto. Nothing contained herein shall be construed as granting, vesting, creating, or conferring any right of action or any other right or benefit upon past, present, or future employees of the Contractor, or upon any other third party. This provision is not intended to limit or impair the rights which any person may have under applicable Federal statutes.

*FFDG Prime Contract*, FERMILAB OFFICE OF GENERAL COUNSEL (Apr. 2, 2026), https://generalcounsel.fnal.gov/ffdg-prime-contract/. This unambiguous language forecloses Barzi's claim. *See Balmoral Racing Club, Inc. v,* 2011 WL 6009610, at *2 (dismissing third-party beneficiary breach-of-contract claim where contract included "No Third Party Beneficiaries" provision); *Wells v. Dominguez*, 2022 WL 17718421, at *9 (N.D. Ill. Dec. 15, 2022) (holding that plaintiff did not establish third-party beneficiary status where contract explicitly stated an intent to have no third-party beneficiaries).

---

[7] Courts may take judicial notice of undisputed material hosted on a party's public website. *Newbold v. State Farm Mut. Auto. Ins. Co.*, 2015 WL 13658554, at *4 n.7 (N.D. Ill. Jan. 23, 2015) (citing *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 944 n.3 (7th Cir. 2010)). Defendants note that the Prime Contract is a public document posted on its website, (Dkt. 33 at 38 n. 7), and Barzi does not dispute it. (Dkt. 35 at 14). Additionally, the contract is referenced throughout the Complaint and is central to Barzi's claims. Thus, the Court may consider the contract without converting this Motion into one for summary judgment. *Newbold*, 2015 WL 13658554, at *4 n.7.

Barzi argues that this language does not defeat her claim "where other incorporated provisions plausibly manifest intent toward a defined class." (Dkt. 35 at 22). Yet, she does not cite any legal authority or identify any provisions of the DOE Prime Contract to support her argument. *See Coatney*, 93 F.4th at 1022 (rejecting similar argument made by defendant where defendant failed to point to specific language that could supersede language explicitly excluding third-party beneficiaries). Because Barzi cannot establish her third-party beneficiary status, the third-party beneficiary claim of Count XII is dismissed.

## B. Retaliatory Discharge

Barzi pleads a retaliatory discharge claim against Defendant FRA in the alternative. (Dkt. 8 ¶¶ 215-17). She claims that FRA terminated her after she engaged in protected activity, in violation of "a clear mandate of Illinois public policy." (*Id.* ¶ 215). The common-law tort of retaliatory discharge is a "limited and narrow" exception to employment at-will. *Turner v. Mem'l Med Ctr.*, 233 Ill. 2d 494, 500 (2009). To establish a claim for retaliatory discharge, Barzi must allege that: (1) she was discharged; (2) her discharge was in retaliation for legally protected activities; and (3) her discharge contravened a clearly mandated public policy of the State of Illinois. *Bourbon v. Kmart Corp.*, 223 F.3d 469, 472 (7th Cir. 2000) (citing *Hartlein v. Ill. Power Co.*, 151 Ill. 2d 142, 159 (1992). With respect to the third element, the Illinois Supreme Court has recognized that "public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions." *Palmateer v. Int'l Harvester Co.*, 85 Ill. 2d 124, 130 (1981). Defendants argue that Barzi fails to identify any specific Illinois statute, constitutional provision, or judicial decision embodying the public policies she claims were violated. (Dkt. 33 at 49).

51

Illinois courts have limited retaliatory discharge claims to terminations under two circumstances: (1) when an employee is discharged for filing or in anticipation of filing a workers' compensation claim; and (2) when an employee is discharged in retaliation for reporting illegal or improper conduct by the employer, or whistleblowing. *See Jacobsen v. Knepper & Moga, P.C.,* 185 Ill.2d 372, 376 (1998). Barzi claims that her termination violated Illinois public policies of "protecting scientific integrity and safety, compliance with law and regulation, and non-retaliation for good-faith disclosures to governmental/public bodies." (Dkt. 8 ¶ 215). She does not, however, identify any Illinois statute, constitutional provision, or judicial decision expressing the first two public policies she invokes. *See Yapp v. Astellas Pharma Glob. Dev., Inc.*, 2015 WL 1326371, at *6 (N.D. Ill. Mar. 20, 2015) (dismissing retaliatory discharge claim where plaintiff did not identify constitutional or statutory provisions embodying alleged public policies of ensuring the integrity of scientific research and ensure the safety of human subjects participating in medical research).

Barzi claims that the IWA embodies a public policy of protecting employees who report violations of law, threats to public safety, or misuse of public resources because it protects employees who disclose violations of laws and regulations to government agencies. (Dkt. 35 at 20). The IWA does not constitute a clearly mandated public policy for the purposes of retaliatory discharge because it contains its own deterrent mechanism. *See Brown v. Biomat USA, Inc.*, 2021 WL 3187599, at *3 (N.D. Ill. July 28, 2021) (citing *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 508 (1991)). Barzi does not point to any other statutes or constitutional provisions to support her asserted public policy. The cases she cites also do not embody the specific public policy she claims. *See Palmateer* , 85 Ill. 2d at 133 (recognizing a public policy of protecting individuals who report violations of criminal law); *Wheeler v. Caterpillar Tractor Co.*, 108 Ill. 2d 502, 506 (1985) (recognizing public policy of protecting the lives and property of citizens from the hazards of

radioactive materials based on federal statute cited by plaintiff regulating radioactive materials); *Turner*, 233 Ill.2d at 508 (holding that plaintiff failed to sufficiently plead the existence of a clearly mandated public policy, and noting that the "general concept of patient safety" was inadequate to justify finding an exception to the general rule of at-will employment"). Accordingly, because Barzi fails to plead a clear public policy mandate, this claim is dismissed.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss [32] is granted in part and denied in part. The Motion is denied as to Count I, Count II, Count IV, the failure to accommodate claim in Count V, Count VI, and Count VIII. Counts III, Count V (the intentional discrimination claims), VII, IX, X, XI, and XII are dismissed without prejudice. To the extent Barzi asserts an Equal Pay Act claim, it is also dismissed without prejudice.

_____
Virginia M. Kendall
United States District Judge

Date: May 1, 2026

53