**BC**

**FILED**
6/18/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

JKS

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DR. EMANUELA BARZI, an Individual, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 25-cv-09247 |
| FERMI RESEARCH ALLIANCE, LLC FERMI FORWARD DISCOVERY GROUP, LLC | ) ) ) | The Honorable Virginia M. Kendall, District Judge |
| LIA MERMINGA, an Individual BONNIE FLEMING, an Individual SAM POSEN, an Individual STEPHEN GOURLAY, an Individual GEORGE VELEV, an Individual ALEXANDER ROMANENKO, an Individual BETH FANCSALI, an Individual, | ) ) ) ) ) ) ) ) | Magistrate Judge Beth W. Jantz

**Jury Trial Demanded** |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

NOW COMES Plaintiff, Dr. Emanuela Barzi ("Plaintiff" or "Barzi"), Pro Se, and, pursuant to the Court's May 1, 2026 Memorandum Opinion and Order and the Court's order granting leave to amend, files this Second Amended Complaint against Defendants and states as follows:

This Second Amended Complaint preserves the claims that survived the Court's May 1, 2026 Memorandum Opinion and Order, and includes previously pleaded factual allegations where relevant to background, notice, motive, causation, pretext, hostile-environment context, damages, or as otherwise permitted by the Court's Order. The surviving counts are included to maintain a complete operative pleading and are not substantively amended except where clarified, supplemented, or expressly stated. This pleading also clarifies and supplements allegations relevant to the claims Plaintiff repleads or strengthens in light of the Court's Order, including Counts IV, V, VII, VIII, IX, X, XI, XI-A, and XII, and the § 1981 claim based on Plaintiff's Italian ancestry and ethnicity. No new standalone count is added beyond the counts pleaded herein.

## THE PARTIES

1. Plaintiff Barzi is a resident of Illinois and, at all relevant times, was employed by Defendant Fermi Research Alliance, LLC at Fermi National Accelerator Laboratory ("Fermilab") in Batavia, Illinois. Plaintiff is a woman over the age of 40 (57) and has a disability (PTSD).

2. Defendant Fermi Research Alliance, LLC ("FRA") is a limited liability company with its principal place of business at Wilson and Kirk Roads, Batavia, Illinois 60510. FRA was the management-and-operations ("M&O") contractor for Fermilab during the relevant period and operated Fermilab for the U.S. Department of Energy under DOE Prime Contract No. DE-AC02-07CH11359 and through federally funded laboratory programs and activities. FRA was formed by the University of Chicago and Universities Research Association, Inc. Upon information and belief, FRA's Board of Directors was chaired by the President of the University of Chicago. Upon information and belief, FRA received federal financial assistance, operated programs or activities receiving such assistance, or both, subjecting it to Section 504 of the Rehabilitation Act. At all relevant times, FRA employed more than 1,500 employees and was an "employer" within the meaning of Title VII, the IHRA, the ADEA, and the ADA.

3. Defendant Fermi Forward Discovery Group, LLC ("FermiForward") is the current M&O contractor for Fermilab under DOE Contract No. 89243024CSC000002, with performance commencing January 1, 2025, after a formal transition period from October 1 through December 31, 2024. Upon information and belief, FermiForward reflects substantial continuity with the Fermilab enterprise operated by FRA, including continuity of facilities, federally funded laboratory operations, University of Chicago involvement, records, relevant personnel, management and legal functions, and authority to provide prospective equitable relief. Since January 1, 2025, FermiForward has been an "employer" within the meaning of Title VII, the IHRA, the ADEA, and the ADA. Plaintiff seeks prospective equitable relief, including reinstatement, expungement, and access restoration, and, to the extent permitted by law, make-whole relief under federal common-law successor-liability principles, without double recovery.

4. For pleading economy only, references to "FRA" in Counts I, II, IV, V, VI, VIII, X, XI, XI-A, and XII shall be construed, where appropriate, to include FermiForward solely in its capacity as alleged successor for purposes of prospective equitable relief and any make-whole remedies available under successor-liability principles, without double recovery. Punitive damages are not sought from FermiForward solely by reason of successorship.

5. Defendant Lia Merminga ("Merminga") is sued in her individual capacity. At all relevant times, she was the Director of Fermilab.

6. Defendant Bonnie Fleming ("Fleming") is sued in her individual capacity. At all relevant times, she was the Deputy Director of Fermilab.

7. Defendant Sam Posen ("Posen") is sued in his individual capacity. At various relevant times, he held subordinate managerial roles within Romanenko's chain of command and later served as Associate Laboratory Director, positions in which he exercised supervisory authority or influence over Plaintiff's work.

8. Defendant Stephen Gourlay ("Gourlay") is sued in his individual capacity. At all relevant times, he served as Division Head with supervisory authority over Plaintiff.

9. Defendant George Velev ("Velev") is sued in his individual capacity. During the relevant period, he exercised managerial authority over Plaintiff's work and opportunities, and had the ability to influence or initiate personnel actions concerning her.

10. Defendant Alexander Romanenko ("Romanenko") is sued in his individual capacity. At all relevant times, he was employed by FRA as a scientist and later served as Division Head with influence over Plaintiff's work assignments.

11. Defendant Beth Fancsali ("Fancsali") is sued in her individual capacity. At all relevant times, she served as Deputy General Counsel or General Counsel of Fermilab.

12. Defendants Merminga, Fleming, Posen, Gourlay, Velev, Romanenko, and Fancsali are referred to collectively as the "Individual Defendants."


## JURISDICTION, VENUE, AND TIMELINESS

13. Plaintiff's claims arise under the Illinois Whistleblower Act ("IWA"), 740 ILCS 174/1 et seq.; the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1 et seq.; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Civil Rights Act of 1866, 42 U.S.C. § 1981; and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

14. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367(a).

15. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because Defendants do business and maintain offices in this District, and a substantial part of the events or omissions giving rise to these claims occurred in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16. Plaintiff has exhausted all administrative prerequisites to filing this action. On November 7, 2021, Plaintiff filed Charge No. 440-2022-00646 with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging discrimination and retaliation covering acts occurring from January 11, 2021 through November 7, 2021, within the 300-day filing period applicable in Illinois. Upon information and belief, the EEOC served FRA with the Notice of Charge shortly after filing, and FRA, through its Human Resources and Office of General Counsel, opened and tracked the matter. Those officials' knowledge is imputed to FRA and, where they advised or influenced personnel actions affecting Plaintiff, to relevant decisionmakers.

17. Plaintiff received a Notice of Right to Sue on August 3, 2023. The discriminatory and retaliatory conduct persisted and intensified thereafter. While earlier discrete acts are not pleaded to revive time-barred claims, the pattern included a hostile work-environment and timely discrete acts continuing through Plaintiff's November 12, 2024 termination, which are encompassed in a second charge, IDHR/EEOC Charge No. 2024CA3371 / 21B-2025-00490.

18. On June 8, 2024, Plaintiff submitted IDHR intake materials alleging discrimination and retaliation by FRA. **Plaintiff expressly requested legal action in her June 8, 2024 IDHR submission**. In the contemporaneous transmittal email, Plaintiff stated that she had filled out the Employment form "for a Discrimination/retaliation complaint" and that she "would like to sue the Respondent asap." On June 10, 2024, IDHR acknowledged receipt of Plaintiff's filing, confirmed "Date Received: June 8, 2024," assigned IDHR Control No. 24M0610.10, and stated that the next step was assignment to an Intake Investigator. IDHR later docketed and verified the charge as No. 2024CA3371, cross-filed with the EEOC as Charge No. 21B-2025-00490, alleging discrimination, harassment, failure to accommodate, and retaliation continuing through Plaintiff's November 12, 2024 termination. Plaintiff alleges that the later-verified charge relates back to June 8, 2024, or, in the alternative, that the June 8 submission and related correspondence are relevant to exhaustion, timeliness, notice, equitable considerations, and the scope of the investigation that reasonably should have followed. The June 8–10, 2024 email exchange is attached as **Exhibit A.**

4

19. Plaintiff timely opted out of the IDHR investigative and administrative process in connection with Charge No. 2024CA3371, and on May 5, 2025, IDHR issued Plaintiff a Notice of Dismissal and Right to Sue, attached as **Exhibit B**.

20. On July 25, 2025, the EEOC issued Plaintiff its Notice of Right to Sue, attached as **Exhibit C**.

21. On August 1, 2025, within ninety (90) days of receipt of the IDHR and EEOC notices of right to sue, Plaintiff timely filed her initial Pro Se Complaint in this matter.

22. Plaintiff's claims are timely to the extent permitted by the applicable statutes of limitations, administrative-filing rules, opt-out procedures, and the Court's May 1, 2026 Memorandum Opinion and Order.

23. The central discrete acts supporting Plaintiff's timely federal and IHRA claims—including the June 2024 ALD denial, July–August 2024 exclusion and HR escalation, September 10, 2024 Final Written Warning, 2024 evaluation manipulation, and November 12, 2024 termination—occurred after the cutoff dates identified in the Court's May 1, 2026 Opinion. Earlier incidents are pleaded as background, notice, motive, causation, pretext, and hostile-environment context; they are not pleaded to revive time-barred discrete acts. For claims governed by longer limitations periods, including § 1981, § 1983, and the Illinois Whistleblower Act, timeliness is asserted to the full extent those statutes allow, and no administrative charge is required.

24. Earlier compensation, classification, promotion, evaluation, and advancement evidence is pleaded as background, comparator evidence, hostile-environment context, notice, motive, causation, pretext, and damages context. Plaintiff does not seek to revive time-barred discrete compensation, promotion, discipline, or termination decisions, and seeks recovery only to the extent permitted by the applicable statutes of limitations, the Court's May 1, 2026 Memorandum Opinion and Order, and governing law.

25. Following the Court's May 1, 2026 Memorandum Opinion and Order, Plaintiff submitted additional IHRA charges concerning related allegations arising from the same employment relationship and adverse actions. These charges named FRA and six individual respondents—Merminga, Fleming, Posen, Gourlay, Velev, and Fancsali—and included allegations relevant to Plaintiff's IHRA aiding-and-abetting and ancestry allegations. Plaintiff timely opted out of the IDHR investigative process for those charges. The corresponding seven opt-out notices are attached collectively as **Exhibit D**.

## FACTUAL ALLEGATIONS

26. Plaintiff is an internationally recognized scientist in superconducting materials and magnet technology, with over 270 peer-reviewed publications, multiple international awards, and decades of contributions to Fermilab and other U.S. national labs through inter-lab research programs. Plaintiff was hired at Fermilab in 1997 as a Guest Engineer.

27. At all relevant times, Plaintiff met or exceeded FRA's legitimate performance expectations and possessed outstanding credentials.

28. Allegations occurring outside the applicable limitations periods, including certain earlier events such as those in ¶¶ 29–47, are pleaded as background, hostile-environment context, notice, motive, causation, pretext, comparator evidence, and damages context; Plaintiff's timely claims are based on acts within the respective statutes of limitations and on continuing hostile-environment allegations to the extent permitted by law.

29. Throughout her 27-year tenure, Plaintiff was consistently paid below the average for her formal or equivalent scientific pay category, denied promotions, excluded from projects, and subjected to demeaning treatment despite outperforming peers. From 1997 onward, she experienced sex-based harassment, discrimination, retaliation, marginalization, and ancestry/ethnicity-related or Italian-credential-based disparagement by various FRA supervisors, including certain Individual Defendants. Earlier events are pleaded as background, hostile-environment context, notice, motive, causation, pretext, comparator evidence, and damages context, and are not pleaded to revive time-barred discrete acts.

29A. Plaintiff alleges that the pattern of discriminatory and retaliatory denial of recognition, titles, leadership opportunities, fair evaluation, and compensation materially suppressed her career trajectory and earning capacity, including by preventing advancement into executive-level scientific leadership roles for which she was qualified. Plaintiff further alleges that her compensation remained persistently below the average for her formal or equivalent scientific pay category in a Senior Scientist workforce that was overwhelmingly male, supporting her allegations of sex-based compensation disparity, depressed salary trajectory, pretext, and damages. Earlier compensation and advancement evidence is pleaded as background, comparator evidence, hostile-environment context, notice, motive, causation, pretext, and damages context; Plaintiff seeks recovery only to the extent permitted by the applicable statutes of limitations, the Court's May 1, 2026 Memorandum Opinion and Order, and governing law.

30. In 1997, Plaintiff was hired as a Guest Engineer while male counterparts with similar or lesser credentials were hired directly into scientific-track roles (e.g.,

Associate Scientist or Scientist). Her efforts to be reclassified to the scientific track were blocked until 2017, despite a long record of high-impact research.

31. The following, ¶¶ 32–34, are pleaded as examples of early incidents contributing to a continuing hostile work environment and are not asserted as independent, time-barred discrete claims. Although Plaintiff was able to avoid physical injury in some instances, the incidents nonetheless caused fear, distress, and professional harm.

32. Between 1997 and 1998, Plaintiff was sexually harassed by then-Division Head Peter Limon, including unwanted physical contact and sexual assault. When she rejected his advances, he spread rumors and damaged her professional reputation.

33. Between 1998 and 1999, Plaintiff was stalked by a married Fermilab male colleague. Sometime before his 2008 wedding, Plaintiff was sexually assaulted in her office by a former Fermilab colleague who had become an elected representative. Plaintiff was again subjected to inappropriate conduct by another senior colleague, who sent her over 300 lewd emails between 2008 and 2013. In 2016, a Physics Nobel Laureate groped Plaintiff at Fermilab.

34. From 1997 onward, during work-related travel to scientific conferences, Plaintiff was similarly subjected by colleagues from other laboratories to unwelcome sexual advances and, on at least one occasion, sexual assault.

35. Despite leading an internationally lauded R&D laboratory — recognized by an international review convened by then-Director Pier Oddone as "producing the broadest and largest test capabilities among U.S. laboratories" — Plaintiff was routinely denied leadership roles and research funding in favor of younger, less experienced male employees. For example, after forming her own research group through independent funding, she officially became its Group Leader in 2003 only after the younger male engineer initially assigned the role resigned.

36. By 2007, Plaintiff, in collaboration with industry, developed a $Nb_3Sn$ superconducting wire that remains, on information and belief, the only commercially available product meeting high-field accelerator magnet specifications. Internally, the work received little recognition, and Plaintiff alleges that credit for related breakthroughs was instead attributed to other laboratories or male colleagues.

37. In 2010, shortly after receiving the Japanese Superconductor Science and Technology Prize, Plaintiff asked to be reclassified to the scientific track. Then-Department Head Mike Lamm declined to support the request, stating that "she was not doing any science," and then-Division Head Giorgio Apollinari denied it as well, dismissing Plaintiff's foreign academic background.

38. In 2011, immediately after Plaintiff led a ~10-person team to achieve a 21.5 Tesla solenoid —then a Fermilab record— her group was reassigned to a newly created Department led by Lance Cooley. Subsequently, public credit for the record was attributed to a younger male group member.

39. Between 2011 and 2014, Cooley repeatedly disparaged Plaintiff's laboratory, showed no interest in its unique experimental capabilities, and at times yelled "Eih, lady!" at her. When Plaintiff reported this to HR (Heather Sidman), she was told that the behavior was permissible.

40. Cooley frequently convened department-wide meetings focused on budget concerns that created fear of job loss, and he micromanaged safety in Plaintiff's lab in ways that, on multiple occasions, created safety risk. He also harassed engineers, graduate students, and technicians associated with Plaintiff's lab. In 2012—the same year Plaintiff was elected a Fellow of the American Physical Society—she received a performance rating of "1."

41. In 2013, following a DOE-reportable safety incident involving an automated helium system located outside Plaintiff's lab, then-Department Head Lance Cooley issued Plaintiff a written reprimand for "inappropriate behavior." The reprimand followed Plaintiff's good-faith objection to Cooley's effort to scapegoat a technician on her team who had faced a serious risk of injury. Then-Division Head Giorgio Apollinari halted Plaintiff's lab operations for months during safety reviews; those reviews ultimately confirmed the failure stemmed from a design defect in the external system, not from Plaintiff's lab. No comparable discipline was imposed on others involved, and misinformation about Plaintiff persisted.

42. From 2014 onward, Plaintiff was systematically excluded from Laboratory Directed Research and Development ("LDRD") funding, while male or younger peers with weaker track records were consistently supported.

43. In Summer 2014, a new Division Head, Hasan Padamsee, began his tenure. He dissolved Cooley's Department and redistributed employees to other Departments; Plaintiff's group was removed from her.

44. In 2015, after Plaintiff presented Padamsee results on $Nb_3Sn$-coated SRF samples (developed with her students at Politecnico di Milano), Padamsee asked her to leave his office (for which he later apologized). On information and belief, the division was then pursuing an alternative coating approach imported from Cornell through Padamsee's former Ph.D. student, Sam Posen, and had become significantly over budget in connection with that effort. Padamsee and his successors disparaged and suppressed Plaintiff's technique inside and outside the organization by, among other things: (i) impeding access to internal funding (e.g., LDRD) to apply the technique to SRF cavities; (ii) preventing her from presenting

results at DOE reviews; (iii) obstructing a patent application; and (iv) on information and belief, undermining support among colleagues serving as DOE proposal reviewers. These actions materially impaired Plaintiff's ability to advance the work and to compete for resources.

45. When Padamsee left in 2015, no opening was publicly posted for Division Head and Plaintiff could not apply. Then-Lab Director Nigel Lockyer assigned the role to Sergey Belomestnykh, a friend and longstanding collaborator of Padamsee.

46. From 2015 onward, Belomestnykh and others kept Plaintiff at the bottom of the organization chart and withheld formal titles, materially harming her candidacy for external executive roles.

## Timely and Continuing Acts, Including Discrete Adverse Actions for Which Relief Is Sought

46A. The preceding allegations are pleaded as background, notice, motive, hostile-environment context, comparator evidence, damages context, and pretext, and are not pleaded to revive time-barred discrete acts except to the extent permitted by law. The following allegations identify timely and continuing discriminatory, retaliatory, and adverse acts, including conduct that began earlier but allegedly continued into the limitations period where legally cognizable, and discrete acts for which Plaintiff seeks affirmative relief.

47. In 2016, Fermilab's Director, Nigel Lockyer, acknowledged systemic gender-based workplace issues. Plaintiff conducted a gender-equity analysis showing systemic disparities at Fermilab, which was later used in support of a female colleague's successful federal discrimination case (1:18-cv-5486). Shortly thereafter, Plaintiff was marginalized, excluded from meetings, and stripped of responsibilities.

48. Beginning in 2016, Defendant George Velev—then a Department Head—used his position to disparage Plaintiff's qualifications and leadership readiness to then–Lab Director Nigel Lockyer. On information and belief, his advocacy contributed to removing Dr. Alexander Zlobin from leadership of the High-Field Magnet Program—a role for which Dr. Zlobin had long prepared Plaintiff and reasonably expected she would be considered. Velev was promoted in April 2017 and, by July 2018, had supplanted Zlobin, despite minimal direct experience in high-field magnet R&D—an area that typically requires many years, if not decades, of specialized work. These appointments displaced Plaintiff's expected progression and materially impaired her advancement opportunities.

49. Once promoted, Velev publicly demeaned Plaintiff in meetings and emails. For example, in August 2018, at a large meeting, he refused to let Plaintiff ask

questions, stated she had "been a scientist for only one year," threatened to remove her if she spoke, and nevertheless reported her to HR thereafter.

50. In Summer of 2018, Defendant Velev and then-Division Head Belomestnykh engaged in a months-long administrative campaign of harassment, leveling unfounded accusations — including alleged "financial dishonesty" — that forced Plaintiff to divert substantial time from her work. In 2019, Velev and Belomestnykh reduced Plaintiff's supervisor's positive annual evaluation by portraying her as undeserving based on those baseless allegations.

51. From 2016 through at least 2024, Defendant Velev engaged in a continuing campaign of defamation, harassment, and professional isolation against Plaintiff, including false accusations of plagiarism and dishonesty, undermining her authorship, and spreading rumors about her mental health. Plaintiff pleads earlier components of this campaign as background, notice, motive, hostile-environment context, pretext, and continuing-course evidence; Plaintiff seeks relief only for timely acts and for legally cognizable continuing violations or harms.

52. In 2018-2019, Plaintiff reported bullying, discrimination, and retaliation to then-Division Head Sergey Belomestnykh, former Deputy Director Joseph Lykken, former COO Timothy Meyer, HR representative Stacey Vassallo, former General Counsel John Myer, and Deputy Beth Fancsali. No remedial action was taken; instead, exclusion and defamation escalated.

53. In 2020, for senior technical leadership roles (including Chief Technology Officer and head of the Applied Physics/Superconducting Technology Division), Director Nigel Lockyer selected Defendant Alexander Romanenko (a substantially younger male) over Plaintiff despite Plaintiff's superior qualifications and expressed interest.

54. In 2021, after Plaintiff received another international award and her then-supervisor Sandor Feher proposed a feature in Fermilab's internal bulletin *Fermi Today*, then-Division Head Alexander Romanenko blocked publication; two years earlier, Belomestnykh had likewise obstructed publicity of Plaintiff's election to the Council Advisory Committee and to other prestigious American Physical Society committees.

55. Throughout 2021—both before and after Plaintiff's November 7, 2021 EEOC charge (see ¶16)—Defendants Alexander Romanenko (then Division Head) and Sam Posen (then Deputy Division Head) harassed Plaintiff over grant budgeting and lodged retaliatory HR complaints against her. Plaintiff was excluded from meetings, denied authorship, and publicly disparaged (see also ¶54). On information and belief, this conduct was driven by retaliatory animus related to Plaintiff's protected critiques of management practices and intensified after the

charge (see ¶¶56–61). Regardless of any individual's claimed ignorance of the 2021 charge, FRA's Human Resources and General Counsel offices were aware of Plaintiff's protected activity and were consulted on personnel matters affecting her.

56. In March 2022, at a collaboration meeting for a DOE Program, a colleague from another DOE laboratory presented partial data that risked misleading the audience. When Plaintiff raised concerns about potential academic or research misconduct, former Fermilab manager Lance Cooley (then at the other laboratory) accused her of defamation under that laboratory's auspices. Although DOE policy obligates employees to report potential research misconduct, then-General Counsel John Myer suggested by email to Plaintiff that she could be treated as a "defendant," rather than protecting or investigating her good-faith concern.

57. In March 2022, Plaintiff co-authored (with professors from Duke and Brown Universities) an arXiv paper, *In Search of Excellence and Equity in Physics*, recommending best practices for selecting effective scientific leaders. The recommendations were circulated during the Director-selection process but were not adopted in connection with the April 2022 appointment of Lia Merminga.

58. In October 2022, Plaintiff published an arXiv article, *How Community Agreements Can Improve Workplace Culture in Physics*, addressing systemic barriers and discrimination in scientific workplaces. Thereafter, retaliation escalated: Plaintiff was barred from participating in DOE grant proposals and prohibited from giving invited talks at prestigious venues by Deputy Director Bonnie Fleming.

59. In March 2023, Plaintiff emailed Fleming a written analysis critiquing slides from an all-hands presentation about reporting misconduct and proposing improvements to better protect victims. Plaintiff received no response.

60. On April 24, 2023, Plaintiff met with Fleming, disclosed authorship of the anonymous APS News editorial *One Woman's Struggle with Harassment in Physics*, and offered to serve as interim Associate Lab Director ("ALD") for the APS-TD directorate in light of leadership changes. Fleming declined to consider her for the interim role and stated that such experiences "are not uncommon for a woman in STEM."

61. On or about June 7, 2023, following the May 25, 2023 fall-from-height accident involving ironworker James Daniels at the DOE-funded PIP-II Linac Construction Project at Fermilab, and following a DOE task force review, Plaintiff met with Director Lia Merminga. Plaintiff explained that culture and ineffective manager selection negatively affected safety and urged leadership to address systemic issues. An administrative assistant took notes. When later asked to

provide "proof," Plaintiff explained that she lacked the resources to conduct a formal investigation and requested leadership review. Public reporting and the DOE accident-investigation record later underscored the seriousness of the 23-foot fall. The fall was later followed by a substantial settlement involving FRA and other project-related entities. Plaintiff pleads these facts not to litigate the accident itself, but to show the public-safety significance of the concerns she raised to Fermilab leadership.

62. In November 2019 Plaintiff was diagnosed with Post-Traumatic Stress Disorder (PTSD). Plaintiff disclosed her condition to HR and requested confidentiality. Nevertheless, on information and belief, in or about 2021 manager George Velev discussed Plaintiff's PTSD with third parties without consent and without any legitimate need to know—including Prof. Giorgio Bellettini and then-supervisor Sandor Feher—and raised it with others in management in a manner that cast doubt on her credibility and professional reliability. These disclosures contravened the ADA's medical-information confidentiality and use restrictions (see 42 U.S.C. § 12112(d)) and were later invoked to undermine her evaluation and opportunities.

63. In September 2023 Plaintiff requested to continue working from home as a reasonable accommodation. HR demanded a "current provider" certification and did not approve the request based on a September 19, 2023 note from her former provider; in September 2024 HR accepted the same 2023 note and allowed WFH. The belated allowance did not cure the prior failure to accommodate.

64. Plaintiff remained qualified and was positively rated by her direct supervisor, but upper management overrode those evaluations and later relied on downgraded ratings and discipline in the lead-up to her November 12, 2024 termination.

65. In November 2023, Plaintiff launched a voluntary think-tank initiative on cronyism, inequitable manager selection, safety violations, financial waste, and budgetary mismanagement, and emailed an invitation to ~2,000 employees in compliance with lab policies (off-site meetings, outside working hours, personal resources). Some recipients forwarded the email to the Office of General Counsel. Interim General Counsel Beth Fancsali identified Plaintiff by name to Director Lia Merminga and Senior Leadership at a late-November 2023 meeting. On information and belief, a witness will testify that Director Merminga expressed displeasure and discouraged participation.

66. In January 2024, Plaintiff was invited to present *Fermilab in the Next Decade* at the 37th Rencontres de Physique de la Vallée d'Aoste (March 3-9, 2024). Fleming declined to authorize the talk, citing funding and suggesting someone 'more involved in Fermilab's strategic planning' should speak. The organizers offered a

remote presentation at no cost and to add a separate 'official perspective', but Plaintiff was not permitted to present.

67. In February 2024, Plaintiff applied for the internal Associate Lab Director ("ALD") position. On or about June 4, 2024, the role was awarded to Sam Posen, a substantially younger male (under 40) who had only recently met the posted eligibility criteria. On information and belief, the selection departed from ordinary merit-based criteria and favored a preselected internal candidate.

68. The posting required capability to develop a science-and-technology vision to accomplish Fermilab's mission, and experience in magnets, SRF, and cryogenics. Plaintiff had approximately 28 years' experience across these areas, had led national and international programs, and interviewed with the selection committee on March 7, 2024. On information and belief, decisionmakers were aware of Plaintiff's protected activity; no legitimate, non-discriminatory reason was provided for discounting her candidacy.

69. In July 2024, Plaintiff and colleagues anonymously released an independent whistleblower report on arXiv titled *An Independent Review of Fermi Research Alliance (FRA)*, addressing gender discrimination, retaliation, misuse of public funds, and safety violations. Shortly thereafter, the same decisionmakers who had been briefed on Plaintiff's identity and protected activity initiated and/or escalated adverse actions against her.

69A. Senior leadership immediately recognized the public and institutional significance of the July 2024 whistleblower report. On July 29, 2024, Director Lia Merminga sent a laboratory-wide message concerning a "recent publicly posted document" that expressed concerns about Fermilab and made recommendations for change. On August 20, 2024, after press coverage concerning the report, Merminga sent another laboratory-wide message titled "Recent negative media coverage," acknowledging substantial criticism of the laboratory and stating that leadership was working to address issues and resume listening sessions. These laboratory-wide communications confirm senior leadership's knowledge of the protected report, the public-concern nature of the issues raised, the institutional sensitivity of the disclosures, and the temporal connection between the report, public scrutiny, and the adverse actions that followed.

70. By then, DOE managers had been notified of Plaintiff's concerns and FRA senior leadership had publicly responded to the whistleblower report and related criticism through laboratory-wide communications. These facts corroborate FRA's and DOE's knowledge of Plaintiff's protected disclosures before the escalation of adverse actions alleged herein.

71. Within a U.S.-Japan grant for which Plaintiff served as U.S. Principal Investigator ("PI"), Plaintiff achieved significant scientific results (including elimination of superconducting-magnet training). Nevertheless, Division Head Stephen Gourlay excluded her from presenting at the August 2024 DOE review, despite her PI role.

72. On July 31, 2024, Plaintiff emailed Director Lia Merminga (copying Deputy Director Bonnie Fleming, HR representative Eileen Beno, Joseph Lykken, and supervisor Sandor Feher), objecting to the ALD selection criteria, noting her exclusion from DOE reviews despite her discoveries, and requesting promotion to Distinguished Scientist. She received no response.

73. Also on July 31, 2024, Plaintiff participated in an inter-laboratory DOE Program Zoom meeting. During the meeting, senior external colleague David Larbalestier confronted Plaintiff and, according to Plaintiff, made inaccurate statements about her and her team. Although Division Head Stephen Gourlay was aware of prior concerns involving Larbalestier, Gourlay offered no support during the exchange. The meeting continued for approximately 20–30 minutes thereafter, and the chair, Soren Prestemon, closed by stating it had been "a very productive meeting." On information and belief, the session was not recorded. Nevertheless, the September 10, 2024 Final Written Warning falsely asserted that the chair abruptly ended the meeting due to Plaintiff's conduct and used the incident as a pretext for discipline.

74. On August 5, 2024, during a recorded internal practice session for the upcoming DOE review, Plaintiff provided good-faith, professional critiques of Gourlay's slides. During the session, Defendant Velev publicly demeaned Plaintiff; when Dr. Zlobin objected, Gourlay admonished Zlobin rather than addressing Velev's conduct. Plaintiff expressly reminded Gourlay—on the record—of the lab's code of conduct.

75. On August 8, 2024, Plaintiff's supervisor, Sandor Feher, notified her of a meeting set for August 13 regarding alleged July 31 misconduct. Plaintiff was not told that HR would attend.

76. On August 9, 2024, Plaintiff emailed Director Merminga to report ongoing harassment by management, request intervention, and state that she would pursue legal remedies if the conduct continued. She received no response. Around the same time, Plaintiff notified Gourlay and Posen that she opposed the unfair treatment and regarded the August 13 meeting as retaliatory. These communications constituted protected activity.

77. On August 13, 2024, at the meeting with Division Head Stephen Gourlay and HR Senior Manager Heather Sidman, Plaintiff was questioned about her conduct at

the July 31 meeting described in ¶73. She was told she had been "disruptive," had allegedly made student attendees uncomfortable during the exchange with the senior external colleague, and was criticized for offering a candid scientific assessment of a junior colleague's research. Plaintiff explained that she intervened to correct inaccurate statements that risked misleading the audience and harming Fermilab's reputation, and that candid, evidence-based critique is central to research integrity, professional ethics, and prudent stewardship of DOE funds. Plaintiff did not concede wrongdoing; her remarks were made in good faith and were consistent with laboratory expectations.

78. On September 1–6, 2024, using her own grant funds, Plaintiff attended the Applied Superconductivity Conference and presented new results with potential Magnetic Resonance Imaging (MRI) applications. On September 9, 2024, she emailed Director Merminga that the discovery was transformative and noted APS-TD management had failed to advance it for over a year.

79. On September 10, 2024, following an internal "investigation," Division Head Stephen Gourlay and HR Senior Manager Heather Sidman issued Plaintiff a Final Written Warning citing "inappropriate verbal communication and behavior toward a colleague." The memorandum inaccurately asserted that the July 31 meeting was "abruptly ended" due to Plaintiff's conduct; in fact, it continued for approximately 20–30 minutes and the chair closed by stating it had been "a very productive meeting" (see ¶73). On information and belief, the Warning relied primarily on complainant David Larbalestier's account while disregarding contrary accounts and context, and was used as a pretext for subsequent termination-related actions.

80. On September 10, 2024, shortly after Plaintiff contested the Final Written Warning in writing, including an email to Director Merminga, HR Senior Manager Heather Sidman emailed Plaintiff at approximately 2:36 p.m. stating that FRA was accepting her "resignation effective immediately." The email further stated that her computing accounts and site access would be suspended immediately, that she would be paid in lieu of a two-week notice period, and instructed her to collect personal belongings and return Laboratory equipment; it also added, "If you feel we reached this decision in error, please contact me immediately." Plaintiff had not resigned and had no intention to resign (she was supervising three graduate students and had just received a two-year renewal of her DOE grant). At approximately 2:48 p.m.—about twelve minutes later—Plaintiff replied that no resignation had been tendered, after which HR corrected the record. Nonetheless, FRA maintained adverse measures that culminated in Plaintiff's termination.

81. On November 12, 2024, Plaintiff was terminated in an announced laboratory-wide Reduction in Force ("RIF") affecting 53 employees. The separation memo stated

that Plaintiff's "position" was being eliminated due to "mission priorities and budget realities." FRA identified no objective selection criteria or RIF matrix explaining why Plaintiff—rather than other Senior Scientists—was selected. On information and belief, the core functions of Plaintiff's role continued and were redistributed to remaining personnel and/or contractors. Plaintiff was the only female Senior Scientist by title selected for termination and was among the most productive in that cohort. The termination departed from FRA policies and procedures— including required Committee for Scientific Appointments ("FCSA") review and application of objective criteria—adopted under the DOE Prime Contract. FRA offered a one-time lump-sum severance conditioned on a waiver and release of claims; Plaintiff declined and therefore did not receive severance.

82. Consistent with the continued need for Plaintiff's work, on November 15, 2024— three days after the RIF—Defendant Stephen Gourlay, acting in his capacity as Division Head on behalf of FRA, sought to replace Plaintiff as U.S. Principal Investigator on her U.S.–Japan grant and to transfer leadership and recognition associated with Plaintiff's prior results and the ongoing grant to a junior engineer who had not been part of the core team. On information and belief, other ongoing projects and responsibilities were likewise redistributed to remaining personnel. After discussions with DOE and the Japanese collaborators, the U.S. PI role was assigned to Plaintiff's long-standing collaborator. These facts undercut FRA's assertion that Plaintiff's position was truly eliminated.

83. On information and belief—and based on FRA's RIF list circulated to employees identifying the job titles and ages of the 53 individuals selected—no management-level employees with direct reports were selected anywhere in the laboratory. Instead, selections skewed toward individual contributors, including employees in protected categories such as age 40+, women, individuals with disabilities or recent medical leave, and racial or ethnic minority groups. Numerous employees who had engaged in protected activity were also selected, including multiple members of the Employee Advisory Group ("EAG"), which communicates workforce concerns to the Directorate, and other employees who had recently complained internally or to government agencies. Plaintiff expects personnel data and discovery to confirm these patterns.

83A. Plaintiff is informed and believes, based on communications from a former EAG member selected for the RIF, that six of the eight EAG members who regularly attended EAG meetings were selected for termination in the November 12, 2024 RIF, representing approximately 75% of the active EAG group. Plaintiff further alleges, on information and belief, that the EAG had begun raising workplace concerns and seeking an executive sponsor before the RIF. Less than one month after the RIF, Fermilab announced a "revitalized Employee Advisory Group," described as a liaison between employees and leadership and a resource for workplace challenges, communication, culture, transparency, and policy feedback.

These facts support an inference that the RIF was not a neutral budget action and that employees involved in workforce advocacy, employee voice, internal feedback, or protected complaints were disproportionately targeted or removed.

83B. Minutes from the November 14, 2024 SAC meeting, attached as **Exhibit E**, further reflect contemporaneous concern regarding the age profile of the scientists selected for RIF. A SAC member noted that at least eight of the twelve scientists selected were very senior and had been at the Laboratory for at least thirty years. Management stated that the overall age profile had been signed off on by DOE. Plaintiff alleges that these facts are relevant to age discrimination, age-skewed selection, DOE involvement, adverse-impact review, RIF pretext, and discovery concerning the decisional unit, selection criteria, and age demographics of employees considered and selected for involuntary separation.

83C. Plaintiff is informed and believes, based on information available to her concerning employees selected for the November 2024 RIF, that multiple employees selected for termination had known disabilities, recent medical leave, or accommodation-related histories known to management or HR. Plaintiff does not plead this pattern as a statistical disparate-impact claim, but as circumstantial evidence of discriminatory intent, subjective selection, and pretext. The RIF was conducted without disclosed objective selection criteria, without a transparent neutral matrix, and without the normal scientific-staff review procedures applicable to Senior Scientist selections, allowing subjective judgments, disability-related stereotypes, accommodation-related hostility, and tainted disciplinary or evaluation records to influence selection outcomes. Plaintiff's own trajectory—PTSD disclosure, confidentiality concerns, accommodation delay, characterization as "disruptive," formal discipline, evaluation downgrade, and selection for termination—mirrors this pattern.

83D. Plaintiff is informed and believes, based on age information produced by FRA in connection with the November 2024 layoff, that the RIF disproportionately selected older Senior Scientists for termination in the affected divisions. Among Senior Scientists in the divisions where Senior Scientists were selected for the RIF and for whom Plaintiff has age information, all eleven selected Senior Scientists were over age 50, ten of eleven were age 60 or older, and eight of eleven were age 65 or older. By contrast, among ninety-nine non-selected Senior Scientists in those same divisions for whom Plaintiff has age information, seventy-six were over age 50, forty-nine were age 60 or older, and twenty-seven were age 65 or older. The selected Senior Scientists had an average age of approximately 66, compared with approximately 59 for non-selected Senior Scientists in those same affected divisions. Stated differently, Senior Scientists over age 50 were selected at approximately 12.6%, compared with approximately 0% for Senior Scientists age 50 or younger; Senior Scientists age 60 or older were selected at approximately 16.9%, compared with approximately 2.0% for Senior Scientists under age 60; and

Senior Scientists age 65 or older were selected at approximately 22.9%, compared with approximately 4.0% for Senior Scientists under age 65. This age-skewed result, combined with the absence of disclosed objective criteria, the lack of a transparent neutral matrix, and FRA's failure to apply individualized Senior Scientist/FCSA review safeguards, supports an inference of age discrimination, pretext, non-neutral selection, and procedural irregularity.

84. On information and belief, the U.S. Department of Energy's Fermi Site Office ("FSO") reviewed, approved, or both reviewed and approved the planning and execution of the November 2024 laboratory-wide RIF, including selection methodology, timing, and implementation logistics; FRA submitted RIF materials to DOE and coordinated implementation with DOE-affiliated security/badging personnel.

85. Public records obtained from the DuPage County Sheriff's Office show that Fermilab requested and paid for two uniformed DuPage County deputies to provide an outside-security detail at Wilson Hall and Site 38 on November 12, 2024, from 9:00 a.m. to 5:30 p.m., the date and time period of the RIF. See **Exhibit F**.

86. On information and belief, access-control and badging actions for selected employees were implemented contemporaneously with the RIF notices in a law-enforcement-backed access-control environment, as further alleged below and reflected in **Exhibits F–H**.

87. Public records separately show that Fermilab's post-termination access-control and removal decisions could be enforced through county law-enforcement authority, including the March 2024 Kane County incident described below. See **Exhibit G**.

88. DOE officials, including the FSO and/or Contracting Officer, exercised oversight over FRA operations pursuant to the DOE Prime Contract. Plaintiff alleges on information and belief that DOE oversight, Contracting Officer involvement, and Prime Contract workforce-restructuring requirements are relevant to whether the November 2024 RIF complied with required procedures and whether FRA's stated RIF rationale was pretextual. Plaintiff expects discovery to clarify DOE's role in the RIF planning, approval, implementation, and related adverse actions.

89. These facts support a plausible inference of joint action, law-enforcement-backed access-control enforcement, and state involvement in the RIF implementation and post-termination exclusion alleged in Count IX. Although Plaintiff worked remotely on the date of her separation, the same RIF and access-control system was used to terminate her, revoke her badge and electronic access, cut off her

Fermilab email, and exclude her from Fermilab property and professional resources.

90. On November 27, 2024, Plaintiff requested her most recent performance evaluation from HR and received it on December 2, 2024: an overall "1" prepared by Gourlay, not by direct supervisor Feher. In an email to Gourlay (forwarded to Plaintiff), Feher stated he had originally rated Plaintiff "2-3" and chose the lowest, i.e. "2", as overall grade at management's request based on the warning; Gourlay then reduced it further to "1."

91. On October 1, 2024, the U.S. Department of Energy announced that Fermi Forward Discovery Group, LLC ("FermiForward") would replace FRA as Fermilab's management-and-operations contractor effective January 1, 2025, with a formal transition period from October 1 through December 31, 2024. Public DOE and laboratory notices reflect substantial continuity of facilities, workforce, functions and operations during and after the transition. On information and belief, FermiForward had actual or constructive notice of Plaintiff's pending charges and claims before and during the transition, including through substantial continuity of legal, management, and operational functions. Plaintiff further alleges that Beth Fancsali, who was involved in FRA legal and HR matters concerning Plaintiff, later appeared as FermiForward's registered agent for service, supporting an inference of continuity, notice, and overlap in legal/management functions. FRA's ability to provide complete relief is uncertain, whereas FermiForward now controls the ongoing enterprise. Under federal common-law successor-liability principles applicable to employment and civil-rights claims, and any applicable Illinois successor doctrines, FermiForward should be responsible, without double recovery, for prospective equitable relief and, as appropriate, make-whole relief.

91A. On January 13, 2025, shortly after FermiForward assumed the M&O contract, Fermilab announced that Lia Merminga had stepped down as Laboratory Director and that University of Chicago Professor Young-Kee Kim had been appointed interim Laboratory Director. This leadership change further supports FermiForward's control over the ongoing Fermilab enterprise and its ability to provide prospective equitable relief, including reinstatement, expungement, access restoration, and corrective measures.

91B. Internal Fermilab organizational charts, post-transition laboratory materials, and public Fermilab communications reflect that, after FermiForward assumed the M&O contract, Fermilab reorganized senior leadership, reporting lines, and directorate structures. On information and belief, those changes affected roles held by individuals involved in Plaintiff's 2024 ALD selection, discipline, evaluation, RIF selection, or post-termination access decisions. These post-transition facts are relevant to successor notice, control over records and personnel

functions, prospective equitable relief, access restoration, expungement, reinstatement or front pay, and the stated reasons for the 2024 ALD and RIF-related decisions.

91C. Plaintiff is informed and believes, based on reports from attendees, that at Fermilab's January 21, 2026 all-hands meeting, Laboratory Director Norbert Holtkamp acknowledged staffing shortfalls affecting critical laboratory projects, including DUNE. Plaintiff alleges that this post-transition admission is relevant to whether Plaintiff's November 2024 RIF selection reflected true elimination of needed scientific work, to pretext, and to FermiForward's ability to provide prospective equitable relief.

91D. In addition to successor liability, Plaintiff alleges that FermiForward is independently liable for post-January 1, 2025 conduct by its officers, managers, employees, and agents that continued, ratified, or compounded the discriminatory, retaliatory, and contract-interfering conduct alleged herein. After FermiForward became the DOE laboratory contractor, FermiForward personnel, including Defendant Posen on information and belief, continued to control or influence Plaintiff's access to Fermilab systems, site access, professional collaborations, authorship, grant-related work, scientific records, and post-termination ability to continue or complete work arising from her prior Fermilab research.

92. The adverse employment decisions described herein were made or ratified by Defendants Lab Director Lia Merminga, Deputy Director Bonnie Fleming, Associate Lab Director Sam Posen, Division Head Stephen Gourlay, Deputy Division Head George Velev, and Interim/Deputy General Counsel Beth Fancsali (collectively, the "Decisionmakers"). Other senior leaders, including Alexander Romanenko and Sergey Belomestnykh, were aware of Plaintiff's protected activity and relevant events; their earlier conduct is pleaded as background unless otherwise specified in particular counts.

93. By late November 2023 – after Interim/Deputy General Counsel Fancsali identified Plaintiff by name to Senior Leadership in connection with Plaintiff's think-tank activity – the Decisionmakers knew of Plaintiff's protected activities (including her 2016 equity analysis, 2018–2019 HR/GC complaints, 2021 EEOC charge, and the October 2022 arXiv article) and, after July 2024, were aware of the July 2024 arXiv whistleblower report; thereafter they participated in and/or ratified the adverse actions alleged (including the August 8, 2024 notice of an HR "ambush" meeting for August 13, the September 10, 2024 Final Written Warning, and the November 12, 2024 termination).

## CLARIFYING FACTUAL ALLEGATIONS FOLLOWING THE COURT'S ORDER

94. The following allegations clarify and supplement Plaintiff's prior factual allegations, including allegations relevant to administrative exhaustion, protected disclosures, individual-respondent conduct, Italian ancestry and ethnicity, disability-related causation, state-action allegations, and claims dismissed without prejudice.

### Gender-Based Defamation, Disability Stigma, and Causation

95. From approximately 2016 through 2024, Defendant Velev spread or contributed to gender-based defamatory statements about Plaintiff, including statements implying that Plaintiff had advanced professionally through sexual relationships with men in positions of power or influence rather than through scientific merit. Plaintiff is informed and believes that witnesses can corroborate that such statements were made or repeated within Fermilab. On information and belief, those narratives reached or influenced persons beyond Plaintiff's immediate division, including through DOE-facing and scientific-collaboration channels. These statements were false, gender-based, humiliating, and professionally damaging, and they reinforced the hostile work environment and harmed Plaintiff's reputation by attacking her credibility, scientific merit, and professional legitimacy through sex-based stereotypes.

96. On information and belief, these narratives were communicated or repeated within management channels, DOE-facing channels, and Plaintiff's broader scientific network, and contributed to Plaintiff being portrayed as unstable, unreliable, disruptive, dishonest, or not credible. Plaintiff is informed and believes that Velev used the term "crazy" multiple times to describe or disparage Plaintiff, reinforcing a disability-stigmatizing narrative connected to Plaintiff's PTSD and undermining Plaintiff's credibility, professionalism, and suitability for leadership.

97. Shortly before Plaintiff's termination, Plaintiff's direct supervisor, Sandor Feher, informed Plaintiff that Gourlay, Velev, and Department Head Guram Chlachidze had spoken very negatively about Plaintiff to him in group or management discussions. Plaintiff is informed and believes that these discussions were not isolated individual comments, but mutually reinforcing statements by senior male managers that contributed to a gendered and disability-stigmatizing management narrative attacking Plaintiff's credibility, mental stability, professionalism, scientific legitimacy, and suitability for leadership.

98. The disclosure and discussion of Plaintiff's PTSD likewise were not isolated privacy violations. In the context of Fermilab's management culture and Plaintiff's scientific collaborations, those disclosures contributed to a stigmatizing disability-related narrative that affected how management and others interpreted Plaintiff's

protected complaints, scientific disagreements, leadership objections, and workplace conduct. Plaintiff is informed and believes that these sex-based and disability-related narratives were repeated or relied upon in management channels and contributed to adverse actions including exclusion from leadership opportunities, the August 2024 HR process, the September 10, 2024 Final Written Warning, the downgraded 2024 performance evaluation, and Plaintiff's selection for termination in the November 2024 RIF.

99. Managers later used similar stigmatizing language—including "disruptive," "inappropriate," "unprofessional," and related characterizations—in the August 2024 HR process, the September 10, 2024 Final Written Warning, the downgraded 2024 performance evaluation, and/or the RIF selection process. In context, those labels reinforced the disability-related narrative that Plaintiff was unstable, unreliable, mentally unfit, or not credible, and contributed to the adverse actions taken against her.

### Cross-Functional Monitoring, Medical/Security Information, and Termination Planning

100. On information and belief, Fermilab maintained a Local Insider Threat Working Group ("LITWG") involving leadership, Legal/ Office of General Counsel, HR, Security, Communications, Occupational Medical, Emergency Management, and related functions. Plaintiff does not challenge Fermilab's ability to maintain a security-focused insider-threat program. However, a September 10, 2024 LITWG agenda, attached as **Exhibit I**, referenced, among other topics, "medical cases of interest or concern," "social media tracking/concerns/posts of concern or awareness," recent OGC issues or concerns related to LITWG, increased Security assistance, reports of concern, and increased requests for Security standby during terminations. The agenda listed Beth Fancsali among the participants. Plaintiff alleges that the scope and use of this cross-functional structure are relevant to discovery concerning disability-related information sharing, possible monitoring of protected speech or whistleblowing activity, HR/OGC escalation, and security/access-control planning during the period leading to Plaintiff's discipline and termination.

101. Plaintiff does not allege that PTSD made her unable to communicate professionally or perform her work. Rather, Plaintiff alleges that FRA's use of terms such as "disruptive," "inappropriate," "unprofessional," or similar behavioral labels was not neutral in context. After HR and management knew of Plaintiff's PTSD, medical-confidentiality concerns, and accommodation history, Plaintiff's protected complaints, scientific disagreements, requests for fair treatment and factual precision, and objections to management conduct were recast as behavioral problems. Plaintiff alleges that, in context, these labels reflected or reinforced disability-based stereotypes that Plaintiff was unstable,

unreliable, overly emotional, not credible, professionally unsafe, or unable to engage appropriately because of her known PTSD and accommodation history. Those labels were then converted into formal employment consequences through the August 2024 HR process, the September 10, 2024 Final Written Warning, the downgraded 2024 performance evaluation, access/security escalation, and the November 2024 RIF selection.

102. Plaintiff alleges that FRA's HR process did not neutrally investigate or correct the underlying discrimination, retaliation, safety, governance, and scientific-management concerns Plaintiff raised. Instead, HR and management converted Plaintiff's protected complaints and professional objections into a formal disciplinary narrative, magnified and selectively enforced alleged communication or conduct issues, and used that narrative to issue the September 10, 2024 Final Written Warning, downgrade Plaintiff's 2024 performance evaluation, escalate access/security treatment, and support or justify her November 2024 RIF selection.

### Protected Disclosures to DOE, Federal Officials, and Public Bodies

103. Before the July 2024 public posting of the independent whistleblower report, Plaintiff disclosed the underlying concerns to DOE officials, DOE oversight personnel, and federal officials, including misuse of federal funds, safety violations, retaliation, discriminatory personnel practices, and institutional noncompliance at Fermilab.

104. On or about November 23, 2023, Plaintiff emailed former Fermilab colleague and Congressman Bill Foster seeking assistance in delivering a letter, to be prepared with her think-tank group of current and former employees, concerning long-standing institutional, governance, safety, workforce, and management problems at FRA/Fermilab to the Secretary of Energy and Senators Durbin and Duckworth. Plaintiff followed up on or about March 14, 2024, with an update regarding the status of the white paper being prepared by the group.

105. On or about December 29, 2023, Plaintiff emailed Dr. Harriet Kung, Deputy Director for Research of the DOE Office of Science, informing her of the think-tank group Plaintiff was leading "to document problems at the lab that the DOE may not know about."

106. On or about June 4, 2024, Plaintiff submitted a complaint to the DOE Office of Inspector General concerning hiring irregularities, discrimination, and retaliation at Fermilab.

107. On or about June 6, 2024, Plaintiff emailed Dr. Juston Fontaine, Deputy Director for Operations of the DOE Office of Science, and Dr. Harriet Kung,

Deputy Director for Research of the DOE Office of Science, informing them of her complaint to the DOE Office of Inspector General and of Fermilab's failure to promote her to Associate Laboratory Director in favor of a substantially younger male with less than ten years of post-PhD experience and substantially fewer peer-reviewed publications, citations, and honors.

108. On or about June 13, 2024, Plaintiff emailed Dr. Juston Fontaine of the DOE Office of Science with a summary of the whistleblowing report.

109. On or about July 13, 2024, Plaintiff provided Regina Rameika, Associate Director of the DOE Office of Science for High Energy Physics, with a draft of the report before its public posting.

110. On or about August 4, 2024, Plaintiff sent an extensive letter to Dr. Geraldine Richmond, DOE Undersecretary for Science and Innovation, concerning serious waste, safety concerns, employment-related civil-rights violations, and institutional noncompliance at Fermilab.

111. On or about August 14, 2024, Plaintiff replied to former Fermilab colleague and Congressman Bill Foster, who informed her that he had "had multiple conversations with both Geri Richmond and Harriet Kung, as well as Lia, about this (and the 'Whistleblowers' letter) — as well as other matters."

112. The July 2024 arXiv posting is not pleaded as the sole protected disclosure under the Illinois Whistleblower Act. Rather, it is pleaded as evidence of the substance, timing, public concern, and retaliatory context of concerns Plaintiff had already disclosed, or attempted to disclose, to DOE officials, DOE oversight personnel, and federal officials.

113. Defendants knew or reasonably inferred that Plaintiff had made, was making, or intended to continue making disclosures to DOE officials, DOE oversight personnel, and federal officials concerning discrimination, retaliation, misuse of federal funds, safety concerns, and institutional noncompliance at Fermilab.

### Italian Ethnicity, Ancestry, and Italian-Trained Credentials

114. Plaintiff is Italian by ancestry and ethnicity, completed her university education in Italy, speaks with an Italian accent, and obtained substantial academic and scientific credentials from Italian universities. Plaintiff's academic formation, professional identity, and scientific credentials were substantially Italian, and FRA managers and decisionmakers knew or perceived Plaintiff as Italian, Italian-trained, and non-U.S.-credentialed.

115. Plaintiff alleges that FRA, acting through its officers, managers, and agents, repeatedly treated Plaintiff's Italian and Italian-trained academic background as less legitimate than U.S.-based credentials and used that perception to discount Plaintiff's qualifications, leadership suitability, scientific-track recognition, and advancement prospects. This pattern included dismissing or disparaging Plaintiff's non-U.S. academic training, discounting her Italian and foreign-trained credentials, underrecognizing her Italian-linked and international scientific collaborations and achievements, and bypassing her for advancement in favor of non-Italian or U.S.-credentialed employees with weaker qualifications.

116. Plaintiff alleges that FRA decisionmakers treated her Italian accent, Italian education, and Italian-trained scientific credentials not as neutral background characteristics, but as markers used to discount her credibility, leadership suitability, scientific judgment, communication style, and eligibility for advancement, particularly in combination with her sex and Italian ancestry/ethnicity.

117. As alleged above, in 2010, when Plaintiff sought reclassification to the scientific track shortly after receiving the Japanese Superconductor Science and Technology Prize, Fermilab decisionmakers denied the request after stating that Plaintiff "was not doing any science" and dismissing Plaintiff's Italian academic credentials. In substance, Plaintiff was told that her Italian degree and academic training did not count like a U.S. Ph.D. Plaintiff alleges that this denial materially delayed her scientific-track recognition and advancement and reflected discriminatory discounting of her Italian/Italian-trained academic identity. Plaintiff further alleges that Apollinari's dismissal of Plaintiff's Italian credentials was arbitrary and pretextual because the relevant scientific-track inquiry should have turned on Plaintiff's scientific record, publications, research leadership, and demonstrated expertise—not on whether her Italian academic formation matched a U.S.-credentialed pathway. Although Apollinari himself was Italian-trained, he treated Plaintiff's Italian academic formation as inferior when evaluating her transition to the scientific track, supporting an inference that the credential rationale was arbitrary, inconsistently applied, and pretextual.

118. Plaintiff further alleges that the 2010 dismissal of her Italian academic credentials occurred against a broader background in which Fermilab-affiliated senior figures discounted Plaintiff's scientific legitimacy despite her peer-reviewed experimental research and leadership roles in multi-laboratory collaborations. In or about 2009, while Plaintiff was serving in leadership roles in the U.S. multi-laboratory Very High Field Superconducting Magnet Collaboration, two senior Fermilab-affiliated scientists told Plaintiff, in substance, that she was not doing science and that her articles were not scientific. Plaintiff alleges that this episode is relevant as background to the later denial of scientific-track recognition and the repeated discounting of her Italian/Italian-trained scientific credentials.

119. Plaintiff alleges that this was not an isolated event, but part of a broader pattern in which Defendants and prior Fermilab decisionmakers treated Plaintiff's Italian and Italian-trained scientific credentials as less legitimate than comparable or weaker credentials held by non-Italian or U.S.-trained male comparators.

120. That pattern included the 2009-2010 statements discounting Plaintiff's scientific legitimacy and Italian academic credentials; the 2010 denial of scientific-track reclassification; the 2014–2015 period in which Division Head Padamsee underrecognized Plaintiff's Italian-linked and international scientific work, including her SRF-related technique; the preferential advancement of Posen and Romanenko, who, on information and belief, received Ph.D.s from Cornell under Hasan Padamsee; repeated exclusion of Plaintiff from high-visibility roles, recognition, and DOE-facing opportunities; and the 2024 Associate Laboratory Director selection, in which Plaintiff was bypassed despite superior cross-domain qualifications, experience, publications, citations, and honors.

### Law-Enforcement-Backed RIF, Badge Revocation, and Access Exclusion

121. Public records obtained from the DuPage County Sheriff's Office, attached as **Exhibit F**, show that Fermilab requested and paid for a DuPage County Sheriff's Office security detail for November 12, 2024, the date of the RIF. The FOIA response identifies the November 11–13, 2024 incident as a "security detail" and states that DuPage produced the request for the special detail, invoice, and personnel schedule.

122. The Agreement for Police Services identifies Fermilab as the requesting entity, lists "outside security" as the requested police service, identifies Wilson Hall and Site 38 as the locations, specifies two deputies, and schedules the detail for Tuesday, November 12, 2024, from 9:00 a.m. to 5:30 p.m.

123. The invoice and schedule produced by DuPage County show that Fermilab was billed for a November 2024 "Special Detail with out Squad," totaling 17 hours at $100 per hour, for a total of $1,700, and that two uniformed deputies were scheduled at the Main Building/Wilson Hall from 9:00 a.m. to 5:30 p.m. on November 12, 2024.

124. Public records also show that Fermilab and the DuPage County Sheriff's Office had an MOU in place before the November 12, 2024 RIF. The October 2024 MOU states that the DuPage County Sheriff's Office had authority and jurisdiction to enter Fermilab property, monitored a dedicated Fermilab radio frequency, and provided law-enforcement services including responding to calls for service,

security checks, apprehension and arrest, maintenance of public order, emergency services, and workplace-violence-related support.

125. Public records obtained from the Kane County Sheriff's Office, attached as **Exhibit G**, separately show that, on March 14, 2024, Kane County deputies responded to Fermilab after Fermilab Security requested law-enforcement assistance in removing a terminated contractor/employee who allegedly refused to leave the property. The report states that Fermilab Security had given the individual verbal notice to leave, removed his work ID, sought return of his Fermilab key, and informed him that he was not allowed on Fermilab property. Deputies warned him that he would be arrested and physically removed if he did not leave; when he refused, deputies arrested him for criminal trespass to state-supported land, physically removed him, and transported him to the Kane County Jail. Plaintiff alleges that this incident is relevant because it shows that Fermilab access-control, post-termination removal, property-retrieval, and no-return decisions could be enforced through county law-enforcement authority.

126. Additional Kane County/Fermilab MOU and law-enforcement coordination materials from 2025–2026, attached as **Exhibit H**, further corroborate the ongoing formal nature of Fermilab's law-enforcement coordination arrangements with Kane County concerning Fermilab property, access control, security response, and related enforcement matters.

127. Immediately after Plaintiff's November 12, 2024 termination, FRA revoked Plaintiff's Fermilab badge, site access, computing access, and Fermilab email account, barzi@fnal.gov. That email account was Plaintiff's professional scientific address and was used for communications with collaborators, laboratories, universities, funding-related contacts, conference organizers, and scientific institutions in the United States and internationally. As a result, Plaintiff was cut off from scientific correspondence, collaboration channels, institutional records, professional contacts, calendar information, scientific facilities, colleagues, and ongoing scientific activities connected to her work.

128. FRA implemented the RIF and access revocation in a manner that did not provide Plaintiff and other selected employees a reasonable opportunity to retrieve personal belongings, records, or work-related information from their offices before badge and site access were cut off. Plaintiff asked whether she could return to retrieve her belongings and was informed that she could not do so. On information and belief, property retrieval for selected employees was handled through third parties and/or courier delivery rather than by allowing employees to return personally. These facts support Plaintiff's allegation that the November 2024 RIF was implemented through an abrupt, security-controlled access-exclusion process rather than through an orderly, neutral, and professionally reasonable transition.

129. Between November 2024 and July 2025, Plaintiff repeatedly sought restoration or renewal of Fermilab access, User status, and related electronic/computing access. The process was paused until January 2025 for separated employees, remained under Leadership review, was cancelled and resubmitted, and later remained pending through internal Fermilab affiliation-approval steps. Plaintiff did not receive completion of access/computing-account processing until approximately July 2025.

130. Plaintiff repeatedly notified FRA and FermiForward personnel that the immediate cutoff of her Fermilab email and electronic access impaired ongoing scientific obligations, including graduate-student advising, grant and PI responsibilities, invited review-panel communications, U.S. and international collaborations, access to professional contacts, and access to calendar information. FRA nevertheless responded that Plaintiff could not access her emails because badge and computing access had been removed on her last work day. Plaintiff alleges that the refusal, delay, cancellation, resubmission, and prolonged processing of her User/access requests impaired her ability to continue work through Ohio State University and later through Muons, Inc., where Plaintiff has performed scientific work without salary to date, and are relevant to retaliation, mitigation, continuing harm, successor control, damages, and prospective equitable relief.

131. The immediate cutoff of Plaintiff's Fermilab email also caused harm beyond ordinary workplace inconvenience. Fermilab policy and practice permitted employees to use their Fermilab email addresses for incidental personal and administrative purposes, including accounts connected to benefits, professional memberships, travel, conferences, utilities, banking, and other services. By cutting off Plaintiff's email without advance transition time, FRA impaired Plaintiff's ability to access accounts, receive notices, preserve records, manage professional and administrative obligations, and mitigate the consequences of her termination.

132. Minutes from the November 14, 2024 SAC meeting, attached as **Exhibit E**, further reflect that SAC members questioned why the affected scientists could not immediately receive guest or emeritus status to preserve email and data access. Management initially stated that the new contractor needed to approve guest/emeritus policies and that the matter would need to wait until January 2025. However, the minutes state that SAC members learned that the guest/emeritus policies had been flagged with the transition team and accepted as-is, undermining the asserted reason for delaying access restoration for the separated scientists.

133. On information and belief, by late May and early June 2025, Plaintiff's access request had been approved by the Fermilab point of contact but remained pending

at the Fermilab affiliation-approval step associated with Defendant Posen, the same individual selected over Plaintiff for the 2024 ALD role and involved in the adverse employment sequence alleged herein.

134.   In April–May 2026, Plaintiff again sought renewal of her Fermilab User/access status before expiration. Her Fermilab point of contact approved the request, but the request remained stalled at the affiliation-approval step. Plaintiff is informed and believes, based on communications from her Muons, Inc. contact after inquiry with Campus Access, that Sam Posen in TD was identified as the responsible person for that approval step. Although Fermilab later indicated that the access request had been approved, Plaintiff has been unable to access her Fermilab email account, barzi@fnal.gov, after the purported renewal. Plaintiff alleges that this repeated delay and resulting loss or impairment of email access are relevant to retaliation, continuing harm, mitigation, successor control, access restoration, and prospective equitable relief.

135.   Plaintiff alleges that the DuPage County November 12, 2024 security detail, the October 2024 DuPage MOU, the Kane County March 2024 arrest/removal incident, and Plaintiff's immediate post-termination badge and access revocation support a plausible inference that the November 12, 2024 RIF was implemented in a law-enforcement-backed access-control environment. That environment included no-reentry consequences and the availability of county law-enforcement authority to enforce removal, exclusion, or trespass consequences against selected employees. Plaintiff further alleges that the scope, purpose, instructions, communications, and custodians associated with those access-control and law-enforcement arrangements are within Defendants' possession, custody, or control or obtainable through third-party discovery, and are relevant to state-action allegations, retaliation, post-termination access restrictions, damages, and prospective equitable relief.

136.   Plaintiff alleges, on information and belief, that the involvement of county law-enforcement agencies was not merely incidental background security. FRA arranged and paid for county deputies to be present at Fermilab on the date of the November 12, 2024 RIF, at the same location and during the same time period as the RIF implementation, while simultaneously deactivating access and excluding selected employees from the site. FRA also maintained law-enforcement coordination agreements governing Fermilab property, access control, security responses, removal, apprehension, arrest, public-order issues, workplace-violence concerns, and enforcement on state-supported land. Although Plaintiff was remote when she received notice of termination, FRA subjected her to the same access-exclusion regime as on-site selected employees, including badge deactivation, email and systems cutoff, inability to return to the site, inability to retrieve personal belongings and records personally, and practical risk of trespass or law-enforcement-backed consequences for unauthorized reentry. Plaintiff alleges that

these facts support a plausible inference that the RIF was executed through a coordinated, government-backed access-control and removal framework and are relevant to state action, joint participation, coercive enforcement, chilling of protected speech, causation, and discovery concerning communications, lists, instructions, planning, and directives among FRA, Fermilab security, DOE/contractor personnel, and county law-enforcement personnel before and during the November 2024 RIF.

<u>Senior Scientist Appointment Protections and Scientific RIF Procedures</u>

137.   Plaintiff was appointed and served as a Senior Scientist within Fermilab's scientific-appointment system. Senior Scientist appointments were institutionally distinct from ordinary staff assignments because they reflected long-term scientific appointment status, peer or governance review, and institutional scientific-career expectations.

138.   Fermilab and related institutional materials have historically described scientific-appointment positions as tenure-track-like, tenure-track-equivalent, permanent, or equivalent scientific ranks within the national-laboratory scientific-career structure. Plaintiff alleges that this institutional usage supports her reasonable understanding that Senior Scientist status was part of a scientific-appointment framework materially different from an ordinary staff assignment terminable through an unreviewed, ad hoc RIF process.

139.   Fermilab and related public materials have used tenure, tenure-track, tenure-track-equivalent, permanent scientific appointment, or equivalent-rank language when describing Fermilab scientific appointments. For example, Fermilab fellowship materials have described the Peoples Fellowship as a "tenure-track position" whose holder may become eligible for promotion to a permanent "Scientist" position; URA Early Career Award criteria have identified Associate Scientist and the Wilson and Peoples Fellowships as "Fermilab tenure track equivalent" positions; Fermilab-related job materials have described an Associate Scientist position as a tenure-track position equivalent to Assistant Professor; and Fermilab Distinguished Scholars materials have referred to tenured or tenure-track faculty at a U.S. university or persons holding equivalent rank at a U.S. national laboratory. Public reporting has also referred to a Fermilab Senior Scientist as a "tenured" scientist. Plaintiff alleges that this public and institutional usage supports her reasonable understanding that Fermilab scientific appointments, including Scientist and Senior Scientist appointments, were treated as tenure-like, permanent, or otherwise protected scientific appointments materially different from ordinary at-will staff assignments, and that termination through a RIF required institutional scientific review, uniform criteria, and FCSA-related safeguards rather than unreviewed ad hoc managerial discretion.

140. Plaintiff does not allege that Senior Scientists could never be terminated. Plaintiff alleges that FRA could terminate a Senior Scientist through a RIF only by applying the institutionally recognized scientific-appointment process, including individualized assessment, FCSA review or concurrence, and consistent application of DOE-approved or Prime-Contract-implemented personnel procedures.

141. Fermilab's scientific-appointment framework was reinforced by formal institutional processes, scientific-appointment policies, FCSA review mechanisms, and long-standing institutional practice distinguishing Scientist and Senior Scientist appointments from ordinary employment categories.

142. Plaintiff's reasonable expectation of Senior Scientist appointment protection arose from the total scientific-appointment framework, including Plaintiff's Senior Scientist appointment status, Fermilab's Scientific Appointments Policy, FCSA governance, institutional practice, and FRA's consistent treatment of Senior Scientist appointments as requiring scientific-review protections.

143. The Scientific RIF Termination Procedure was not the sole source of Plaintiff's implied appointment rights. Rather, it was evidence of how Fermilab operationalized the broader Senior Scientist appointment framework. The implied promise arose from the total appointment structure and was accepted by Plaintiff through continued service as a Senior Scientist.

144. The Scientific RIF Termination Procedure required individualized review of a Scientist proposed for RIF, including job function, performance, knowledge, skills, and abilities needed for Fermilab's future mission. It further required review by the Laboratory Director, Workforce Development and Resources Section ("WDRS"), and FCSA and provided that, absent concurrence, an individual Scientist would not be included in the RIF event.

145. On information and belief, and based on Fermilab records available to Plaintiff before or after the November 2024 RIF, the Scientific RIF Termination Procedure was maintained or made available as part of Fermilab's scientific-staff RIF materials, with revision tracking showing "Rev. 0" and an effective date of January 31, 2015. FRA did not notify Plaintiff or other Senior Scientists before the November 2024 RIF that the Scientific RIF Termination Procedure, the Senior Scientist appointment framework, the Scientific Appointments Policy, FCSA governance, or scientific RIF-review protections had been rescinded, superseded, revised, or made inapplicable to Senior Scientist RIF decisions. Plaintiff reasonably understood the Senior Scientist appointment and RIF-review framework to remain part of Fermilab's operative scientific-appointment structure.

146. To the extent FRA contends that the Scientific RIF Termination Procedure or related scientific-staff RIF protections had been withdrawn, rescinded, superseded, or made inapplicable before the November 2024 RIF, Plaintiff alleges that FRA did not provide reasonable notice of any such change to Plaintiff or similarly situated Senior Scientists, did not identify any replacement scientific-staff RIF procedure, and did not explain how the November 2024 Senior Scientist selections complied with the broader Senior Scientist appointment framework, FCSA governance, or DOE-approved personnel practices.

147. On information and belief, on November 11, 2024, the day before the RIF, FRA management met with the FCSA concerning the planned scientific-staff layoffs. During that meeting, the FCSA Secretary objected that the planned RIF violated the scientific-staff RIF policy because the policy required individualized FCSA review and concurrence before a Scientist could be included in a RIF. Management did not provide FCSA with the names of the Scientists proposed for layoff and stated that it was seeking only feedback, not FCSA concurrence. On information and belief, the FCSA members present objected to the planned approach, and management proceeded with the November 12, 2024 RIF without individualized FCSA review.

148. Minutes from a November 14, 2024 Scientific Advisory Council meeting, attached as **Exhibit E**, and attended by SAC members and by Bonnie Fleming, Doug Glenzinski, and Eileen Crowley from the Directorate, further corroborate that the Scientific RIF Termination Procedure was not followed. During that meeting, a SAC member asked why the 2015 scientist-RIF policy, created after prior layoffs, had not been followed. Fleming and Glenzinski responded, in substance, that management considered the policy not in compliance with other procedures or processes, citing confidentiality and equity concerns. When SAC members asked why the policy had never been reviewed or modified if management believed it was noncompliant, management did not provide a substantive explanation. Management further stated that it did not want to change the policy before the RIF because doing so would have alerted employees to the possibility of a RIF.

149. On information and belief, the FCSA Secretary was also selected for the November 12, 2024 RIF. Plaintiff alleges that this fact is relevant to the practical bypass of the FCSA review process, the absence of meaningful individualized scientific review, and pretext.

150. FRA selected Plaintiff for the November 12, 2024 RIF without the required individualized Senior Scientist review, without uniform criteria applied to similarly situated Senior Scientists, without the expected FCSA concurrence process, and without a transparent scientific-review record supporting Plaintiff's selection.

151. FRA's failure to follow the Senior Scientist appointment and RIF framework is relevant to Plaintiff's implied-contract, promissory-estoppel, and public-policy claims and supports pretext, non-uniform treatment, and retaliatory or discriminatory motive.

## DOE Workforce Restructuring Requirements and November 2024 Separation Sequence

152. FRA publicly characterized the November 2024 termination as part of a budget-driven reduction in force. Under the DOE Prime Contract framework and Appendix A / Advance Understandings on Human Resources, contractor workforce reductions were required to follow Contracting Officer-approved policies and applicable DOE workforce-restructuring guidance.

153. Plaintiff alleges, on information and belief, that DOE Prime Contract provisions applicable to FRA required Contracting Officer approval, involvement, or review for corporate or laboratory-wide programs or policies affecting staffing levels or compensation costs, regardless of whether any separate DOE Headquarters workforce-restructuring threshold was triggered. Plaintiff further alleges that DOE workforce-restructuring provisions applicable to FRA may have required notice, approval, documentation, business-case review, adverse-impact or diversity analysis, decisional-unit review, and/or DOE Headquarters involvement for qualifying workforce-reduction actions or programs.

154. Plaintiff alleges, on information and belief, that FRA implemented multiple separation actions during the same budget-restructuring period, including voluntary separation offerings ("VSOs") in 2024 followed by the November 12, 2024 involuntary RIF of 53 employees, including 11 Senior Scientists. Plaintiff is informed and believes that approximately 77 employees participated in an earlier 2024 voluntary separation round and approximately 33 to 35 employees participated in a later 2024 voluntary separation round, making the cumulative 2024 budget-driven separation sequence substantially larger than the November 2024 involuntary RIF alone. Plaintiff alleges that the VSO/RIF sequence is relevant to whether FRA treated related workforce-reduction measures separately to avoid, minimize, or obscure cumulative workforce-restructuring impact, DOE or Contracting Officer review, adverse-impact analysis, decisional-unit analysis, and workforce-composition review.

155. Plaintiff further alleges, on information and belief, that FRA's 2024 workforce-reduction sequence may have implicated DOE and Contracting Officer workforce-restructuring review requirements or expectations, including review of reductions approaching or exceeding applicable thresholds, adverse-impact or diversity analysis, workforce-composition review, decisional-unit review, and

documentation of business justification. Plaintiff alleges that the earlier voluntary separation offering, later voluntary separation offering, and November 12, 2024 involuntary RIF arose from the same asserted budget conditions, workforce-restructuring rationale, and contractor-transition period, and therefore are relevant to whether FRA segmented related reduction measures in a manner that avoided, minimized, delayed, or obscured cumulative DOE oversight, Contracting Officer review, adverse-impact analysis, and compliance review. Plaintiff pleads these facts as evidence of procedural irregularity, non-neutral selection, pretext, public-policy concern, and retaliatory motive, and not as an independent private enforcement action under the DOE Prime Contract.

156. Plaintiff is further informed and believes that additional voluntary separation measures occurred in 2025 after the FermiForward transition, involving approximately 50 additional volunteers. Plaintiff alleges that those later measures are relevant only to continuity of budget rationale, workforce planning, successor control, staffing needs, prospective equitable relief, and discovery concerning whether the November 2024 RIF reflected genuine elimination of Plaintiff's work or a pretextual selection decision.

157. Plaintiff alleges that FRA used non-transparent and non-uniform selection mechanisms for Senior Scientists, bypassed the scientific-appointment review structure, and failed to provide an objective individualized explanation for selecting Plaintiff rather than other similarly situated Senior Scientists.

158. Plaintiff is informed and believes that several other Senior Scientists selected in the November 2024 RIF filed administrative charges with the EEOC concerning, among other things, the lack of meaningful disclosure of RIF eligibility factors, selection criteria, decisional-unit information, and OWBPA-related materials. Plaintiff alleges that this is relevant not as a separate claim on behalf of other employees, but as circumstantial evidence that FRA's asserted "objective" RIF process lacked transparency, did not provide affected Senior Scientists with meaningful notice of the criteria used, and may have functioned as a post hoc or non-uniform justification for selections already made.

159. These deviations and related objections are material because they support a plausible inference that the RIF was not a neutral budget action, but a procedurally irregular mechanism for discrimination and retaliation and a departure from Prime Contract, scientific-appointment, and public-policy safeguards. FRA's failure to disclose or meaningfully apply eligibility factors, objective criteria, decisional-unit information, and Senior Scientist review procedures further supports an inference of pretext and deprived Plaintiff of the institutional safeguards, transparency, and individualized review associated with her Senior Scientist appointment.

160. Plaintiff further alleges that the unusual use of a RIF to terminate appointed scientific staff, including Senior Scientists, without meaningful FCSA review, individualized scientific assessment, transparent criteria, or a neutral scientific-review record supports Plaintiff's allegations of procedural irregularity, unreasonable departure from institutional practice, pretext, non-neutral selection, and retaliatory or discriminatory motive. Plaintiff pleads these facts as relevant to the implied-contract, promissory-estoppel, discrimination, retaliation, and public-policy theories alleged herein, and not as an independent claim to enforce the DOE Prime Contract.

## COUNT I: SEX DISCRIMINATION IN VIOLATION OF TITLE VII AND THE IHRA
(Against Defendant Fermi Research Alliance, LLC)

161. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

162. Title VII and the IHRA prohibit discrimination based on sex.

163. As set out in the Factual Allegations, FRA—acting through its officers and managers—denied Plaintiff promotions, recognition, leadership opportunities, and fair evaluation, and ultimately selected her for termination because of sex. See ¶¶ 29–31, 35–37, 47–51, 53–55, 66–68, 71–74, 79, 81, 90. These practices materially and foreseeably impaired Plaintiff's advancement and culminated in her discharge.

164. Similarly situated male colleagues were treated more favorably than Plaintiff, including:
a. In 2024, for the Associate Laboratory Director role, selection of Sam Posen (male, substantially younger) over Plaintiff despite Plaintiff's superior cross-domain qualifications (see ¶¶ 67–68).
b. In 2020, for senior technical leadership roles (including Chief Technology Officer and head of the Applied Physics/Superconducting Technology Division), selection of Alexander Romanenko (substantially younger male) over Plaintiff despite her superior qualifications (see ¶ 53).

165. Defendant FRA's conduct constitutes unlawful sex discrimination in violation of Title VII and the IHRA.

166. As a direct and proximate result, Plaintiff suffered pecuniary and non-pecuniary damages and seeks all available legal and equitable relief, including back pay, front pay or reinstatement, compensatory damages, and—where

permitted by law (e.g., under Title VII)—punitive damages, together with attorneys' fees and costs.

## COUNT II: SEXUAL HARASSMENT AND HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII AND THE IHRA
(Against Defendant Fermi Research Alliance, LLC)

167. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

168. Title VII and the IHRA prohibit sex-based harassment that is sufficiently severe or pervasive to alter the terms and conditions of employment.

169. As set out in the Factual Allegations, Plaintiff—a woman—was subjected to a decades-long pattern of sex-based misconduct and gender denigration, beginning in the late 1990s and continuing through 2024, including unwelcome sexual advances/assaults and, later, public belittlement, exclusion, gender-based defamation, and attacks on her scientific legitimacy that culminated in discipline and termination. See ¶¶ 31–34 (early sexual misconduct contributing to a hostile environment); ¶¶ 47–51 and 95–99 (Velev's derision, campaigns to undermine Plaintiff, gender-based defamation, and stigmatizing attacks on Plaintiff's credibility and professional legitimacy); ¶¶ 73–79 (demeaning conduct in recorded sessions and use of those incidents as a disciplinary pretext). Consistent with ¶28, earlier incidents are pleaded as background and as part of a continuing hostile work environment.

170. Beyond overt misconduct, the hostile environment included marginalization from leadership meetings, interference with recognition/authorship, exclusion from key opportunities, manipulation/downgrading of performance evaluations, and weaponization of HR processes (retaliatory HR complaints, "ambush" meetings, and pretextual discipline) because of sex. See, e.g., ¶¶ 42, 49–50, 54–55, 64, 66, 71, 74–80, 90.

171. The misconduct was not isolated; it formed a continuing pattern over multiple years, intensified after Plaintiff raised concerns, and was condoned or ignored by senior leadership despite repeated complaints.

172. The conduct was severe or pervasive, created an intimidating, hostile, and offensive work environment that unreasonably interfered with Plaintiff's work, and culminated in tangible employment actions, including the September 10, 2024 Final Written Warning and the November 12, 2024 termination. See ¶¶ 79, 81.

173. FRA had actual or constructive notice long before termination. Plaintiff repeatedly reported harassment and exclusion to management, HR, and counsel (2018–2019), renewed complaints in 2023–2024, and specifically complained on August 9, 2024. See ¶¶ 52, 59–61, 65–66, 72, 76–77.

174. Despite notice and opportunity to act, FRA failed to take prompt and effective remedial measures; instead, decisionmakers escalated hostile measures, used contested incidents as pretext for discipline, and proceeded to termination. See ¶¶ 74–81, 90–93, 95–102.

175. FRA is vicariously liable for supervisor harassment that culminated in tangible employment actions and otherwise liable for failing to prevent and promptly correct the hostile environment.

176. Defendant FRA's conduct violated Title VII and the IHRA and materially impaired Plaintiff's career progression.

177. As a direct and proximate result, Plaintiff suffered pecuniary and non-pecuniary damages and seeks all available legal and equitable relief, including back pay, front pay or reinstatement, compensatory damages, and—where permitted by law (e.g., under Title VII)—punitive damages, together with attorneys' fees and costs; FRA's conduct was willful and/or in reckless indifference to Plaintiff's rights.

*Note: Count III is intentionally omitted to preserve the count numbering used in prior pleadings and the Court's May 1, 2026 Memorandum Opinion and Order.*

## COUNT IV: AGE DISCRIMINATION
## IN VIOLATION OF THE ADEA AND THE IHRA
(Against Defendant Fermi Research Alliance, LLC)

178. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

179. The Age Discrimination in Employment Act ("ADEA") and the Illinois Human Rights Act ("IHRA") prohibit discrimination because of age.

180. At all relevant times since 2008, Plaintiff was over the age of 40 and thus within the ADEA/IHRA protected class.

181. Plaintiff met or exceeded FRA's legitimate performance expectations and was qualified for promotion, advancement, continued employment, and retention. See ¶¶27, 64, 90.

182. No later than 2020, FRA, acting through its officers, managers, and agents, consistently favored substantially younger employees for promotions and recognition, while repeatedly denying Plaintiff advancement despite superior credentials and experience. See, e.g., ¶¶53 (2020 selection of Romanenko), 67–68 (2024 selection of Posen).

183. In 2020, when Plaintiff was 52, she was passed over for the Technical Division Head role in favor of Romanenko, who was significantly younger and less experienced. See ¶53.

184. In June 2024, at age 56, Plaintiff was again bypassed for Associate Lab Director in favor of Posen (then under 40), despite Plaintiff's superior cross-domain qualifications. See ¶¶67–68.

185. On November 12, 2024, Plaintiff was terminated in the announced laboratory-wide Reduction in Force ("RIF"). Plaintiff was an older Senior Scientist selected for termination while substantially younger employees in comparable scientific or technical roles were retained, on information and belief. See ¶¶81, 83–83D.

186. FRA's proffered reasons were pretextual, including:
a. Manipulated 2024 performance scores despite positive direct-supervisor assessments (¶90);
b. Deviation from required procedures, including lack of FCSA/Senior Scientist review, disclosed objective criteria, transparent selection matrix, or uniform scoring at termination. See ¶¶81, 143–150;
c. Inconsistent application of RIF criteria and age-skewed selection of older Senior Scientists, with retention of substantially younger Senior Scientists. See ¶¶83–83D; and
d. Concentration of decision-making among the same Decisionmakers who had authority over Plaintiff's advancement and separation. See ¶¶92–93.

187. The age profile of the RIF further supports an inference of age discrimination, pretext, non-neutral selection, and willfulness. As alleged above, all eleven selected Senior Scientists in the affected divisions for whom Plaintiff has age information were over age 50, and the selected Senior Scientists had an average age of approximately 66, compared with approximately 59 for non-selected Senior Scientists in those same affected divisions. Senior Scientists over age 50, age 60 or older, and especially age 65 or older, were selected at materially higher rates than younger Senior Scientists in the same affected divisions. See ¶83D.

188. Under the ADEA, Plaintiff pleads that but for her age she would not have been denied the promotions above and would not have been selected for termination; under the IHRA, age was at least a motivating factor.

189. Defendant FRA's conduct constitutes unlawful intentional age discrimination in violation of the ADEA and IHRA.

190. As a direct and proximate result, Plaintiff suffered pecuniary losses and, under the IHRA, non-pecuniary harms. Plaintiff seeks all available legal and equitable relief, including back pay; reinstatement or front pay; attorneys' fees and costs where authorized; liquidated damages under the ADEA for willful violations where available; all make-whole relief available under the IHRA; and pre- and post-judgment interest as permitted by law.

## COUNT V: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA, THE REHABILITATION ACT, AND THE IHRA
(Against Defendant Fermi Research Alliance, LLC)

191. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

192. The Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("§ 504"), and the Illinois Human Rights Act ("IHRA") prohibit discrimination because of disability and require reasonable accommodations for qualified individuals.

193. FRA operates Fermilab under contract with the U.S. Department of Energy and, on information and belief, received federal financial assistance and/or operated programs or activities funded by DOE, bringing it within § 504's scope.

194. Plaintiff was diagnosed with Post-Traumatic Stress Disorder ("PTSD") in November 2019, arising from cumulative workplace trauma.

195. PTSD is a disability under the ADA, § 504, and the IHRA; Plaintiff also had a record of such impairment or was regarded as disabled.

196. Plaintiff's PTSD substantially limited major life activities (including sleeping, concentrating, thinking, and working), with symptoms including:
a. Intrusive recollections/nightmares with autonomic hyperarousal;
b. Avoidance of people/places associated with trauma;
c. Hyper-vigilance, exaggerated startle response, irritability, and chronic sleep disturbance.

197. Plaintiff disclosed this diagnosis to HR and requested confidentiality. On information and belief, managers nevertheless discussed or disclosed Plaintiff's PTSD without consent and without a legitimate need to know, including to Prof. Bellettini and supervisor Feher (¶62), contrary to the ADA's medical-information

confidentiality provisions. See 42 U.S.C. § 12112(d). These disclosures contributed to a stigmatizing disability-related narrative that Plaintiff was unstable, unreliable, disruptive, dishonest, or not credible. See ¶¶98–102.

198. In September 2023 Plaintiff requested a reasonable accommodation—continuation of remote work common among similarly situated scientists. HR demanded a "current provider" form and declined to approve the request despite a September 19, 2023 note from her former provider; one year later, in September 2024, HR belatedly accepted that same note and allowed WFH. FRA failed to engage in a good-faith interactive process, and the last-minute allowance did not cure the preceding failure to accommodate. See ¶63.

199. Plaintiff was a qualified individual who could perform the essential functions of her position with or without accommodation. Her direct supervisor rated her positively, but upper management overrode those evaluations and imposed the lowest rating ("1"), which was later invoked toward termination. See ¶¶64, 90.

200. Adverse actions followed Plaintiff's disability disclosure, accommodation request, and disability-related stigmatization, including denial or delay of accommodation, exclusion from leadership and DOE-facing opportunities, the August 2024 HR process, the September 10, 2024 Final Written Warning, the downgraded 2024 performance evaluation, access/security escalation, and termination on November 12, 2024. See ¶¶79–81, 90, 98–102.

201. FRA's adverse actions were causally connected to Plaintiff's disability because HR and management knew of Plaintiff's PTSD, medical-confidentiality concerns, and accommodation requests. After that knowledge, management, HR, OGC, Occupational Medical, Security, and related cross-functional channels participated in, reinforced, or relied upon a negative narrative portraying Plaintiff as disruptive, unstable, unreliable, dishonest, not credible, or professionally unsafe. That disability-tainted narrative was used in the August 2024 HR process, the September 10, 2024 Final Written Warning, the downgraded 2024 performance evaluation, access/security escalation, and the November 2024 RIF selection. Plaintiff alleges that this narrative materially affected her leadership opportunities, discipline, performance evaluation, access treatment, and termination.

202. The September 10, 2024 LITWG agenda, attached as **Exhibit I** and described in ¶100, further supports Plaintiff's allegations that FRA used cross-functional Occupational Medical, OGC, Security, Communications, Emergency Management, and related channels during the same period in which Plaintiff was subjected to disability-related stigma, discipline, downgraded evaluation, termination, and access restrictions. Plaintiff does not allege at this stage that the

LITWG agenda alone proves that Plaintiff's medical information was discussed by name. Rather, Plaintiff pleads the agenda as relevant context supporting a plausible inference and warranting discovery into whether medicalized, behavioral, security, communications, HR, OGC, and termination-related narratives were coordinated or used in connection with the adverse actions taken against Plaintiff.

203. Plaintiff's disability, record of disability, perceived disability, and/or accommodation requests caused or materially contributed to the adverse actions alleged, including the denial or delay of accommodation, downgraded evaluation, exclusion from opportunities, access/security escalation, and termination. Plaintiff alleges causation under the ADA, § 504, and the IHRA to the extent required by each statute, including but-for causation where applicable and motivating-factor causation where permitted.

204. FRA's conduct—including improper medical disclosure, failure to accommodate, failure to engage in the interactive process, exclusion from professional activities, and termination — violated the ADA, § 504 (applying ADA standards, 29 U.S.C. § 794(d)), and the IHRA.

205. The disclosure of medical information, refusal or delay of accommodation, disability-tainted discipline and evaluation, and exclusion from opportunities materially and foreseeably impaired Plaintiff's advancement, promotion prospects, professional standing, and continued employment.

206. As a direct and proximate result, Plaintiff suffered pecuniary losses and, under the ADA and the IHRA, non-pecuniary harms. She seeks all available legal and equitable relief, including reinstatement or front pay; back pay; reasonable accommodation if reinstated; injunctive and declaratory relief; compensatory damages; attorneys' fees and costs; and pre- and post-judgment interest as permitted by law. Non-pecuniary damages are not sought under § 504. Punitive damages are sought under the ADA only, subject to applicable statutory caps, and are not sought under § 504 or the IHRA.

<u>COUNT VI: RETALIATION IN VIOLATION</u>
<u>OF TITLE VII, THE ADA, THE ADEA, AND THE IHRA</u>
(Against Defendant Fermi Research Alliance, LLC)

207. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

208. Title VII, the ADA, the ADEA, and the IHRA prohibit retaliation for protected activity, including opposing discrimination or retaliation, filing administrative

charges, requesting reasonable accommodation, and complaining about unlawful workplace practices. The ADA also prohibits interference with rights protected by the statute.

209. Plaintiff engaged in protected activity repeatedly, including: her 2016 gender-equity analysis concerning systemic sex disparities (¶47); 2018–2019 internal complaints to management, HR, and counsel concerning bullying, discrimination, harassment, and retaliation (¶52); the November 7, 2021 EEOC charge (¶¶16–17); her October 2022 arXiv publication addressing workplace discrimination and barriers in physics (¶58); her September 2023 ADA accommodation request and medical-confidentiality concerns (¶¶62–63); 2023 internal critiques and meetings with leadership concerning discrimination, harassment, reporting failures, workplace culture, and retaliation (¶¶59–61); the November 2023 think-tank activity to the extent it opposed discriminatory, retaliatory, and inequitable management practices (¶65); her July 31, 2024 objections regarding discriminatory leadership selection and exclusion from DOE-facing opportunities (¶72); her July–August 2024 disclosures and objections concerning discrimination and retaliation to DOE or federal officials to the extent they opposed unlawful employment practices (¶¶103–113); and her August 9, 2024 written objection and request for intervention regarding ongoing harassment, discrimination, and retaliation (¶76). Plaintiff also engaged in protected activity by pursuing administrative civil-rights remedies and by filing and prosecuting this federal action.

210. By late November 2023, the Decisionmakers in ¶92 had been briefed on Plaintiff's protected activity, as alleged in ¶93, and FRA had additional notice through HR/GC channels, including receipt and tracking of Plaintiff's November 7, 2021 EEOC charge (¶16), as well as the items cited at ¶¶52, 65, 72, 76–77, and 95–102. At a minimum, FRA had general corporate knowledge of Plaintiff's protected activity by virtue of HR/GC's receipt of the EEOC Notice (¶16), HR/GC's direct involvement in accommodation, disciplinary, evaluation, and RIF processes, and HR/GC or cross-functional monitoring and escalation channels. See also ¶100. Under agency and cat's-paw principles, HR/GC knowledge, retaliatory animus or adverse input, to the extent relied upon by decisionmakers, supports causation for the adverse actions alleged.

211. After that notice, managers escalated adverse measures: blocking talks and leadership opportunities (¶¶66, 71); convening an HR "ambush" meeting in August 2024 (¶¶75–77); issuing a pretextual Final Written Warning on September 10, 2024 (¶79); attempting to characterize Plaintiff as having resigned (¶80); downgrading Plaintiff's 2024 performance evaluation (¶90); and selecting Plaintiff for termination in the November 12, 2024 RIF (¶81).

212. FRA's post-termination access restrictions and interference with Plaintiff's scientific work in 2025 and 2026 constituted discrete retaliatory acts and materially adverse post-termination retaliation, not merely background. After Plaintiff engaged in protected activity, including administrative charges, whistleblower disclosures, and later this federal action, FRA and its agents delayed, restricted, obstructed, or failed to restore Plaintiff's badge, email, computing, User, site, records, property, collaboration, authorship, grant-related, and/or scientific-work access, including in connection with Plaintiff's ability to continue or complete DOE-related scientific work, communicate through normal Fermilab channels, maintain professional collaborations, and preserve grant-related leadership or recognition. These actions would dissuade a reasonable person from making or supporting protected complaints and are pleaded as independent retaliatory acts, evidence of retaliatory intent, and a basis for appropriate injunctive and make-whole relief, without double recovery. See ¶¶127–136.

213. The temporal proximity and clear escalation from late 2023 through September–November 2024—together with deviations from procedure, including lack of required FCSA review at termination (¶¶81, 143–150), manipulated evaluations (¶90), disability-tainted or retaliatory HR narratives (¶¶98–102), and reliance on disputed allegations (¶79)—support a strong inference of causation. The 2025–2026 post-termination access restrictions and interference with Plaintiff's scientific work further support causation, retaliatory intent, and the need for injunctive and make-whole relief. Under Title VII, the ADA, and the ADEA, Plaintiff pleads but-for causation; under the IHRA, protected activity was at least a motivating factor.

214. FRA's conduct constitutes unlawful retaliation in violation of Title VII, the ADA (including 42 U.S.C. § 12203(a) retaliation and § 12203(b) interference), the ADEA, and the IHRA.

215. As a direct and proximate result, Plaintiff suffered pecuniary and non-pecuniary damages and seeks all available legal and equitable relief, including back pay, front pay or reinstatement, compensatory damages, liquidated damages under the ADEA for willful violations, and—where permitted by law (e.g., under Title VII)—punitive damages, together with attorneys' fees and costs.

<u>**COUNT VII: AIDING AND ABETTING DISCRIMINATION**</u>
<u>**AND RETALIATION IN VIOLATION OF THE IHRA**</u>
(Against Defendants Merminga, Fleming, Posen, Gourlay, Velev, and
Fancsali in their individual capacities)

216. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

217. The Illinois Human Rights Act ("IHRA") makes it a civil-rights violation for any person to aid, abet, compel, or coerce the commission of any act prohibited by the IHRA, including discrimination, harassment, failure to accommodate, and retaliation. 775 ILCS 5/6-101.

218. Plaintiff has exhausted, or timely opted out of, the administrative proceedings applicable to this claim. Plaintiff submitted additional IDHR charges naming FRA and Defendants Merminga, Fleming, Posen, Gourlay, Velev, and Fancsali as respondents, and timely opted out of the IDHR process as to those charges. Plaintiff pleads this Count in light of the Court's prior dismissal without prejudice for lack of administrative exhaustion and alleges that the defect has now been cured by the additional IDHR charges and opt-out notices. The corresponding opt-out notices are attached as **Exhibit D**.

219. Count VII is derivative of the underlying IHRA violations alleged in Counts I, II, IV, V, and VI and does not require that each Individual Defendant personally committed every underlying IHRA violation or made the final employment decision. Plaintiff alleges that FRA committed the underlying IHRA violations through its officers, managers, supervisors, HR/legal personnel, and agents, and that each Individual Defendant named in this Count knowingly facilitated, encouraged, ratified, escalated, implemented, concealed, or substantially assisted one or more aspects of FRA's discriminatory, hostile-environment, disability-related, and/or retaliatory conduct. See ¶¶52, 59–61, 65–66, 72, 76–77, 79, 81, 90, 92–93, 95–102.

220. Each Individual Defendant named below knew, or was generally aware, that his or her conduct was part of an overall pattern of discriminatory, hostile, disability-related, or retaliatory activity. Each knowingly provided substantial assistance, encouragement, ratification, implementation, escalation, concealment, or support, including by failing to take reasonable corrective action despite having authority, influence, access, or responsibility to do so, thereby enabling or perpetuating FRA's underlying IHRA violations.

221. The underlying IHRA violations include, among other things, the denial of promotion to Associate Laboratory Director in June 2024, exclusion from

leadership and DOE-facing opportunities, retaliatory HR proceedings in August 2024, the September 10, 2024 Final Written Warning, the attempted characterization of Plaintiff as having resigned, manipulation or ratification of Plaintiff's performance evaluation, Plaintiff's selection for termination in the November 12, 2024 RIF, and post-termination access restrictions. See ¶¶58–60, 65–66, 69–70, 72, 76–79, 81, 90, 127–136.

222.   Defendant Merminga aided and abetted FRA's IHRA violations by using, and failing to use, her authority as Laboratory Director after receiving repeated notice of Plaintiff's discrimination, harassment, retaliation, and workplace-culture complaints. Plaintiff raised concerns to Merminga in 2023–2024, including Plaintiff's July 31, 2024 objections to the ALD selection and exclusion from DOE reviews and Plaintiff's August 9, 2024 written complaint requesting intervention. After Fancsali identified Plaintiff by name to Senior Leadership in connection with the think-tank activity, Merminga, on information and belief, expressed displeasure and discouraged participation. Despite notice and authority to intervene, Merminga failed to investigate, stop, or correct the discriminatory, hostile, disability-related, and retaliatory course of conduct, and, on information and belief, knowingly approved, permitted, or ratified adverse actions including the ALD selection outcome, the August 2024 HR process, the September 10, 2024 Final Written Warning, the attempted resignation characterization, and the November 12, 2024 RIF selection, thereby substantially assisting or enabling FRA's IHRA violations.

223.   Defendant Fleming aided and abetted FRA's IHRA violations by using, permitting, or failing to correct the use of her Deputy Director authority to block Plaintiff's scientific visibility, leadership opportunities, and DOE-facing role after Plaintiff raised discrimination, harassment, safety, workplace-culture, and reporting-process concerns. Fleming received Plaintiff's March 2023 written critique of Fermilab's misconduct-reporting process, met with Plaintiff in April 2023 after Plaintiff disclosed authorship of the APS News editorial, declined to consider Plaintiff for interim leadership, and later blocked, approved, or ratified the blocking of Plaintiff's invited talks and DOE-facing opportunities, including the January–February 2024 invited presentation at the 37th Rencontres de Physique de la Vallée d'Aoste. Despite notice of Plaintiff's protected activity and authority to prevent or correct retaliatory exclusion, Fleming knowingly facilitated, encouraged, ratified, or substantially assisted FRA's discriminatory and retaliatory conduct by allowing Plaintiff's exclusion from leadership, visibility, and DOE-facing opportunities to continue.

224.   Defendant Posen aided and abetted FRA's IHRA violations by participating in, supporting, ratifying, or substantially assisting adverse actions against Plaintiff after he knew or reasonably understood that Plaintiff had opposed discriminatory

and retaliatory treatment, including unfair leadership exclusion and retaliation. After being selected over Plaintiff as Associate Laboratory Director despite Plaintiff's superior qualifications, Posen used, or permitted the use of, his scientific-management authority to impair Plaintiff's work, authorship, visibility, leadership opportunities, evaluation, post-termination access, collaborations, grant-related activities, and professional recognition. This included, on information and belief, participation in or support for exclusion from meetings and authorship, retaliatory HR complaints, opposition to Plaintiff's objections concerning unfair treatment, the downgraded evaluation, the November 12, 2024 RIF selection, and post-termination access restrictions affecting Plaintiff's scientific work.

225. Defendant Gourlay aided and abetted FRA's IHRA violations by using his supervisory and Division Head authority to exclude Plaintiff from DOE-facing scientific opportunities, initiate or participate in discipline, influence or ratify her downgraded performance evaluation, support or participate in her RIF selection, and attempt to transfer her grant leadership and professional recognition after termination. Although Plaintiff was U.S. Principal Investigator on the U.S.–Japan grant, Gourlay excluded her from the August 2024 DOE review, participated in the August 13, 2024 HR meeting, issued or participated in the September 10, 2024 Final Written Warning based on disputed allegations, and after termination sought to replace Plaintiff as U.S. Principal Investigator and transfer recognition for her prior results. On information and belief, Gourlay knew or reasonably understood that Plaintiff had engaged in protected activity and opposed discriminatory and retaliatory treatment, including exclusion from DOE-facing opportunities. Through these acts and omissions, Gourlay knowingly implemented, encouraged, ratified, or substantially assisted FRA's discriminatory and retaliatory conduct.

226. Defendant Velev aided and abetted FRA's IHRA violations by engaging in and contributing to a continuing campaign of harassment, defamation, professional isolation, and disparagement of Plaintiff's credibility, qualifications, mental health, and scientific legitimacy. Velev contributed to false accusations of plagiarism and dishonesty, attacks on Plaintiff's professional integrity, disability-stigmatizing narratives, and gender-based defamatory statements implying that Plaintiff advanced through sexual relationships rather than scientific merit. Within the limitations period, Velev publicly demeaned Plaintiff during the August 5, 2024 recorded internal practice session and, on information and belief, supplied, influenced, reinforced, or supported internal evaluations, feedback, narratives, or selection-related input that contributed to Plaintiff's exclusion, discipline, downgraded evaluation, and termination. Through these acts and omissions, Velev knowingly encouraged, reinforced, supplied adverse input for, or

substantially assisted FRA's discriminatory, hostile-environment, disability-related, and retaliatory conduct.

227. Defendant Fancsali aided and abetted FRA's IHRA violations by using, permitting, or failing to correct the use of FRA's legal, HR, and cross-functional channels to identify, escalate, and ratify adverse action against Plaintiff after Plaintiff engaged in protected opposition. Fancsali had notice of Plaintiff's discrimination, harassment, and retaliation complaints, including from her 2019 OGC role and later legal/HR involvement. In late November 2023, after employees forwarded or reported Plaintiff's think-tank communications to OGC, Fancsali identified Plaintiff by name to Senior Leadership. The September 10, 2024 LITWG agenda, attached as **Exhibit I** and described in ¶100, listed Fancsali among participants in a cross-functional structure involving OGC, HR, Security, Communications, Occupational Medical, and related topics. Plaintiff does not allege that the LITWG agenda alone proves that Plaintiff was discussed by name; rather, Plaintiff alleges that it supports a plausible inference of Fancsali's involvement in cross-functional legal, HR, security/access-control, communications, and medicalized escalation channels during the same period in which Plaintiff was subjected to discipline, attempted resignation characterization, downgraded evaluation, RIF selection, and access restrictions. On information and belief, Fancsali's legal, HR, and cross-functional involvement contributed to the institutional response against Plaintiff, including the August 2024 HR process, Final Written Warning, attempted resignation characterization, downgraded evaluation, RIF selection, and post-termination access restrictions. Through these acts and omissions, Fancsali knowingly facilitated, escalated, ratified, or substantially assisted FRA's discriminatory, hostile-environment, disability-related, and retaliatory conduct.

228. Allegations regarding other senior leaders or managers, including but not limited to Belomestnykh, are pleaded as background evidence of pattern, intent, notice, and retaliatory context (see ¶¶50, 52, 54), and are not asserted in this Count as a basis for individual liability under IHRA § 6-101.

229. As alleged above, the Individual Defendants' conduct was not merely passive, ministerial, or based only on job title. Each Individual Defendant used his or her authority, role, influence, or access to FRA's legal, HR, supervisory, scientific-management, security/access-control, or leadership channels to assist, encourage, ratify, implement, escalate, conceal, or fail to take reasonable corrective action to prevent discriminatory, hostile-environment, disability-related, and retaliatory conduct prohibited by the IHRA. See ¶¶58–60, 65–66, 71–81, 90, 93, 95–102, 127–136.

230. As a direct and proximate result of the Individual Defendants' aiding and abetting, Plaintiff suffered loss of advancement, loss of compensation, loss of professional opportunities, reputational injury, emotional distress, termination, and other pecuniary and non-pecuniary damages.

231. Plaintiff seeks all relief available under the IHRA, including compensatory damages, equitable relief, reinstatement or front pay, back pay, expungement of unlawful discipline, costs, reasonable attorneys' fees where permitted, and any other relief the Court deems just and proper.

## COUNT VIII: RETALIATION IN VIOLATION OF THE ILLINOIS WHISTLEBLOWER ACT
(Against Defendant Fermi Research Alliance, LLC)

232. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

233. The Illinois Whistleblower Act ("IWA") prohibits an employer from taking retaliatory action against an employee who, in good faith, discloses information to a public body about violations of law or substantial and specific dangers to public health or safety, and also protects disclosures to a supervisor or other employee with authority to investigate, discover, or correct violations. 740 ILCS 174/15; 174/20.1.

234. Plaintiff made protected disclosures to public bodies, government agencies, federal officials, and supervisors or officials with authority to investigate or correct violations, including but not limited to: (i) her November 7, 2021 EEOC charge (¶¶16–17); (ii) her disclosures to DOE officials, the DOE Office of Science, DOE oversight personnel, and federal officials concerning misuse of federal funds, safety concerns, discriminatory and retaliatory personnel practices, and institutional noncompliance at Fermilab (¶¶103–113); (iii) her June 4, 2024 complaint to the DOE Office of Inspector General concerning hiring irregularities, discrimination, and retaliation (¶106); (iv) her June and July 2024 pre-publication disclosures and related communications to DOE Office of Science officials concerning the substance of the whistleblower report (¶¶107–110); and (v) her August 9, 2024 written complaint to the Lab Director requesting intervention (¶76). DOE, DOE OIG, and DOE Office of Science are federal governmental entities and/or public bodies for purposes of Plaintiff's IWA disclosures.

235. Plaintiff's protected disclosures under the IWA include not only her November 7, 2021 EEOC charge and the July 2024 arXiv posting, but also her pre-publication and related disclosures to DOE officials, DOE oversight personnel, DOE OIG,

DOE Office of Science officials, and federal officials concerning suspected violations of law, safety obligations, misuse of federal funds, retaliation, discriminatory personnel practices, and noncompliance in DOE-funded operations. The July 2024 arXiv posting is pleaded not as the sole protected disclosure, but as evidence of the substance, timing, public concern, and retaliatory context of the disclosures Plaintiff had already made or attempted to make to appropriate public, federal, DOE-affiliated, or governmental authorities.

236. FRA had notice of Plaintiff's protected disclosures and protected opposition. FRA's HR and General Counsel offices received and tracked the 2021 EEOC charge. In November 2023, Plaintiff circulated a think-tank recruiting email to employees concerning cronyism, safety concerns, financial waste, and institutional noncompliance at Fermilab; some employees forwarded or reported that email to the Office of General Counsel. Interim/Deputy General Counsel Fancsali then identified Plaintiff by name to Senior Leadership in late November 2023 in connection with that activity. As alleged in ¶93, by late November 2023 the Decisionmakers knew of Plaintiff's protected activities, and after July 2024 they were aware of the July 2024 whistleblower report. As alleged in ¶113, Defendants also knew or reasonably inferred that Plaintiff had made, was making, or intended to continue making disclosures to DOE officials, DOE oversight personnel, and federal officials concerning discrimination, retaliation, misuse of federal funds, safety concerns, and institutional noncompliance at Fermilab.

237. Following Plaintiff's protected disclosures— and continuing thereafter — FRA escalated adverse measures, including: (a) removing Plaintiff from leadership and DOE-facing opportunities and blocking invited talks (¶¶66, 71); (b) convening an HR "ambush" meeting in August 2024 (¶¶75–77); (c) issuing a pretextual Final Written Warning on September 10, 2024 (¶79); (d) attempting to characterize her as having resigned on September 10, 2024 (¶80); (e) downgrading her 2024 performance evaluation (¶90); (f) selecting Plaintiff for termination in the November 12, 2024 RIF (¶81); and (g) revoking and delaying restoration of badge, email, computing, User, and site access (¶¶89, 127–136). These actions constitute "retaliatory action" within the meaning of 740 ILCS 174/5.

238. The close temporal proximity and pattern of escalation following Plaintiff's protected disclosures—together with procedural deviations, including lack of required FCSA review and scientific-staff RIF procedures (¶¶143–150), reliance on disputed allegations (¶79), the downgraded 2024 performance evaluation (¶90), law-enforcement-backed access exclusion and delayed access restoration (¶¶121–136), and the redistribution of Plaintiff's work after termination (¶82)—support a strong inference of causation under the IWA.

239.     FRA's conduct violates the IWA, including 740 ILCS 174/15 and 174/20.1, and materially impaired Plaintiff's advancement, visibility in DOE-facing activities, professional reputation, and ability to continue her scientific work.

240.     As a direct and proximate result, Plaintiff suffered pecuniary and non-pecuniary damages and seeks all relief necessary to make her whole under the IWA, including injunctive and declaratory relief, reinstatement or front pay, back pay, restoration of seniority and benefits, expungement of unlawful discipline, and an award of costs and reasonable attorneys' fees.

## COUNT IX: FIRST AMENDMENT RETALIATION AND EQUAL PROTECTION VIOLATIONS UNDER 42 U.S.C. § 1983
(Against Defendants Merminga, Fleming, Posen, Gourlay, Velev, and Fancsali in their individual capacities)

241.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

242.     Plaintiff had and has constitutional rights to speak as a citizen on matters of public concern, to petition and disclose concerns to public and governmental authorities, and to be free from retaliation for protected speech under the First Amendment, enforceable through 42 U.S.C. § 1983.

243.     Plaintiff also had and has a constitutional right to equal protection of the laws, including the right not to be subjected to intentional discrimination by state actors or private actors jointly engaged with state actors in conduct affecting protected rights, enforceable through 42 U.S.C. § 1983.

244.     Plaintiff's protected speech and petitioning activity included, among other things, her October 2022 arXiv article addressing workplace culture and systemic discrimination in physics; her November 2023 think-tank activity concerning cronyism, inequitable manager selection, safety concerns, financial waste, and institutional noncompliance; her June 2024 DOE Office of Inspector General complaint; her June and July 2024 disclosures to DOE officials and federal officials; her August 2024 letter to DOE Undersecretary Geraldine Richmond; and her July 2024 whistleblower report concerning misuse of public funds, safety violations, retaliation, and institutional noncompliance at a DOE-funded facility. See ¶¶58, 65, 103–113.

245.     Plaintiff's protected speech addressed matters of public concern, including scientific integrity, workplace discrimination and retaliation, public safety, misuse of public funds, management failures, and governance of a federally

funded national laboratory. Plaintiff spoke outside her ordinary job duties and directed these concerns to DOE officials, federal officials, the scientific community, and/or the public.

246. Defendants Merminga, Fleming, Posen, Gourlay, Velev, and Fancsali took, approved, ratified, or substantially assisted adverse actions against Plaintiff after her protected speech and disclosures, including blocking speaking opportunities and leadership roles (see ¶¶66, 71–74), excluding Plaintiff from DOE-facing opportunities, initiating or ratifying the August 2024 HR process, issuing or ratifying the September 10, 2024 Final Written Warning (see ¶79), downgrading or ratifying the downgrade of Plaintiff's 2024 performance evaluation (¶90), selecting or ratifying Plaintiff's selection for termination in the November 12, 2024 RIF (¶81), and implementing or ratifying post-termination badge, email, computing, User, and site-access restrictions, no-reentry consequences, and exclusion from Fermilab property, systems, and resources (¶¶89, 127–136).

247. These actions would deter a person of ordinary firmness from engaging in protected speech and petitioning activity. Plaintiff's protected speech and disclosures were a substantial or motivating factor, or, where required, a but-for cause, of the adverse actions taken against her, and the same adverse actions would not have occurred absent Plaintiff's protected speech and disclosures. See *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).

248. Plaintiff alleges that the state-action element is satisfied, or at minimum plausibly pleaded for discovery, not merely because county deputies were present on the day of the RIF, but because FRA used a coordinated, law-enforcement-backed access-control and exclusion mechanism to implement and enforce the challenged adverse actions and their immediate consequences. Plaintiff alleges that the challenged conduct included immediate access revocation, site exclusion, no-reentry consequences, denial of access to personal belongings and records, and other speech-chilling consequences enforced or backed by county law-enforcement authority, badge deactivation, and Fermilab security.

249. Defendants also violated Plaintiff's equal-protection rights by intentionally treating her less favorably than similarly situated employees because of sex and/or Italian ethnicity and ancestry, including by denying or blocking advancement, excluding her from opportunities, relying on discriminatory and stigmatizing narratives, subjecting her to pretextual discipline, downgrading her evaluation, and selecting her for termination.

250. The Equal Protection claim is based on intentional discriminatory treatment and disparate adverse action, including the same discriminatory core allegations supporting Plaintiff's surviving statutory sex-discrimination claims and the

additional allegations concerning Italian ethnicity and ancestry. Disability-related stigma is pleaded as relevant background, causation, and overlap with the adverse-action narrative, but Plaintiff's primary disability claims are pleaded under the ADA, Rehabilitation Act, and IHRA.

251. Plaintiff alleges that Defendants acted jointly with state actors, and thus under color of state law, to the extent they used, coordinated with, paid for, or relied upon county law-enforcement authority to implement or enforce the immediate consequences of the November 12, 2024 RIF, including badge revocation, access-control restrictions, no-reentry consequences, physical-removal procedures, and trespass enforcement against selected employees.

252. Public records obtained from the DuPage County Sheriff's Office, attached as **Exhibit F**, show that Fermilab requested and paid for two uniformed DuPage County deputies to provide an outside-security detail at Wilson Hall and Site 38 on November 12, 2024, from 9:00 a.m. to 5:30 p.m., the date and time period of the RIF.

253. Public records attached as **Exhibit F** also show that Fermilab and the DuPage County Sheriff's Office had an October 2024 MOU in place before the RIF, providing for law-enforcement coordination on Fermilab property, including security checks, response to calls for service, apprehension and arrest, maintenance of public order, emergency services, and workplace-violence-related support.

254. Plaintiff further alleges that the September 10, 2024 LITWG agenda, described in ¶100 and attached as **Exhibit I**, supports a plausible inference that, during the same period in which Plaintiff was being disciplined and prepared for termination, FRA used a coordinated cross-functional structure involving Legal/ Office of General Counsel, HR, Security, Communications, Occupational Medical, Emergency Management, and related functions relevant to employee monitoring, termination-related access restrictions, security escalation, and law-enforcement-backed or security-backed exclusion.

255. Plaintiff does not allege that the LITWG agenda, standing alone, proves that Plaintiff was discussed by name or that county law-enforcement personnel made the termination decision. Rather, Plaintiff alleges that the LITWG agenda, together with the paid DuPage County deputy detail on the RIF date, the DuPage and Kane County law-enforcement arrangements, the prior use of county deputies to remove and arrest a terminated Fermilab worker, and Plaintiff's immediate post-termination badge, email, computing, User, and site-access restrictions, supports a plausible inference that FRA used a coordinated security and law-enforcement-backed access-control structure to implement or enforce retaliatory

exclusion and no-reentry consequences, warranting discovery into the scope of that coordination.

256. Public records obtained from the Kane County Sheriff's Office, attached as **Exhibit G**, further show that Fermilab previously used county deputies in March 2024 to remove and arrest a terminated Fermilab worker who refused to leave Fermilab property after termination, demonstrating that Fermilab's post-termination access-control and removal decisions could be enforced through county law-enforcement authority.

257. Although Plaintiff was working remotely on the date of her termination, the deprivation was not limited to physical escort from an office. Plaintiff's immediate badge, email, computing, User, and site-access revocation excluded her from Fermilab property, laboratories, scientific resources, professional interactions, work systems, institutional communications, and employment-related privileges. That exclusion occurred in the same RIF/access-control environment in which Fermilab had paid for uniformed DuPage County deputies to provide onsite security.

258. Defendants' approval, ratification, substantial assistance, or reliance upon law-enforcement-backed access-control and no-reentry enforcement supports a plausible inference that the RIF-related adverse actions and post-termination exclusion were implemented through joint action with state actors, or at minimum warrants discovery into the extent of coordination between FRA personnel, Fermilab security, and county law-enforcement authorities.

259. As a direct and proximate result of Defendants' violations of Plaintiff's First Amendment and Equal Protection rights, Plaintiff suffered pecuniary and non-pecuniary damages, including lost compensation, lost advancement, lost professional opportunities, reputational harm, emotional distress, exclusion from Fermilab property and resources, and termination.

260. Defendants acted intentionally, maliciously, and/or with reckless or callous indifference to Plaintiff's constitutional rights. On information and belief, Defendants knew of Plaintiff's protected speech, public disclosures, administrative charges, and protected status based on sex and Italian ethnicity/ancestry, yet deliberately participated in, approved, ratified, or substantially assisted adverse actions, access restrictions, and exclusionary measures that would deter protected speech and deny equal protection. Plaintiff seeks compensatory damages, punitive damages against the Individual Defendants where permitted by law, appropriate equitable relief where available, costs, and attorneys' fees under 42 U.S.C. § 1988.

## COUNT X: DISCRIMINATION AND RETALIATION BASED ON ITALIAN ETHNICITY AND ANCESTRY IN VIOLATION OF 42 U.S.C. § 1981

(Against Defendant Fermi Research Alliance, LLC and Defendants Merminga, Fleming, Posen, Gourlay, Velev, Romanenko, and Fancsali in their individual capacities)

261. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

262. Plaintiff is of Italian ethnicity and ancestry. Section 1981 protects the right to make and enforce contracts free from intentional discrimination based on race, ethnicity, and ancestry, including discrimination against persons of Italian ethnicity or ancestry. See *St. Francis College v. Al-Khazraji*, 481 U.S. 604 (1987). Section 1981 also prohibits retaliation for opposing such discrimination. See *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008).

263. Plaintiff's employment relationship with FRA, including compensation, promotion, advancement, leadership opportunities, performance evaluation, discipline, retention, access to work-related opportunities, and termination, constituted and involved the making, performance, modification, and enforcement of a contractual employment relationship within the meaning of § 1981.

264. Defendants knew or perceived Plaintiff as Italian by ethnicity and ancestry, as speaking with an Italian accent, as educated in Italy, and as trained through an Italian/non-U.S. academic pathway. Defendants intentionally discriminated against Plaintiff because of her Italian ethnicity and ancestry, including by treating her Italian academic credentials, Italian-accented communication, and Italian-trained scientific background as markers of lesser credibility, legitimacy, leadership suitability, and advancement eligibility than comparable or weaker credentials held by non-Italian or U.S.-credentialed employees.

265. As alleged in ¶¶114–120, Plaintiff's Italian academic credentials were expressly discounted when Fermilab decisionmakers stated, in substance, that Plaintiff's Italian degree and academic training did not count like a U.S. Ph.D. Plaintiff alleges that this was not an isolated event, but part of a broader pattern in which Defendants and prior Fermilab decisionmakers treated Plaintiff's Italian ethnicity, ancestry, Italian education, Italian accent, and Italian-trained academic identity as less legitimate than comparable or weaker credentials held by non-Italian or U.S.-credentialed comparators, including Cornell/Padamsee-trained comparators.

266. Defendants interfered with Plaintiff's contractual employment relationship by discounting her Italian academic credentials and Italian-trained background, dismissing or disparaging her Italian academic training as less legitimate, blocking advancement and recognition, excluding her from leadership and DOE-facing opportunities, manipulating or ratifying adverse performance evaluations, imposing pretextual discipline, selecting her for termination in the November 12, 2024 RIF, and delaying or restricting post-termination access.

267. Illustrative examples include the 2010 rejection of Plaintiff's request for reclassification to the scientific track after her Italian academic background was dismissed or treated as inadequate; later advancement and recognition decisions favoring non-Italian or U.S.-credentialed comparators despite Plaintiff's superior qualifications and expressed interest; the 2021 blocking of publicity for Plaintiff's scientific achievements; the 2024 selection of Defendant Posen for Associate Laboratory Director despite Plaintiff's superior cross-domain qualifications; Plaintiff's termination in the November 12, 2024 RIF; and post-termination access restrictions affecting Plaintiff's ability to continue scientific work and professional collaborations.

268. Plaintiff alleges that her Italian ethnicity, ancestry, Italian education, and Italian-trained academic identity were a but-for cause of Defendants' interference with her contractual employment rights, including denial of advancement, exclusion from leadership and DOE-facing opportunities, blocked recognition, adverse evaluation, discipline, RIF selection, termination, and post-termination access restrictions. Plaintiff pleads this § 1981 theory in the alternative to her sex, age, disability, retaliation, and other claims and does not seek double recovery.

269. Plaintiff also opposed discriminatory and retaliatory treatment connected to her Italian ethnicity and ancestry, Italian academic credentials, Italian-trained scientific background, and exclusion from advancement, including by challenging personnel practices and advancement decisions that devalued her Italian academic formation and impaired her contractual employment rights. To the extent Defendants retaliated against Plaintiff for opposing such ancestry/ethnicity-linked discrimination and credential devaluation, Defendants violated § 1981.

270. Defendants knew or reasonably understood that Plaintiff's opposition included objections to ancestry/ethnicity-linked discrimination and the devaluation of her Italian academic credentials, Italian-trained scientific background, and Italian-accented communication as bases for denying her advancement, recognition, equal evaluation, and equal contractual employment benefits. After Plaintiff engaged in

such opposition, Defendants escalated adverse actions against her, including exclusion from leadership and DOE-facing opportunities, retaliatory HR complaints and discipline, the downgraded 2024 performance evaluation, selection for the November 12, 2024 RIF, immediate access and email cutoff, delayed post-termination access restoration, and interference with her continuing scientific work and contractual relationships. To the extent Defendants retaliated against Plaintiff for opposing ancestry/ethnicity-linked discrimination and interference with her contractual rights, Defendants violated § 1981.

271. Defendant Merminga is named under § 1981 based on conduct within the four-year limitations period, including approving, permitting, or ratifying advancement decisions and adverse actions that impaired Plaintiff's contractual employment rights after Plaintiff directly raised concerns to Merminga and after Merminga, on information and belief, received or had access to notice through Senior Leadership, HR, OGC, disciplinary, evaluation, and RIF channels concerning Plaintiff's protected opposition and objections to discriminatory and retaliatory treatment. This included, on information and belief, failing to correct discriminatory treatment after notice and approving or ratifying adverse actions including denial of advancement, discipline, downgraded evaluation, RIF selection, and termination.

272. Defendant Fleming is named under § 1981 based on conduct within the four-year limitations period, including blocking or ratifying the blocking of Plaintiff's invited talks, DOE-facing opportunities, and interim leadership consideration after Plaintiff opposed discriminatory and retaliatory treatment, including discriminatory discounting of her credentials and advancement rights; declining to consider Plaintiff for interim leadership despite her superior qualifications; and impairing Plaintiff's advancement and contractual employment rights.

273. Defendant Posen is named under § 1981 based on conduct within the four-year limitations period, including conduct after he knew or reasonably understood Plaintiff's protected opposition and objections to discriminatory and retaliatory treatment. After being selected over Plaintiff as Associate Laboratory Director despite Plaintiff's superior qualifications, Posen used, or permitted the use of, his scientific-management authority to participate in, support, ratify, or substantially assist subsequent discriminatory and retaliatory adverse actions that impaired Plaintiff's work, visibility, authorship, leadership opportunities, evaluation, post-termination access, collaborations, grant-related activities, professional recognition, and contractual employment rights, including the downgraded evaluation, the November 12, 2024 RIF selection and termination, and post-termination access restrictions.

274. Defendant Gourlay is named under § 1981 based on conduct within the four-year limitations period, including excluding Plaintiff from DOE-facing scientific opportunities after Plaintiff objected to discriminatory and retaliatory exclusion; issuing or participating in the September 10, 2024 Final Written Warning; influencing or ratifying Plaintiff's downgraded performance evaluation; supporting, participating in, approving, permitting, or ratifying her RIF selection and termination while serving as Division Head; and attempting to transfer Plaintiff's grant leadership and recognition after termination. Plaintiff alleges that this conduct formed part of the discriminatory and retaliatory course of conduct described above and impaired Plaintiff's contractual employment rights.

275. Defendant Velev is named under § 1981 based on conduct within the four-year limitations period, including spreading or reinforcing narratives that attacked Plaintiff's credibility, scientific legitimacy, and advancement suitability; contributing to false accusations and defamatory narratives; and supplying or influencing feedback, evaluations, or selection-related input that impaired Plaintiff's contractual employment rights, including in contexts where Plaintiff's Italian-trained credentials and scientific legitimacy were discounted.

276. Defendant Romanenko is named under § 1981 based on conduct within the four-year limitations period, including 2021 and later conduct blocking recognition of Plaintiff's scientific achievements, excluding Plaintiff from meetings and authorship, participating in or endorsing retaliatory HR complaints, and interfering with Plaintiff's contractual employment relationship after Plaintiff opposed discriminatory and retaliatory treatment. Plaintiff alleges that Romanenko's conduct formed part of the discriminatory and retaliatory course of conduct described above, including the discounting of Plaintiff's Italian-trained credentials, scientific legitimacy, and advancement rights, and retaliation for Plaintiff's protected opposition.

277. Defendant Fancsali is named under § 1981 based on conduct within the four-year limitations period, including escalating Plaintiff's protected think-tank activity to Senior Leadership, failing to take corrective action despite notice of Plaintiff's discrimination and retaliation complaints, and facilitating or ratifying legal, HR, and cross-functional processes that impaired Plaintiff's contractual employment rights and culminated in discipline and termination. Plaintiff alleges that Fancsali's conduct formed part of the discriminatory and retaliatory course of conduct described above, including retaliation for Plaintiff's protected opposition to ancestry/ethnicity-linked discrimination and interference with her contractual employment rights.

278. Each Individual Defendant named in this Count personally participated in, approved, ratified, or substantially assisted conduct that interfered with Plaintiff's right to make, perform, modify, and enforce her employment relationship on equal terms.

279. Defendants' conduct impaired Plaintiff's right to make, perform, modify, and enforce her employment contract on equal terms, including her rights to compensation, promotion, advancement, discipline-free employment, fair evaluation, continued employment, access to work-related opportunities, and equal enjoyment of all benefits, privileges, terms, and conditions of the employment relationship.

280. Defendants acted intentionally, maliciously, or with reckless or callous indifference to Plaintiff's federally protected rights under § 1981. On information and belief, Defendants knew or reasonably understood Plaintiff's Italian ethnicity and ancestry, protected opposition, complaints, and contractual employment rights, yet deliberately participated in, approved, ratified, or substantially assisted adverse actions impairing those rights. This includes, among other conduct, Velev's alleged reinforcement of stigmatizing narratives attacking Plaintiff's credibility, legitimacy, and professional fitness; Fancsali's alleged participation or ratification through legal, HR, OGC, and LITWG-related channels despite legal knowledge and notice of Plaintiff's protected complaints; and Gourlay's alleged participation in discipline, DOE-facing exclusion, RIF-related decisions, and post-termination efforts affecting Plaintiff's grant leadership and recognition despite knowledge of Plaintiff's protected activity and complaints.

281. As a direct and proximate result of Defendants' violations of § 1981, Plaintiff suffered pecuniary and non-pecuniary damages, including lost compensation, lost advancement, lost professional opportunities, reputational harm, emotional distress, and termination. Plaintiff seeks compensatory damages, punitive damages where permitted by law, equitable relief, costs, and attorneys' fees under 42 U.S.C. § 1988.

### COUNT XI: BREACH OF IMPLIED CONTRACT
(Against Defendant Fermi Research Alliance, LLC)

282. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

283. Under Illinois law, employment without a fixed duration is presumptively at will, but that presumption may be overcome where the facts show that the parties

contracted otherwise. A policy, manual, or institutional statement may create enforceable contractual rights where the language is sufficiently definite, is disseminated to the employee, and is accepted by the employee through beginning or continuing work. See *Duldulao v. St. Mary of Nazareth Hosp. Ctr.,* 115 Ill. 2d 482, 490 (1987).

284. Institutional appointment protections may arise from policies, practices, representations, and mutually understood appointment frameworks even where the institution does not use the formal word "tenure." Plaintiff cites appointment-protection authorities such as *Perry v. Sindermann*, 408 U.S. 593, 601–03 (1972), and *McConnell v. Howard Univ.*, 818 F.2d 58, 67–69 (D.C. Cir. 1987), as persuasive support for the principle that institutional practice and promulgated procedures may create enforceable or reasonably relied-upon expectations of process.

285. Plaintiff's Senior Scientist appointment was not an ordinary staff assignment terminable solely at management's unreviewed discretion. It was part of Fermilab's scientific-appointment system, which historically distinguished Scientist and Senior Scientist appointments from ordinary employment categories and treated such appointments as long-term scientific appointments governed by institutional scientific-review procedures, FCSA governance, and long-standing practice.

286. Plaintiff does not allege that Senior Scientists could never be terminated. Plaintiff alleges that FRA impliedly agreed that a Senior Scientist could be terminated through a RIF only by applying the institutionally recognized scientific-appointment framework, including individualized scientific assessment, uniform criteria applied to similarly situated Senior Scientists, FCSA review or concurrence, and DOE-compliant or Prime-Contract-implemented personnel procedures.

287. The implied appointment contract arose from the total Senior Scientist appointment framework, including Plaintiff's Senior Scientist appointment status, Fermilab's Scientific Appointments Policy, FCSA governance, institutional practice, Director-level and committee-level scientific-appointment procedures, and FRA's consistent treatment of Senior Scientist appointments as requiring scientific-review protections.

288. FRA's continued publication, maintenance, or availability of the Scientific RIF Termination Procedure as an unrevised scientific-staff RIF procedure reinforced Plaintiff's reasonable understanding that it evidenced and implemented the broader Senior Scientist appointment framework.

289. Any disclaimer in the Scientific RIF Termination Procedure does not defeat Plaintiff's claim at the pleading stage because Plaintiff does not allege that the procedure alone created the implied appointment contract. Rather, Plaintiff alleges that the procedure evidenced and implemented a broader Senior Scientist appointment framework arising from appointment status, scientific-appointment policies, FCSA governance, institutional practice, FRA's course of conduct, and Plaintiff's continued service as a Senior Scientist.

290. Any disclaimer in the Scientific RIF Termination Procedure, at most, preserved FRA's ability to revise, terminate, or modify that procedure prospectively and confirmed that the procedure did not guarantee permanent employment. The disclaimer did not permit FRA to maintain the Scientific RIF Termination Procedure and broader Senior Scientist appointment framework as operative, reasonably lead Senior Scientists to rely on that framework, and then disregard the individualized review, FCSA participation or concurrence, uniform criteria, and scientific-appointment safeguards that distinguished Senior Scientist appointments from ordinary at-will staff positions.

291. Plaintiff accepted and relied on the implied appointment contract by continuing to serve as a Senior Scientist, building long-term scientific programs, maintaining grant and collaboration responsibilities, foregoing other professional opportunities, and organizing her scientific career around FRA's institutional scientific-appointment framework.

292. FRA breached the implied appointment contract by selecting Plaintiff for the November 12, 2024 RIF without the required individualized Senior Scientist review, without uniform standards applied to similarly situated Senior Scientists, without the expected FCSA review or concurrence process, without a transparent selection matrix, and without a neutral scientific-review record supporting Plaintiff's selection. See ¶¶143–150.

293. On information and belief, FRA proceeded despite contemporaneous FCSA objection that the planned scientific-staff RIF violated the Director's RIF Policy and despite management's refusal to provide FCSA the names needed for individualized review.

294. FRA further breached the implied appointment contract by manipulating, overriding, or ratifying adverse performance evaluations to justify Plaintiff's termination rather than reflect Plaintiff's actual performance and her direct supervisor's more favorable assessment.

295. FRA's breach was material. The procedures FRA bypassed were not merely discretionary or ministerial; they were part of the institutional scientific-

appointment framework designed to protect Senior Scientists from arbitrary, retaliatory, discriminatory, or non-uniform termination decisions.

296. FRA's departure from its own scientific-appointment and Senior Scientist RIF process also supports pretext because an employer's failure to follow its own internal procedures may support an inference that the stated reason was not the true reason for the adverse action. See *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005).

297. The inference of breach and pretext is further supported by the historical treatment of Fermilab scientific appointments as tenure-like, permanent, or otherwise protected scientific appointments, and by the absence or rarity, on information and belief, of comparable Scientist or Senior Scientist RIF terminations before November 2024. FRA's use of a purported Scientist RIF against Plaintiff without meaningful FCSA review, individualized scientific assessment, transparent criteria, or a neutral scientific-review record supports Plaintiff's allegation that FRA departed from the Senior Scientist appointment framework and used the RIF as a pretextual mechanism rather than a neutral budget action.

298. As a direct and proximate result of FRA's breach, Plaintiff suffered lost wages, lost benefits, retirement-related losses, Social Security-related earnings impacts, lost scientific standing, lost grant leadership, lost advancement and collaboration opportunities, reputational harm, and other pecuniary and professional losses.

299. Plaintiff seeks contract damages, reinstatement or front pay where legally available, restoration or correction of personnel and scientific records, pre- and post-judgment interest, costs, and any other relief the Court deems just and proper.

## COUNT XI-A: PROMISSORY ESTOPPEL (pleaded in the alternative to Count XI)
(Against Defendant Fermi Research Alliance, LLC)

300. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

301. Under Illinois law, promissory estoppel applies where a defendant made an unambiguous promise, the plaintiff reasonably and foreseeably relied on that promise, the reliance was detrimental, and enforcement is necessary to avoid injustice. See *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill. 2d 46, 51 (2009).

302. In the alternative, to the extent the Senior Scientist appointment framework, Scientific Appointments Policy, FCSA governance, Scientific RIF Termination Procedure, DOE-compliant personnel procedures, public and institutional tenure-

equivalent materials described above, and long-standing institutional practices were deemed non-contractual, FRA nevertheless made clear and definite promises on which Plaintiff reasonably and foreseeably relied.

303. Those promises included, among others, that Senior Scientist appointments were governed by institutional scientific-review protections; that a Senior Scientist proposed for RIF would receive individualized assessment of job function, performance, knowledge, skills, and abilities needed for Fermilab's future mission; that FCSA review or concurrence would be part of the process; that similarly situated Senior Scientists would be evaluated under uniform and non-arbitrary criteria; and that RIF or termination decisions would be made consistently with established scientific-appointment and DOE-compliant personnel procedures.

304. FRA's continued publication, maintenance, or availability of the Scientific RIF Termination Procedure, together with the broader Senior Scientist appointment framework, FCSA governance, scientific-appointment practices, and public and institutional tenure-equivalent materials described above, made Plaintiff's reliance on the promised review process reasonable and foreseeable, regardless of whether the Director retained ultimate decision-making authority.

305. FRA reasonably expected, or should have expected, Senior Scientists, including Plaintiff, to rely on those promises in making career decisions, continuing employment, accepting assignments, building scientific programs, leading grants and collaborations, and foregoing or delaying outside opportunities. Plaintiff reasonably and foreseeably relied on FRA's promises in those ways by continuing to serve as a Senior Scientist for many years and organizing her professional activities around Fermilab's scientific-appointment framework.

306. Plaintiff's reliance was detrimental. FRA selected Plaintiff for the November 12, 2024 RIF without the promised individualized Senior Scientist review, without uniform criteria applied to similarly situated Senior Scientists, without the expected FCSA review or concurrence process, without a transparent selection matrix, and without a neutral scientific-review record supporting Plaintiff's selection.

307. FRA also acted inconsistently with its promises by manipulating, overriding, or ratifying adverse performance evaluations to justify Plaintiff's termination rather than reflect Plaintiff's actual performance and her direct supervisor's more favorable assessment.

308. Injustice can be avoided only by enforcing FRA's promises or awarding relief for Plaintiff's detrimental reliance. FRA should be estopped from denying the

institutional scientific-appointment commitments on which Plaintiff reasonably relied.

309. As a direct and proximate result, Plaintiff suffered pecuniary and professional losses, including lost wages, lost benefits, retirement-related losses, Social Security-related earnings impacts, lost scientific standing, lost grant leadership, lost advancement and collaboration opportunities, reputational harm, and other reliance damages in amounts to be proven at trial.

310. Plaintiff seeks reliance damages, equitable relief where available, reinstatement or front pay where legally available, restoration or correction of personnel and scientific records, pre- and post-judgment interest, costs, and any other relief the Court deems just and proper.

## COUNT XII: ILLINOIS RETALIATORY DISCHARGE IN VIOLATION OF CLEARLY MANDATED PUBLIC POLICY
(Against Defendant Fermi Research Alliance, LLC)

311. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

312. Plaintiff pleads this Count as an Illinois common-law retaliatory-discharge claim based on discharge in violation of clearly mandated public policy. Plaintiff does not plead this Count as a standalone breach-of-contract claim, does not seek to enforce the DOE Prime Contract as an independent third-party beneficiary contract claim, and does not seek double recovery for the same injury.

313. FRA operated Fermilab as the Department of Energy's management-and-operations contractor under the DOE Prime Contract. Plaintiff relies on the DOE Prime Contract, DOE oversight structure, federal-laboratory compliance obligations, public-funds stewardship responsibilities, and approved personnel procedures as factual context for the public-policy interests implicated by her disclosures, FRA's knowledge, pretext, motive, and the retaliatory circumstances of her discharge.

314. FRA was not acting merely as a private employer; it was operating a federally funded national laboratory in Illinois under DOE oversight and was responsible for lawful, non-discriminatory, non-retaliatory, safe, and procedurally compliant management of laboratory personnel and scientific operations. Plaintiff does not plead generalized scientific integrity, safety, public-funds stewardship, or federal-contract compliance as standalone public policies, but as factual contexts in which

she reported suspected illegal or improper conduct and matters affecting public welfare.

315. Appendix A § I(b) of the DOE Prime Contract provides, in substance, that programs or policies initiated for corporate application, whether permanent or for a finite period, that will impact staffing levels or compensation costs, including furloughs or salary cuts, will not be applicable to Laboratory employees or employees otherwise funded through the Prime Contract without prior approval of the Contracting Officer. Appendix A § XII further provides, in substance, that reductions in employment will be conducted in accordance with the contractor's Contracting Officer-approved policies and practices.

316. Plaintiff relies on Appendix A, Contracting Officer approval requirements, Contracting Officer-approved personnel policies and practices, DOE oversight, workforce-restructuring documentation, adverse-impact review, and compliance with approved RIF procedures not as a standalone breach-of-contract claim, but as factual context showing the public-policy interests implicated by Plaintiff's disclosures, FRA's knowledge and motive, procedural irregularity, pretext, and the non-neutral and retaliatory circumstances of her discharge. The November 2024 RIF was a staffing-level action affecting Laboratory employees, including Senior Scientists, making those procedures and oversight mechanisms relevant to whether FRA's stated rationale was neutral and non-pretextual.

317. Plaintiff alleges, on information and belief, that the FCSA RIF Procedure and related Senior Scientist appointment and RIF-review procedures were among the Contracting Officer-approved, Prime-Contract-implemented, DOE-compliant, or institutionally adopted policies and practices governing reductions in employment affecting Scientists, including Senior Scientists. The FCSA RIF Procedure provided a safeguard for Scientists by requiring FCSA review or concurrence before a Scientist could be included in a RIF event. FRA's failure to follow those procedures is pleaded as evidence of procedural irregularity, pretext, retaliation, and non-neutral selection, not as a standalone claim to enforce the DOE Prime Contract.

318. Plaintiff further alleges, on information and belief, that the November 2024 RIF occurred as part of a broader budget-restructuring sequence that included voluntary separation offerings and involuntary terminations. That sequence made DOE oversight, Contracting Officer approval or involvement, workforce-restructuring documentation, adverse-impact analysis, and compliance with approved personnel practices relevant to whether FRA's stated RIF rationale was neutral, consistently applied, non-retaliatory, and non-pretextual.

319. As alleged in ¶¶152–155, Plaintiff further states, on information and belief, that the 2024 voluntary-separation and RIF sequence is relevant to whether FRA segmented related workforce-reduction measures in a manner that avoided or obscured cumulative DOE oversight, Contracting Officer review, adverse-impact analysis, compliance review, procedural regularity, and workforce-composition review. Plaintiff pleads this allegation as evidence of procedural irregularity, non-neutral selection, pretext, public-policy concern, and retaliatory motive, and not as an independent private enforcement action under the DOE Prime Contract.

320. To the extent FRA relies on internal disclaimer language in the FCSA RIF Procedure or related personnel documents, Plaintiff does not plead those procedures as independently enforceable contract promises in this Count. Rather, Plaintiff pleads FRA's publication, maintenance, representation, and selective non-application of those procedures as evidence of FRA's knowledge of applicable personnel safeguards, procedural irregularity, pretext, non-neutral selection, and retaliatory motive.

321. Illinois recognizes a narrow tort for retaliatory discharge where an employee is terminated in violation of a clearly mandated public policy, including where the discharge retaliates against the employee for reporting suspected illegal or improper conduct affecting public welfare. See *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 130–34 (1981); *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172 (1978); *Jacobson v. Knepper & Moga, P.C.,* 185 Ill. 2d 372 (1998).

322. The clearly mandated Illinois public policies implicated by Plaintiff's discharge are reflected in, among other sources, the Illinois Whistleblower Act, 740 ILCS 174/15 and 174/20.1; the Illinois Human Rights Act, including 775 ILCS 5/1-102 and 775 ILCS 5/2-102; and Illinois judicial decisions recognizing a public policy against terminating employees for reporting suspected illegal or improper conduct affecting public welfare, including *Palmateer and Jacobson*.

323. Federal public policies implicated by Plaintiff's discharge are also reflected in DOE contractor-employee protection regulations, including 10 C.F.R. Part 708; DOE research-misconduct regulations applicable to scientific research conducted under DOE contracts, including 10 C.F.R. Part 733; and DOE scientific-integrity policies favoring honest, non-retaliatory reporting, oversight, and communication of federally funded scientific work.

324. Plaintiff's reports and disclosures implicated those public policies because they concerned suspected discrimination and retaliation, misuse of federal or public funds, safety-related misconduct, research-integrity concerns, hiring irregularities, procedural irregularities, and institutional noncompliance at a federally funded national laboratory operating in Illinois.

325. Plaintiff engaged in activity protected by those public policies, including but not limited to: submitting a June 4, 2024 complaint to the DOE Office of Inspector General concerning hiring irregularities, discrimination, and retaliation; disclosing concerns to DOE Office of Science officials and federal officials in June and July 2024; providing a draft or summary of the whistleblower report to DOE officials before its public posting; reporting concerns regarding waste, safety, civil-rights violations, retaliation, and institutional noncompliance to DOE and federal officials; objecting to discriminatory and retaliatory personnel practices; and requesting intervention from FRA leadership.

326. Plaintiff's July 2024 public posting is pleaded as evidence of the substance, timing, public concern, and retaliatory context of Plaintiff's disclosures. Plaintiff does not plead the public posting as the sole basis for this public-policy claim; Plaintiff had already disclosed or attempted to disclose the underlying concerns to DOE officials, DOE oversight personnel, the DOE Office of Inspector General, federal officials, and senior FRA leadership.

327. FRA terminated Plaintiff because of, and in retaliation for, those protected disclosures and public-policy-protected activities. The termination followed Plaintiff's DOE/OIG and DOE-facing disclosures, the July 2024 whistleblower disclosures and public posting, her July 31, 2024 objections regarding leadership selection and exclusion from DOE reviews, and her August 9, 2024 written complaint to the Laboratory Director requesting intervention. But for Plaintiff's protected disclosures and public-policy-protected activity, FRA would not have escalated the August 2024 HR process, issued the September 10, 2024 Final Written Warning, downgraded Plaintiff's 2024 performance evaluation, or selected Plaintiff for termination in the November 12, 2024 RIF.

328. FRA then escalated adverse actions through the August 2024 HR process, the September 10, 2024 Final Written Warning, the attempted characterization of Plaintiff as having resigned, the downgraded 2024 performance evaluation, and the November 12, 2024 RIF termination.

329. FRA's conduct further supports Plaintiff's allegations of retaliatory discharge, pretext, procedural irregularity, non-neutral selection, and causation, including but not limited to:

a. Terminating Plaintiff on November 12, 2024 without FCSA review or concurrence and outside established Senior Scientist RIF procedures.

b. Failing to apply the institutionally recognized Senior Scientist appointment and RIF-review process, including individualized assessment, FCSA review or concurrence, and uniform criteria applied to similarly situated Senior Scientists.

c. Failing to disclose, follow, or consistently apply objective selection criteria, eligibility factors, a transparent selection matrix, or a neutral scientific-review record supporting Plaintiff's selection, while later representing or relying on the assertion that department leadership identified positions for elimination using objective criteria based on Fermilab's priorities, mission and future budgets.

d. Failing to explain how any alleged objective criteria were applied to Plaintiff, particularly where FRA's stated or implied rationale omitted or mischaracterized Plaintiff's actual duties, Principal Investigator responsibilities, grant-funded work, scientific leadership, publications, mentoring, and continuing institutional need for her work.

e. Manipulating, overriding, or ratifying adverse performance evaluations to justify termination rather than reflect Plaintiff's actual performance and her direct supervisor's more favorable assessment. See ¶90.

f. Failing to investigate or correct Plaintiff's reported discrimination, retaliation, research-integrity, safety, and misuse-of-funds concerns. See ¶¶56, 59–61, 103–113.

g. Escalating discipline after Plaintiff's protected disclosures, including the August 2024 HR process, the September 10, 2024 Final Written Warning, and downgraded evaluation. See ¶¶65, 69–70, 76, 79–81, 90.

h. Selecting Plaintiff for termination in the November 12, 2024 RIF after her disclosures to DOE officials, the DOE Office of Inspector General, federal officials, and senior FRA leadership.

i. Implementing voluntary separation offerings and the November 12, 2024 involuntary RIF as part of the same budget-restructuring period in a manner that, on information and belief, avoided or obscured the cumulative workforce-restructuring impact and related DOE oversight, adverse-impact review, documentation, or approval requirements.

j. Redistributing Plaintiff's duties, projects, grant responsibilities, and scientific work after termination while representing that her position had been eliminated due to mission priorities and budget realities.

330. FRA's stated RIF rationale was pretextual for the reasons alleged above. Failure to follow internal procedures may support pretext. See *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005).

331. FRA's discharge of Plaintiff violated clearly mandated Illinois public policy independently of Plaintiff's statutory IWA claim. Plaintiff pleads this public-policy claim in the alternative to Count VIII and does not seek duplicate compensatory recovery for the same injury. Plaintiff seeks punitive damages on this common-law claim to the extent permitted by Illinois law.

332. As a direct and proximate result of FRA's retaliatory discharge in violation of clearly mandated public policy, Plaintiff suffered economic losses, including lost wages, lost benefits, retirement-related losses, Social Security-related earnings impacts, lost advancement and grant opportunities, and other pecuniary damages. Plaintiff also suffered non-economic harms, including emotional distress, humiliation, reputational injury, and loss of enjoyment of life, to the extent recoverable under the applicable theory. Plaintiff seeks all relief available by law, including compensatory damages, punitive damages where permitted, pre- and post-judgment interest, costs, and any other relief the Court deems just and proper.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and award the following relief:

a. Enter judgment in favor of Plaintiff and against Defendants as follows:

i. Against Fermi Research Alliance, LLC ("FRA") on Counts I, II, IV, V, VI, VIII, X, XI, XI-A, and XII; and against Fermi Forward Discovery Group, LLC ("FermiForward"), to the extent it is joined and held liable as successor-in-interest under applicable successor-liability principles and/or independently liable for post-January 1, 2025 conduct by its officers, managers, employees, or agents that continued, ratified, compounded, or implemented discriminatory, retaliatory, access-restricting, or contract-interfering conduct alleged herein, awarding appropriate equitable relief, including reinstatement and expungement, and any non-duplicative make-whole monetary relief necessary to afford complete relief, including, where appropriate, front pay, back pay, restoration of seniority and benefits, and relief for post-transition access restrictions or interference with Plaintiff's scientific work, professional collaborations, authorship, records, grant-related work, or contractual employment rights, without double recovery. Punitive damages are not sought from FermiForward solely by reason of successorship. For clarity, Plaintiff does not seek judgment against FRA on Count VII or Count IX. Count XI-A is pleaded in the alternative to Count XI.

ii. Against the Individual Defendants Merminga, Fleming, Posen, Gourlay, Velev, and Fancsali on Count VII (IHRA aiding and abetting) and Count IX (42 U.S.C. § 1983—First Amendment Retaliation and Equal Protection); and against the Individual Defendants Merminga, Fleming, Posen, Gourlay, Velev, Romanenko, and Fancsali on Count X (§ 1981).

b. Declare that Defendants violated Plaintiff's rights under the federal and state laws alleged, and issue injunctive relief requiring FRA and, as applicable,

FermiForward, whether as successor-in-interest and/or based on independent post-January 1, 2025 conduct by its officers, managers, employees, or agents, to:

i. Cease and desist from discriminatory and retaliatory practices;
ii. Implement and enforce effective anti-discrimination and anti-retaliation policies and training;
iii. Establish transparent promotion and evaluation procedures;
iv. Remove from Plaintiff's personnel file any discipline and ratings imposed in violation of law;
v. Adopt effective complaint and investigation procedures with appropriate oversight and monitoring for compliance.

    c. Award compensatory and make-whole damages in an amount to be determined at trial, including but not limited to:

i. Back pay from the date of termination through trial, with prejudgment interest;
ii. Front pay or reinstatement to an appropriate position;
iii. Lost benefits, bonuses, and pension contributions;
iv. Other pecuniary losses proved at trial;
v. Compensatory damages for emotional distress, pain and suffering, humiliation, and injury to reputation where permitted by law (e.g., Title VII, ADA Title I, IHRA, § 1981);
vi. Out-of-pocket medical expenses and future medical costs, where legally recoverable and causally related to Defendants' unlawful conduct.

    d. Award punitive damages to the extent permitted by law, including against the Individual Defendants under 42 U.S.C. §§ 1981 and 1983 where the evidence shows malicious intent or reckless or callous indifference to Plaintiff's federally protected rights, and against FRA where allowed, including under § 1981 and the common-law public-policy retaliatory-discharge claim. For the avoidance of doubt, punitive damages are not sought under the IHRA or § 504, and the damages caps under 42 U.S.C. § 1981a do not apply to § 1981 or § 1983 claims.

    e. Provide that, for compensatory damages arising from the same injury under Count VII (IHRA aiding and abetting), Count IX (§ 1983—First Amendment Retaliation and Equal Protection), and Count X (§ 1981), Defendants shall be held jointly and severally liable, without double recovery. Punitive damages, if awarded, shall be assessed individually against the defendants found liable. No double recovery is sought among overlapping theories for the same injury.

    f. Award liquidated damages under the ADEA for willful violations, and all make-whole relief available under the Illinois Whistleblower Act, including costs and fees where authorized.

g. Award taxable costs and, where authorized by statute, reasonable attorneys' fees and costs (including under 42 U.S.C. § 1988 for federal civil-rights claims, 42 U.S.C. § 12205 for ADA claims, 29 U.S.C. § 626(b) for ADEA claims, 29 U.S.C. § 794a(b) for Rehabilitation Act claims, and applicable provisions under the IHRA and IWA), and expert-witness fees where authorized (including 42 U.S.C. § 1988(c)).

h. Award pre- and post-judgment interest (post-judgment pursuant to 28 U.S.C. § 1961) at the maximum legal rate.

i. Retain jurisdiction to ensure Defendants' compliance with any injunctive relief ordered.

j. Grant such other legal and equitable relief as this Court deems just, proper, and equitable. Any injunctive order should bind FRA, FermiForward to the extent it is held liable as successor-in-interest and/or for independent post-January 1, 2025 conduct, and all persons in active concert or participation with them who receive actual notice, consistent with Fed. R. Civ. P. 65(d)(2).

k. If the Court identifies any pleading deficiency, Plaintiff respectfully requests leave to amend pursuant to Rule 15(a)(2) so that this action may be resolved on the merits.

Plaintiff demands trial by jury on all claims so triable.

Respectfully submitted,

/s/ Dr. Emanuela Barzi
Plaintiff, Pro Se
889 Napa Lane
Aurora, IL 60502
(630) 518-5765
emanuela.barzi@yahoo.com
June 18, 2026

**EXHIBIT LIST**

Exhibit A – IDHR Email Confirming Filing Receipt, Control Number, and Plaintiff's Request to Sue Respondent (June 8–10, 2024)

Exhibit B – IDHR Notice of Dismissal and Right to Sue (May 5, 2025)

Exhibit C – EEOC Notice of Right to Sue (July 25, 2025)

Exhibit D – Seven IDHR Notices of Opt Out, Right to Commence an Action, and Administrative Closure for Charges Against FRA, Merminga, Fleming, Posen, Gourlay, Velev, and Fancsali (May 2026)

Exhibit E – Minutes from Scientific Advisory Council Meeting Regarding November 2024 RIF and Scientist RIF Policy (November 14, 2024)

Exhibit F – DuPage County Sheriff's Office FOIA Response and Related Materials Concerning the November 12, 2024 Fermilab Security Detail, Including Agreement for Police Services, Invoice, Schedule, and October 2024 MOU

Exhibit G – Kane County Sheriff's Office March 14, 2024 Fermilab Trespass/Removal Records

Exhibit H – Kane County/Fermilab 2025–2026 MOU and Law-Enforcement Coordination Materials Produced in Response to FOIA

Exhibit I: September 10, 2024 Local Insider Threat Working Group ("LITWG") Agenda.

# CERTIFICATE OF SERVICE

The undersigned certifies that on June 18, 2026, she submitted the foregoing SECOND AMENDED COMPLAINT, including its attached exhibits, for filing with the Clerk of Court using the pro se filing portal. Upon docketing, the Court's electronic filing system will send notification of such filing to all counsel of record, including:

Daniel A. Kaufman
Malin A. Ehrsam
Katarina D. Stockton
MICHAEL BEST & FRIEDRICH LLP
444 West Lake Street, Suite 3200
Chicago, IL 60606
dakaufman@michaelbest.com
malin.ehrsam@michaelbest.com
kdstockton@michaelbest.com
*Counsel for Defendants*

The undersigned further certifies that, on the same date, she served a copy of the SECOND AMENDED COMPLAINT, including the IDHR opt-out notices attached as part of the exhibits, on the Illinois Department of Human Rights by email at IDHR.optouts@illinois.gov, pursuant to the IDHR Notices of Opt Out, Right to Commence an Action, and Administrative Closure.

/s/ Dr. Emanuela Barzi
Plaintiff, Pro Se

889 Napa Lane
Aurora, IL 60502
(630) 518-5765
emanuela.barzi@yahoo.com
June 18, 2026

# Exhibit A

**IDHR Email Confirming Filing Receipt, Control Number , and Plaintiff's Request to Sue Respondent (June 8–10, 2024)**

**Martinez, Andrea**

| | |
|---|---|
| **From:** | IDHR.Intake <IDHR.Intake@illinois.gov> |
| **Sent:** | Monday, June 10, 2024 8:53 AM |
| **To:** | emanuela barzi |
| **Subject:** | RE: [External] Employment charge attached |

Thank you for submitting your filing to the Illinois Department of Human Rights. This email shall serve as confirmation that your filing has been received:

Date Received: June 8, 2024

IDHR Control #: 24M0610.10

Next Step: Assignment to Intake Investigator for review

Once assigned, the Intake Investigator will reach out to you directly via letter, telephone, or email to possibly obtain any missing or clarifying information.

Please note that due to current staffing levels and the volume of filings, it is currently taking between 12 to 16 weeks for assignment to an Intake Investigator. Thank you for your patience.

When reaching out to the Intake Unit for questions please be sure to reference the IDHR Control # above.

 **INTAKE UNIT**
**CHARGE PROCESSING DIVISION**
**Illinois Department of Human Rights (IDHR)**
312.814.6200 (t) 866.740.3953 (TTY)
312.814.6251 (f)

From: emanuela barzi <emanuela.barzi@yahoo.com>
Sent: Saturday, June 8, 2024 4:10 PM
To: IDHR.Intake <IDHR.Intake@illinois.gov>
Subject: [External] Employment charge attached

To Whom It May Concern:

I have filled in the Employment form, which is herein attached, for a Discrimination/retaliation complaint. Often the narrative next overflows underneath the boxes. I hope that you can read the whole text! If not, please let me know, as I have a copy of the text on a Word file.

Also, I would like to sue the Respondent asap, and I am looking for a contingency lawyer. I so much hope you can help me find one!

Thank you and kind regards.

Emanuela Barzi
Senior Scientist, Fermi National Accelerator Laboratory

# Exhibit B

**IDHR Notice of Dismissal and Right to Sue (May 5, 2025)**

**STATE OF ILLINOIS**
**DEPARTMENT OF HUMAN RIGHTS**

**IN THE MATTER OF:**

EMANUELA BARZI,

                    COMPLAINANT,

AND

FERMI RESEARCH ALLIANCE LLC,

                    RESPONDENT.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CHARGE NO.     2024CA3371
EEOC NO.      21BA50590

## NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND NOTICE OF ADMINISTRATIVE CLOSURE

<table>
<tr><td><u>For Complainant</u></td><td><u>For Respondent</u></td></tr>
<tr><td>Emanuela Barzi<br>889 Napa Lane<br>Aurora, IL 60502</td><td>Malin A. Ehrsam<br>Michael Best & Friedrich LLP<br>790 North Water Street, Suite 2500<br>Milwaukee, WI 53202</td></tr>
</table>

DISMISSAL / NOTICE DATE: May 5, 2025

Date Perfected Charge Filed: February 2, 2025    Date Opt Out Request Filed: February 4, 2025

YOU ARE HEREBY NOTIFIED that pursuant to Section 7A-102(C-1) of the Illinois Human Rights Act (775 ILCS 5/7A-102(C-1)), Complainant having filed a written request to opt out of the Illinois Department of Human Rights' investigation and administrative processing of the above-captioned charge, the IDHR issues this Notice of Opt Out of the Investigative and Administrative Process, and the Right of Complainant to Commence an Action in the Circuit Court or other appropriate court of competent jurisdiction within 90 days from the date of this Notice and Order, as identified above.

- Complaint filed and serve a copy of the complaint to the Department and Respondent on the same date that the complaint is filed with the circuit court or other appropriate court of competent jurisdiction.
- Complainant may not file or refile a substantially similar charge with the Department arising from the same incident of unlawful discrimination or harassment.

NOW, THEREFORE, it is further hereby ORDERED that the Department cease the investigation and **ADMINISTRATIVELY CLOSE** the charge of civil rights violation(s).

                                DEPARTMENT OF HUMAN RIGHTS
                                James L. Bennett
                                Director

NOC Rev 01/13/2025

| STATE OF ILLINOIS | ) | |
|---|---|---|
| | ) | ss |
| COUNTY OF COOK | ) | |

**CHARGE NO. 2024CA3371**

## AFFIDAVIT OF SERVICE

The undersigned served a copy of the attached **NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND NOTICE OF ADMINISTRATIVE CLOSURE** on ___May 5, 2025___ , to each person named below by email or first class mail, addressed as follows:

<table>
<tr><td>For Complainant</td><td>For Respondent</td></tr>
<tr><td>Emanuela Barzi<br>889 Napa Lane<br>Aurora, IL 60502</td><td>Malin A. Ehrsam<br>Michael Best & Friedrich LLP<br>790 North Water Street, Suite 2500<br>Milwaukee, WI 53202</td></tr>
</table>

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true.

_____

**PLEASE NOTE:**

The above-signed person is responsible only for <u>mailing</u> these documents. If you wish a review of the findings in this case, you must complete the Request for Review form attached. Department of Human Rights' staff are not permitted to discuss the investigation findings once a Notice of Determination has been issued.

May 5, 2025

Emanuela Barzi
889 Napa Lane
Aurora, IL 60502

Malin A. Ehrsam
Michael Best & Friedrich LLP
790 North Water Street, Suite 2500
Milwaukee, WI 53202

### Re: <u>EMANUELA BARZI vs. FERMI RESEARCH ALLIANCE LLC</u>
### Charge No. 2024CA3371

Dear Complainant and Respondent:

Please be advised that on April 9, 2025, the Illinois Department of Human Rights ("Department") issued in error a NOTICE OF CLOSURE for the above-identified case. By this letter, the Department is vacating and rescinding that NOTICE OF CLOSURE.

Accordingly, the Department has determined that the NOTICE OF CLOSURE dated April 9, 2025, was issued due to administrative error and therefore, that NOTICE OF CLOSURE is null and void.

Attached to this letter and served on you is the proper **NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND ORDER OF ADMINISTRATIVE CLOSURE**.

The Department apologizes for any inconvenience to you.

Sincerely,

DEPARTMENT OF HUMAN RIGHTS
James L. Bennett
Director

Jss
cc:     Investigation file

# Exhibit C

**EEOC Notice of Right to Sue (July 25, 2025)**

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Chicago District Office**
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website:  www.eeoc.gov

# NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 07/25/2025

**To:** Emanuela  Barzi
Emanuela.barzi@yahoo.com

Charge No: 21B-2025-00490

EEOC Representative and email:    Barbara Ystenes
SLTP Manager
barbara.ystenes@eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge. The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court WITHIN 90 DAYS of your receipt of the EEOC's official notice of dismissal. Otherwise, your right to sue based on the above-numbered charge will be lost.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By: Amrith Kaur Aakre
07/25/2025

Amrith Kaur Aakre
District Director

**Cc:** Malin A Ehrsam
Michael Best & Friedrich LLP
Malin.ehrsam@michaelbest.com
Please retain this Notice for your records.

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 21B-2025-00490 to the District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 21B-2025-00490 to the District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

**are not considered** in determining if the impairment substantially limits a major life activity.

✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

# Exhibit D

**Seven IDHR Notices of Opt Out, Right to Commence an Action, and Administrative Closure for Charges Against FRA, Merminga, Fleming, Posen, Gourlay, Velev, and Fancsali (May 2026)**

STATE OF ILLINOIS )

COUNTY OF COOK )

) ss

CHARGE NO. 2026CA1618

### AFFIDAVIT OF SERVICE

The undersigned served a copy of the attached **NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND NOTICE OF ADMINISTRATIVE CLOSURE** on ___May 21, 2026___ , to each person named below by email or first class mail, addressed as follows:

For Complainant

Emanuela Barzi
889 Napa Lane
Aurora, IL 60502

For Respondent

Chief Executive Officer
Fermi Research Alliance LLC
Wilson Street and Kirks Rds.
P.O. Box 500 MS #213
Batavia, IL 60510

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true.



### PLEASE NOTE:

The above-signed person is responsible only for <u>mailing</u> these documents. If you wish a review of the findings in this case, you must complete the Request for Review form attached. Department of Human Rights' staff are not permitted to discuss the investigation findings once a Notice of Determination has been issued.

**IN THE MATTER OF:**

EMANUELA BARZI,

                     COMPLAINANT,

AND

FERMI RESEARCH ALLIANCE LLC,

                     RESPONDENT.

CHARGE NO.     2026CA1618
EEOC NO.   21B-2026-01001

## NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND NOTICE OF ADMINISTRATIVE CLOSURE

<table>
<tr><td align="center">For Complainant</td><td align="center">For Respondent</td></tr>
<tr><td>Emanuela Barzi<br>889 Napa Lane<br>Aurora, IL 60502</td><td>Chief Executive Officer<br>Fermi Research Alliance LLC<br>Wilson Street and Kirks Rds.<br>P.O. Box 500 MS #213<br>Batavia, IL 60510</td></tr>
</table>

DISMISSAL / NOTICE DATE: May 21, 2026

Date Perfected Charge Filed: May 3, 2026      Date Opt Out Request Filed: May 15, 2026

YOU ARE HEREBY NOTIFIED that pursuant to Section 7A-102(C-1) of the Illinois Human Rights Act (775 ILCS 5/7A-102(C-1)), Complainant having filed a written request to opt out of the Illinois Department of Human Rights' investigation and administrative processing of the above-captioned charge, the IDHR issues this Notice of Opt Out of the Investigative and Administrative Process, and the Right of Complainant to Commence an Action in the Circuit Court or other appropriate court of competent jurisdiction within 90 days from the date of this Notice and Order, as identified above.

- Complaint filed and serve a copy of the complaint to the Department and Respondent on the same date that the complaint is filed with the circuit court or other appropriate court of competent jurisdiction.
- Complainant may not file or refile a substantially similar charge with the Department arising from the same incident of unlawful discrimination or harassment.

NOW, THEREFORE, it is further hereby ORDERED that the Department cease the investigation and **ADMINISTRATIVELY CLOSE** the charge of civil rights violation(s).

                                    DEPARTMENT OF HUMAN RIGHTS
                                    James L. Bennett
                                    Director

### AFFIDAVIT OF SERVICE

The undersigned served a copy of the attached **NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND NOTICE OF ADMINISTRATIVE CLOSURE**

on     May 19, 2026    , to each person named below by email or first class mail, addressed as follows:

<table>
<tr><td>For Complainant</td><td>For Respondent</td></tr>
<tr><td>Emanuela Barzi<br>889 Napa Lane<br>Aurora, IL 60502</td><td>Lia Merminga<br>Wilson and Kirk, Rds.<br>P.O. Box 500, MS #315<br>Batavia, IL 60510-5011</td></tr>
</table>

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true.

_____

**PLEASE NOTE:**

The above-signed person is responsible only for <u>mailing</u> these documents. If you wish a review of the findings in this case, you must complete the Request for Review form attached. Department of Human Rights' staff are not permitted to discuss the investigation findings once a Notice of Determination has been issued.

**IN THE MATTER OF:**

EMANUELA BARZI,

COMPLAINANT,

AND

LIA MERMINGA,

RESPONDENT.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CHARGE NO. 2026CN1734
EEOC NO. N/A

## NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND NOTICE OF ADMINISTRATIVE CLOSURE

| For Complainant | For Respondent |
|---|---|
| Emanuela Barzi<br>889 Napa Lane<br>Aurora, IL 60502 | Lia Merminga<br>Wilson and Kirk, Rds.<br>P.O. Box 500, MS #315<br>Batavia, IL 60510-5011 |

DISMISSAL / NOTICE DATE: May 19, 2026

Date Perfected Charge Filed: May 3, 2026          Date Opt Out Request Filed: May 15, 2026

YOU ARE HEREBY NOTIFIED that pursuant to Section 7A-102(C-1) of the Illinois Human Rights Act (775 ILCS 5/7A-102(C-1)), Complainant having filed a written request to opt out of the Illinois Department of Human Rights' investigation and administrative processing of the above-captioned charge, the IDHR issues this Notice of Opt Out of the Investigative and Administrative Process, and the Right of Complainant to Commence an Action in the Circuit Court or other appropriate court of competent jurisdiction within 90 days from the date of this Notice and Order, as identified above.

- Complaint filed and serve a copy of the complaint to the Department and Respondent on the same date that the complaint is filed with the circuit court or other appropriate court of competent jurisdiction.
- Complainant may not file or refile a substantially similar charge with the Department arising from the same incident of unlawful discrimination or harassment.

NOW, THEREFORE, it is further hereby ORDERED that the Department cease the investigation and **ADMINISTRATIVELY CLOSE** the charge of civil rights violation(s).

DEPARTMENT OF HUMAN RIGHTS
James L. Bennett
Director

NOC Rev 01/13/2025

**STATE OF ILLINOIS** )
                      ) **ss**
**COUNTY OF COOK** )

**CHARGE NO.** 2026CN1736

### AFFIDAVIT OF SERVICE

The undersigned served a copy of the attached **NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND NOTICE OF ADMINISTRATIVE CLOSURE** on ___May 20, 2026___ , to each person named below by email or first class mail, addressed as follows:

| For Complainant | For Respondent |
|---|---|
| Mrs. Emanuela Barzi<br>889 Napa Lane<br>Aurora, IL 60502 | Bonnie Fleming<br>Wilson and Kirk Rds.<br>P.O. Box Box 500 MS #213<br>Batavia, IL 60510 |

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true.

_____

### PLEASE NOTE:

The above-signed person is responsible only for <u>mailing</u> these documents. If you wish a review of the findings in this case, you must complete the Request for Review form attached. Department of Human Rights' staff are not permitted to discuss the investigation findings once a Notice of Determination has been issued.

## STATE OF ILLINOIS
## DEPARTMENT OF HUMAN RIGHTS

**IN THE MATTER OF:**

MRS. EMANUELA BARZI,

              COMPLAINANT,

AND

BONNIE FLEMING,

              RESPONDENT.

)
)
)
)
)
)
)
)
)
)
)
)
)

CHARGE NO.    2026CN1736
EEOC NO.        N/A

## NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND NOTICE OF ADMINISTRATIVE CLOSURE

<table>
<tr><td>For Complainant</td><td>For Respondent</td></tr>
<tr><td>Mrs. Emanuela Barzi<br>889 Napa Lane<br>Aurora, IL 60502</td><td>Bonnie Fleming<br>Wilson and Kirk Rds.<br>P.O. Box Box 500 MS #213<br>Batavia, IL 60510</td></tr>
</table>

DISMISSAL / NOTICE DATE: May 20, 2026

Date Perfected Charge Filed: May 3, 2026      Date Opt Out Request Filed: May 15, 2026

YOU ARE HEREBY NOTIFIED that pursuant to Section 7A-102(C-1) of the Illinois Human Rights Act (775 ILCS 5/7A-102(C-1)), Complainant having filed a written request to opt out of the Illinois Department of Human Rights' investigation and administrative processing of the above-captioned charge, the IDHR issues this Notice of Opt Out of the Investigative and Administrative Process, and the Right of Complainant to Commence an Action in the Circuit Court or other appropriate court of competent jurisdiction within 90 days from the date of this Notice and Order, as identified above.

- Complaint filed and serve a copy of the complaint to the Department and Respondent on the same date that the complaint is filed with the circuit court or other appropriate court of competent jurisdiction.
- Complainant may not file or refile a substantially similar charge with the Department arising from the same incident of unlawful discrimination or harassment.

NOW, THEREFORE, it is further hereby ORDERED that the Department cease the investigation and **ADMINISTRATIVELY CLOSE** the charge of civil rights violation(s).

                                DEPARTMENT OF HUMAN RIGHTS
                                James L. Bennett
                                Director

STATE OF ILLINOIS  )
        )  ss
COUNTY OF COOK  )          CHARGE NO. 2026CN1735

## AFFIDAVIT OF SERVICE

The undersigned served a copy of the attached **NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND NOTICE OF ADMINISTRATIVE CLOSURE**

on  May 19, 2026 , to each person named below by email or first class mail, addressed as follows:

<table>
<tr><td><u>For Complainant</u></td><td><u>For Respondent</u></td></tr>
<tr><td>Emanuela Barzi<br>889 Napa Lane<br>Aurora, IL  60502</td><td>Sam Posen<br>Wilson and Kirk Rds.<br>P.O. Box 500, MS #316<br>Batavia, IL  60510-5011</td></tr>
</table>

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true.

**PLEASE NOTE:**

The above-signed person is responsible only for <u>mailing</u> these documents. If you wish a review of the findings in this case, you must complete the Request for Review form attached. Department of Human Rights' staff are not permitted to discuss the investigation findings once a Notice of Determination has been issued.

**IN THE MATTER OF:**

EMANUELA BARZI,

COMPLAINANT,

AND

SAM POSEN,

RESPONDENT.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CHARGE NO.　2026CN1735

EEOC NO.　N/A

## NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND NOTICE OF ADMINISTRATIVE CLOSURE

<u>For Complainant</u>

Emanuela Barzi
889 Napa Lane
Aurora, IL 60502

<u>For Respondent</u>

Sam Posen
Wilson and Kirk Rds.
P.O. Box 500, MS #316
Batavia, IL 60510-5011

DISMISSAL / NOTICE DATE: May 19, 2026

Date Perfected Charge Filed: May 3, 2026　　　Date Opt Out Request Filed: May 15, 2026

YOU ARE HEREBY NOTIFIED that pursuant to Section 7A-102(C-1) of the Illinois Human Rights Act (775 ILCS 5/7A-102(C-1)), Complainant having filed a written request to opt out of the Illinois Department of Human Rights' investigation and administrative processing of the above-captioned charge, the IDHR issues this Notice of Opt Out of the Investigative and Administrative Process, and the Right of Complainant to Commence an Action in the Circuit Court or other appropriate court of competent jurisdiction within 90 days from the date of this Notice and Order, as identified above.

- Complaint filed and serve a copy of the complaint to the Department and Respondent on the same date that the complaint is filed with the circuit court or other appropriate court of competent jurisdiction.
- Complainant may not file or refile a substantially similar charge with the Department arising from the same incident of unlawful discrimination or harassment.

NOW, THEREFORE, it is further hereby ORDERED that the Department cease the investigation and **ADMINISTRATIVELY CLOSE** the charge of civil rights violation(s).

DEPARTMENT OF HUMAN RIGHTS
James L. Bennett
Director

STATE OF ILLINOIS     )
                  )   ss
COUNTY OF COOK     )

CHARGE NO. 2026CN1732

## AFFIDAVIT OF SERVICE

The undersigned served a copy of the attached **NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND NOTICE OF ADMINISTRATIVE CLOSURE**

on    May 20, 2026   , to each person named below by email or first class mail, addressed as follows:

| For Complainant | For Respondent |
|---|---|
| Mrs. Emanuela Barzi<br>889 Napa Lane<br>Aurora, IL 60502 | Stephen Gourlay<br>Wilson and Kirk Rds.<br>P.O. Box Box 500 MS #213<br>Batavia, IL 60510 |

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true.

_Kalen Leyens_

**PLEASE NOTE:**

The above-signed person is responsible only for <u>mailing</u> these documents. If you wish a review of the findings in this case, you must complete the Request for Review form attached. Department of Human Rights' staff are not permitted to discuss the investigation findings once a Notice of Determination has been issued.

## STATE OF ILLINOIS
## DEPARTMENT OF HUMAN RIGHTS

IN THE MATTER OF:

MRS. EMANUELA BARZI, )
)
)
)
COMPLAINANT, )          CHARGE NO.   2026CN1732
AND )          EEOC NO.      N/A
)
STEPHEN GOURLAY, )
)
)
)
)
)
)
RESPONDENT. )

### NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND NOTICE OF ADMINISTRATIVE CLOSURE

| For Complainant | For Respondent |
|---|---|
| Mrs. Emanuela Barzi | Stephen Gourlay |
| 889 Napa Lane | Wilson and Kirk Rds. |
| Aurora, IL 60502 | P.O. Box Box 500 MS #213 |
| | Batavia, IL 60510 |

DISMISSAL / NOTICE DATE: May 20, 2026

Date Perfected Charge Filed: May 3, 2026      Date Opt Out Request Filed: May 15, 2026

YOU ARE HEREBY NOTIFIED that pursuant to Section 7A-102(C-1) of the Illinois Human Rights Act (775 ILCS 5/7A-102(C-1)), Complainant having filed a written request to opt out of the Illinois Department of Human Rights' investigation and administrative processing of the above-captioned charge, the IDHR issues this Notice of Opt Out of the Investigative and Administrative Process, and the Right of Complainant to Commence an Action in the Circuit Court or other appropriate court of competent jurisdiction within 90 days from the date of this Notice and Order, as identified above.

- Complaint filed and serve a copy of the complaint to the Department and Respondent on the same date that the complaint is filed with the circuit court or other appropriate court of competent jurisdiction.
- Complainant may not file or refile a substantially similar charge with the Department arising from the same incident of unlawful discrimination or harassment.

NOW, THEREFORE, it is further hereby ORDERED that the Department cease the investigation and **ADMINISTRATIVELY CLOSE** the charge of civil rights violation(s).

DEPARTMENT OF HUMAN RIGHTS
James L. Bennett
Director

NOC Rev 01/13/2025

STATE OF ILLINOIS )
) ss
COUNTY OF COOK ) CHARGE NO. 2026CN1733

**AFFIDAVIT OF SERVICE**

The undersigned served a copy of the attached **NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND NOTICE OF ADMINISTRATIVE CLOSURE** on    May 19, 2026    , to each person named below by email or first class mail, addressed as follows:

|  |  |
|---|---|
| For Complainant | For Respondent |
| Emanuela Barzi<br>889 Napa Lane<br>Aurora, IL 60502 | George Velev<br>Wilson and Kirk Rds.<br>P.O. Box 500, MS #314<br>Batava, IL 60510-5011 |

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true.

_____

**PLEASE NOTE:**

The above-signed person is responsible only for <u>mailing</u> these documents. If you wish a review of the findings in this case, you must complete the Request for Review form attached. Department of Human Rights' staff are not permitted to discuss the investigation findings once a Notice of Determination has been issued.

## STATE OF ILLINOIS
## DEPARTMENT OF HUMAN RIGHTS

IN THE MATTER OF:

EMANUELA BARZI,

)
)
)
)
COMPLAINANT, )
)
AND )
)
GEORGE VELEV, )
)
)
)
)
)
)
RESPONDENT. )

CHARGE NO.   2026CN1733
EEOC NO.        N/A

## NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND NOTICE OF ADMINISTRATIVE CLOSURE

### For Complainant
Emanuela Barzi
889 Napa Lane
Aurora, IL 60502

### For Respondent
George Velev
Wilson and Kirk Rds.
P.O. Box 500, MS #314
Batava, IL 60510-5011

DISMISSAL / NOTICE DATE: May 19, 2026

Date Perfected Charge Filed: May 3, 2026      Date Opt Out Request Filed: May 15, 2026

YOU ARE HEREBY NOTIFIED that pursuant to Section 7A-102(C-1) of the Illinois Human Rights Act (775 ILCS 5/7A-102(C-1)), Complainant having filed a written request to opt out of the Illinois Department of Human Rights' investigation and administrative processing of the above-captioned charge, the IDHR issues this Notice of Opt Out of the Investigative and Administrative Process, and the Right of Complainant to Commence an Action in the Circuit Court or other appropriate court of competent jurisdiction within 90 days from the date of this Notice and Order, as identified above.

- Complaint filed and serve a copy of the complaint to the Department and Respondent on the same date that the complaint is filed with the circuit court or other appropriate court of competent jurisdiction.
- Complainant may not file or refile a substantially similar charge with the Department arising from the same incident of unlawful discrimination or harassment.

NOW, THEREFORE, it is further hereby ORDERED that the Department cease the investigation and ADMINISTRATIVELY CLOSE the charge of civil rights violation(s).

DEPARTMENT OF HUMAN RIGHTS
James L. Bennett
Director

NOC Rev 01/13/2025

STATE OF ILLINOIS )
) ss
COUNTY OF COOK )

CHARGE NO. 2026CN1737

**AFFIDAVIT OF SERVICE**

The undersigned served a copy of the attached **NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND NOTICE OF ADMINISTRATIVE CLOSURE** on     May 20, 2026     , to each person named below by email or first class mail, addressed as follows:

For Complainant

Mrs. Emanuela Barzi
889 Napa Lane
Aurora, IL 60502

For Respondent

Beth Fancsali
Wilson and Kirk Rds.
P.O. Box Box 500 MS #213
Batavia, IL 60510

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true.

_____

**PLEASE NOTE:**

The above-signed person is responsible only for <u>mailing</u> these documents. If you wish a review of the findings in this case, you must complete the Request for Review form attached. Department of Human Rights' staff are not permitted to discuss the investigation findings once a Notice of Determination has been issued.

**STATE OF ILLINOIS**
**DEPARTMENT OF HUMAN RIGHTS**

**IN THE MATTER OF:**

MRS. EMANUELA BARZI,

|                        |              |    |                  |            |
|------------------------|--------------|----|------------------|------------|
|                        |              | )  |                  |            |
|                        |              | )  |                  |            |
|                        |              | )  |                  |            |
|                        | COMPLAINANT, | )  | CHARGE NO.       | 2026CN1737 |
| AND                    |              | )  | EEOC NO.         | N/A        |
| BETH FANCSALI,         |              | )  |                  |            |
|                        |              | )  |                  |            |
|                        |              | )  |                  |            |
|                        |              | )  |                  |            |
|                        |              | )  |                  |            |
|                        | RESPONDENT.  | )  |                  |            |

**NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND NOTICE OF ADMINISTRATIVE CLOSURE**

For Complainant

Mrs. Emanuela Barzi
889 Napa Lane
Aurora, IL 60502

For Respondent

Beth Fancsali
Wilson and Kirk Rds.
P.O. Box Box 500 MS #213
Batavia, IL 60510

DISMISSAL / NOTICE DATE: May 20, 2026

Date Perfected Charge Filed: May 3, 2026          Date Opt Out Request Filed: May 15, 2026

YOU ARE HEREBY NOTIFIED that pursuant to Section 7A-102(C-1) of the Illinois Human Rights Act (775 ILCS 5/7A-102(C-1)), Complainant having filed a written request to opt out of the Illinois Department of Human Rights' investigation and administrative processing of the above-captioned charge, the IDHR issues this Notice of Opt Out of the Investigative and Administrative Process, and the Right of Complainant to Commence an Action in the Circuit Court or other appropriate court of competent jurisdiction within 90 days from the date of this Notice and Order, as identified above.

- Complaint filed and serve a copy of the complaint to the Department and Respondent on the same date that the complaint is filed with the circuit court or other appropriate court of competent jurisdiction.
- Complainant may not file or refile a substantially similar charge with the Department arising from the same incident of unlawful discrimination or harassment.

NOW, THEREFORE, it is further hereby ORDERED that the Department cease the investigation and **ADMINISTRATIVELY CLOSE** the charge of civil rights violation(s).

DEPARTMENT OF HUMAN RIGHTS
James L. Bennett
Director

# Exhibit E

**Minutes from Scientific Advisory Council Meeting Regarding 2024 RIF and Scientist RIF Policy (November 14, 2024)**

Minutes from SAC Meeting November 14 2024
Submitted by Liz Buckley-Geer

Attendees:
SAC members: Stephen Parke, Liz Buckley-Geer, Daniel Baxter, Jonathan Eisch, David van Zanten, Jonathan Lewis, Vaia Papadimitriou, Stoyan Stoynev, Seon-Hee (Sunny) Seo, Adam Schreckenberger, Kellen McGee
We were joined by Bonnie Fleming, Doug Glenzinski and Eileen Crowley from the Directorate

I apologize if I didn't get the names of everyone who made comments. I will just say "SAC asked" if I didn't write it down.

Bonnie talked about the RIF.
FY24 was a challenging year. The lab took a number of actions to stay within the budget – LOMO, vacation, SSVP, DOE bailout, not hiring postdocs.
Repeating these actions for FY25 is not sustainable. Furloughs were considered untenable as they are a band aid and not a long-term solution as it seems we will have continued budget issues in FY26 and FY27.

SAC asked whether it was prudent, given what we knew about the budget, to have hired all the new people in procurement and ES&H (some number like 50 was mentioned). Bonnie noted that there was pressure from DOE headquarters as well as the site office to improve mission support as it has been under supported relative to the mission side. She did confess that it maybe should have been approached with more caution.

There was some discussion of overhead rates that I didn't fully capture but I think the comment was made that the large projects like DUNE contribute less to the overhead than the base program.

Bonnie said that they looked at reshuffling people where possible. There was some consultation with Division heads and department heads about the effects of losing people on certain tasks, but I got the impression that this was limited.

Vaia asked why the policy for scientist RIFs that was drawn up in 2015 as a result of the last layoffs in ~2010 was not followed. Bonnie and Doug said that it was not in compliance with other procedures and processes. The two main concerns were confidentiality and equity. The equity concern is that if scientists have a special procedure why not engineers, technicians etc. The confidentiality concern comes limiting the number of people who are involved in the layoff process. In a university there would not be such a policy, terminations are done by the HR department only. It was noted however that the bar for firing tenured faculty at a university is higher, but, for example, when entire departments are eliminated then the faculty are not involved in the decisions.

Policies are supposed to be reviewed every 3 years. SAC asked why the policy has never been reviewed and modified if it was not in compliance as written. There did not seem to be a good answer for that. They didn't want to change in before the RIF as that would have alerted people to the possibility of a RIF. Doug noted that all policies are being evaluated as part of the transition and that policies are being matched to owners. There are a number of policies that have not been updated for more than 3 years. The scientific appointments policy is complicated, and management didn't think it could be updated before the transition. There was a task force setup by Nigel to look at scientific hiring but it the process never completed. SAC suggested that it would us useful for them to see the report if one existed.

Bonnie noted that the size of the scientific staff impacts the size of raises that we can give. Femilab has dropped below the level of other labs in this area. This is a retention issue.

Stephen Parke asked what the criteria were for choosing who to RIF. Bonnie said that they looked at the lab priorities over all areas. When asked why someone working on a high priority project like mu2E was included in the RIF she said that even if an project was high priority it didn't mean that all aspects of the project had equal priority.

Comments were made that the lab is a miserable place to work, we no longer have a community, and we need to fix this. Dan Baxter made several points – he spends at least 40 hours a week on bureaucracy rather than science; people in his team don't want to come to work; the reputation of the lab in the community is atrocious; it is embarrassing to represent Fermilab at a conference.

Bonnie noted that the security posture has changed across the whole DOE complex and Fermilab was behind in implementing these changes. She noted that the barn is now open for public events, and they are working on the Users Center. Many SAC members did not know about the barn, so communication is still problematic. Dan Baxter noted that we really need better communication as progress is being made but people aren't aware of it. Bonnie noted that it is harder to get the message out to the user community, but they are trying.

SAC asked how many scientists were laid off. The answer was 12. Also 33 people on direct funds took the SSVP. The total for the lab was 53.

We discussed access to email and data. SAC wanted to know why the affected scientists could not immediately become guest/emeritus. All guest/emeritus appointments expire on December 31 and must be renewed. The claim was that the new contractor needs to approve the guest/emeritus policies so that is why it needs to wait until January. However, we learned that, in fact, the guest/emeritus polices were flagged with the transition team and they have accepted the policy as is. EDITORIAL NOTE: Given this fact, I see no reason why we cannot immediately extend guest/emeritus status to the 12 scientists now and they will transition to the new contract along with the existing ones in January. It would at least make their situation slightly more palatable.

Liz Buckley-Geer asked about the age demographics, given that at least 8 of the 12 scientists are very senior and have all been at the lab for at least 30 years. Bonnie claimed that the overall age profile was signed off on by the DOE. EDITORIAL NOTE: I still think the scientist demographic is biased, over 50% of the scientists were eligible for retirement. That doesn't look like a gaussian to me! Under the Age Discrimination in Employment Act, a RIF'd employee must be provided with the ages of the individuals considered for the RIF and those who were RIF'd. Steve got a copy. There were 252 people in total across the lab in various job categories who were considered and 53 people were chosen for involuntary separation. As I have nothing better to do, I typed in the ages and made a histogram. I leave you to draw your own conclusions.



SAC commented that from the beginning of the lab the scientists had a special role but now it seems that all the protections are gone as they are treated the same as everyone else. Bonnie said that scientists are still critical to the lab mission which is to do science. EDITORIAL NOTE: I think some of us have a hard time believing that statement.

We discussed the upcoming all-scientist meeting on November 22 at 1pm. The agenda will be split between the RIF and the transition. There will be an in introductory talk from Bonnie. The announcement will be sent out shortly.

At the end of the meeting Liz Buckley-Geer asked about the timeline to re-open the cafeteria. There is no re-opening date at the moment. EDITORIAL NOTE: after I sent the minutes we received a notification that the cafeteria would re-open on Monday 18.

# Exhibit F

**DuPage County Sheriff's Office FOIA Response and Related Materials Concerning the November 12, 2024 Fermilab Security Detail, Including Agreement for Police Services, Invoice, Schedule, and October 2024 Memorandum of Understanding**


May 12, 2026

Emanuela Barzi
889 Napa Lane
Aurora, IL 60502

RE:  Freedom of Information Request
Fermilab

Thank you for writing to the DuPage County Sheriff's Office with your request for information pursuant to the Illinois Freedom of Information Act, 5 ILCS 140/1 et seq.

On May 8, 2026, I received your two emails requesting any agreement with Fermilab and the Sheriff's Office. In your second request you wanted all communication concerning a planned presence at Fermilab from the dates Nov. 11-13 in 2024.

Your request is granted. I have attached the agreement between the two parties that was signed in October of 2024.

The incident that covered your time frame of Nov. 11th-13th in 2024 was a security detail. No telephone records would be available. Any calls would have been handled by our Civil Division, and their phone lines are not recorded. The request for the special detail from Fermilab is attached. I have also attached the invoice and the schedule for requested personnel.

Sincerely,

Kent Kouba
Freedom of Information Officer

# AGREEMENT FOR POLICE SERVICES

WHEREAS, one of the primary duties of the Sheriff of DuPage County is to enforce all criminal and traffic laws, to prevent crime, to keep the peace, and to otherwise maintain the public safety and order within the County; and

WHEREAS, it is in the public interest that the County of DuPage, through its Sheriff, James Mendrick, enter into agreements for police services with certain private entities in order to aid these entities by providing security patrol and traffic regulation in addition to regularly assigned Sheriff's personnel; and

WHEREAS, Art. VII, Section 10 of the Illinois Constitution and Section 11-209 of the Illinois Vehicle Code provides authority to the county to enter into agreements of this nature.

NOW, THEREFORE, in exchange for the respective covenants and agreements, it is HEREBY AGREED BY AND BETWEEN THE PARTIES AS FOLLOWS:

1. This Agreement, concerning the furnishing of certain police services, is entered into by the County of DuPage through its Sheriff, James Mendrick, and

   Fermi National Accelerator Laboratory                              .

2. The County, through the Sheriff, shall provide the following police services:

   a. outside security  Yes at site 38
   b. traffic regulation  N/A
   c. marked squad car  unmarked preferred
   d. number of deputies  2
   e. other  N/A

at the following locations:

Wilson Hall  and Site 38

on the following dates and times:

Tuesday, November 12th (9am - 5:30pm)

The services to be provided pursuant to this Agreement will be in addition to regularly assigned Sheriff's personnel operating within the area. The deputy and any squad car to be provided under this Contract will at all times remain the SHERIFF'S responsibility and will be under the SHERIFF'S control and supervision. The deputy will be responsible at all times for performing any and all of the duties of a police officer according to the laws of the State of Illinois governing the duties, obligations and conduct of police officers. It is understood, however, that the primary responsibility of any deputy to be assigned under this agreement will be preventative patrol and the deputy will operate as a tactical unit.

## DuPage County Sheriff's Office

501 N. County Farm Road
Wheaton, IL 60187

**Invoice**

Emailed invoice 12/3/24 JF

★Resent via USPS 8/4/25
Also Resent email 8/6/25

| Mail payment to the above address Attention: Civil Division |
| --- |

Invoice #: 5131
Invoice Date: 12/3/2024
Due Date: 01/03/2025

**Bill To:**

FERMI LAB
ACCOUNTS PAYABLE
PO BOX 500
BATAVIA, IL 60510

PAID
08/22/25 JF
CK# 1084018

PAST DUE
8/6/25 JF

| Item | Description | Detail Date: | Hours/Qty | Rate | Amount |
|---|---|---|---|---|---|
| Special Detail | Special Detail with out Squad | November 2024 | 17 | 100.00 | 1,700.00 |

| | | |
|---|---|---|
| | **Total** | $1,700.00 |
| | **Payments/Credits** | $0.00 |
| | **Balance Due** | $1,700.00 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| TUE | 11/12/2024 | FERMI LAB | MAIN BUILDING & WILSON HALL | 0900-1730 | 8.50 | | | | | |
| TUE | 11/12/2024 | FERMI LAB | MAIN BUILDING & WILSON HALL | 0900-1730 | 8.50 | | UNIFORM | | | |
| | | | | | X | | 17.00 | | TOTAL | |
| | | | | | X | | $1,700.00 | | $1,700.00 | |

Lia Merminga
Laboratory Director

**Office of the Director**
P.O. Box 500, MS 105
Kirk Road and Pine Street
Batavia, Illinois 60510-5011
USA
Office: 630.840.3211
Merminga@fnal.gov

14 October 2024

James Mendrick
Sheriff
DuPage County Sheriff's Office
501 N. County Farm Road
Wheaton, Illinois 60187
USA

SUBJECT: MEMORANDUM OF UNDERSTANDING (MOU) with DUPAGE COUNTY SHERIFF'S OFFICE

Dear Sheriff Mendrick,

Approval and signature is requested for the attached Memorandum of Understanding (MOU) and Exhibit A regarding the working relationship between the DuPage County Sheriff's Office and the management and operating contractor for the Fermi National Accelerator Laboratory (under prime contract with the United States Department of Energy).

Fermi National Accelerator Laboratory's working relationship with the DuPage County Sheriff's Office is subject to Department of Energy (DOE) Order 473.2 A, which states in Attachment 1, Chapter I – Contractors Only, at paragraph 2e that: if "local, State, or Federal or other agencies support the implementation of this Order, sites must establish cooperative agreements, e.g., Memorandums of Understanding (MOUs) outlining the specific support to be provided and how the external support will be integrated into" Contractor Protective Force operations.

For additional questions regarding this correspondence, please contact Donna Iraci at 630-840-4182 or Iraci@fnal.gov.

Sincerely,

Digitally signed by Lia
Merminga
Date: 2024.10.14
12:56:09 -05'00'

Lia Merminga
Laboratory Director

cc:

R. Snyder, w/o enclosed
D. Chovancek,, w/o enclosed
G. Stephens, w/o enclosed
G. Lopez, w/o enclosed
J. Rogers, w/o enclosed

D. Iraci, w/o enclosed
L. Limberg, w/o enclosed
D. Esterquest, w/o enclosed
C. Mulryan, w/o enclosed


## MEMORANDUM OF UNDERSTANDING

Whereas, the United States Department of Energy Order DOE O 473.2A "Protective Force Operations" is applicable to the operations at Fermi National Accelerator Laboratory, parts of which are located in unincorporated DuPage County, Illinois; and,

Whereas, the management and operating contractor (under prime contract with the United States Department of Energy) for the Fermi National Accelerator Laboratory, and the DuPage County Sheriff's Office have a long and established history of working together; and,

Whereas, the management and operating contractor (under prime contract with the United States Department of Energy) for the Fermi National Accelerator Laboratory has relied on the services of DuPage County Sheriff's Office in law enforcement operations and investigations over the past years; and,

Whereas, the DuPage County Sheriff's Office has a dedicated radio frequency they monitor 24/7/365 in their communications center on behalf of Fermi National Accelerator Laboratory; and,

Whereas, the DuPage County Sheriff's Office is a nationally-accredited law enforcement agency; and,

Whereas, the DuPage County Sheriff's Office has full authority and jurisdiction to enter onto Fermi National Accelerator Laboratory property; and,

Whereas, the management and operating contractor (under prime contract with the United States Department of Energy) for the Fermi National Accelerator Laboratory does not currently have the resources to conduct law enforcement operations and investigations; and,

Whereas, the DuPage County Sheriff's Office has, in the past, conducted law enforcement operations and investigations as outlined in Exhibit 'A', which is attached hereto and incorporated into this agreement; and

Whereas, the DuPage County Sheriff's Office has expressed an interest in continuing to conduct law enforcement operations and investigations as outlined in Exhibit 'A' at Fermi National Accelerator Laboratory; and,

Whereas, the Sheriff's Office currently has the resources to conduct law enforcement operations and investigations as outlined in Exhibit 'A' at Fermi National Accelerator Laboratory;

Therefore, the management and operating contractor (under prime contract with the United States Department of Energy) for the Fermi National Accelerator Laboratory requests and the DuPage County Sheriff's Office agrees to continue to conduct law enforcement operations and investigations as outlined in Exhibit 'A' as required at Fermi National Accelerator Laboratory; and,

Furthermore, the DuPage County Sheriff's Office requests and the management and operating contractor (under prime contract with the United States Department of Energy) for the Fermi National Accelerator Laboratory agrees to continue to provide the assistance of its security staff in working

1

with the DuPage County Sheriff's Office staff in order to conduct such law enforcement operations and investigations as outlined in Exhibit 'A'.

Fermi Research Alliance, LLC (FRA) is the current management and operating contractor (under prime contract with the United States Department of Energy) for the Fermi National Accelerator Laboratory. FRA may assign or transfer this Memorandum of Understanding, including Exhibit A, to a successor management and operating contractor for the Fermi National Accelerator Laboratory. This Memorandum of Understanding, including Exhibit A, will continue upon that assignment or transfer.

Approved by the management and operating contractor Fermi National Accelerator Laboratory by Director Nikolitsa (Lia) Merminga and the DuPage County Sheriff James Mendrick, this 14th day of October, 2024.

| Fermi Research Alliance, LLC as manager and operator of the Fermi National Accelerator Laboratory<br><br>Digitally signed by Nikolitsa (Lia) Merminga Date: 2024.10.14 12:55:23 -05'00' | DuPage County Sheriff's Office |
|---|---|
| Nikolitsa (Lia) Merminga, Laboratory Director<br>Date: 10/14/24 | Sheriff of DuPage County, James Mendrick<br>Date: 10/15/2024 |

2

**EXHIBIT 'A'**

The DuPage County Sheriff's Office Law Enforcement Bureau provides various functions and services in DuPage County which includes Fermi National Accelerator Laboratory. These functions and services include, but are not limited to:

- Providing preventive patrols utilizing marked and unmarked patrol units, bicycle, and foot patrols;
- Monitoring the DuPage County Sheriff's Office radio system for a dedicated Fermi National Accelerator Laboratory radio frequency being: Fermilab Fire Department and Fermilab Security Department;
- Responding to calls for service;
- Traffic enforcement and education;
- Accident investigations;
- Security checks;
- Community relations programs to include development of relations between citizens and the DuPage County Sheriff's Office;
- Apprehending and arresting offenders, and the transportation of said offenders to the DuPage County Jail, or when required, to other agency jurisdictions;
- Evidence preservation and collection;
- Law enforcement;
- General assistance to the public;
- Maintenance of public order;
- Emergency services;
- Reporting of information to appropriate office components;
- Responding to situations involving hazardous agents (radiological/biological/chemical);
- Participating in and providing training programs for:
  - a.) Violence in the Workplace;
  - b.) Active Shooter situations;
  - c.) Hostage situations.

The DuPage County Sheriff's Office maintains a division within the Law Enforcement Bureau which is responsible for conducting criminal investigations. This Criminal Investigation Division's functions include, but are not limited to:

- Investigation of reported and suspected crimes;
- Apprehension of criminals;
- Recovery of property;

The DuPage County Sheriff's Office maintains a unit within the Law Enforcement Bureau with special operations capabilities in order to engage in and bring critical incidents to a successful conclusion. This Special Operations Unit functions include, but are not limited to:

- Hostage situations
- Barricaded subject situations

3

- Terrorist situations
- VIP protection and security
- Other special tactical situations
- High risk arrest situations or execution of warrants
- Providing assistance to other divisions/units of the DuPage County Sheriff's Office in situations requiring their specialized training and tactics.

The DuPage County Sheriff's Office maintains a unit with the Law Enforcement Bureau with experience and expertise in responding to hazardous device and explosives. This Hazardous Devices and Explosives Unit's functions include, but are not limited to:

- Responding to and investigating incidents involving explosions, bombings, bomb threats and hazardous devices or explosives; and
- Bomb and other hazardous device disposal.

The DuPage County Sheriff's Office maintains a unit within the Law Enforcement Bureau comprised of canine teams. This Canine Unit's functions include, but are not limited to:

- Tracking persons;
- Detecting narcotics evidence;
- Locating human remains; and
- Responding to bomb threats/suspicious devices.

# Exhibit G

**Kane County Sheriff's Office March 14, 2024 Fermilab Trespass/ Removal Records**

# Kane County Sheriff's Office



37W755 IL Rt 38 • St Charles, IL 60175
Tel: (630) 232-6840 • Fax: (630) 513-6984
www.KaneSheriff.com

Ron Hain, Sheriff                                    Amy Johnson, Undersheriff

May 4, 2026

Ms. Emanuela Barzi
Emanuela.barzi@yahoo.com

Dear Ms. Barzi,

Subject: FOIA

Thank you for writing to the Kane County Sheriff's Office with your request for information pursuant to the Illinois Freedom of Information Act, 5 ILCS 140/1 et seq.

On May 4, 2026 you requested the following:

A copy of reports occurring on March 14, 2024 involving Fermi National Accelerator Laboratory (Fermilab) for your records.

**A copy of the report and CAD (dispatch) report is attached.**

Redactions have been made under the following exemption:

**5 ILCS 140/7(1)(b)** – **Private information** such as, unique identifiers, including social security numbers, driver's license, telephone numbers, employee identification number, biometric identifiers, personnel financial information, medical information, graphic photos, race. Passwords or other access codes, home address, signatures and personal license plates.

**5 ILCS 140/7(1)(c)** – The disclosure of a **date of birth** would constitute a clearly unwarranted invasion of personal privacy.

**5 ILCS 140/7(1)(d)(iv)** – **Allows a public body to withhold records that would unavoidably identify person who file** complaints or witnesses that provide information to law enforcement or were never arrested.

# Kane County Sheriff's Office



37W755 IL Rt 38  •  St Charles, IL 60175
Tel: (630) 232-6840  •  Fax: (630) 513-6984
www.KaneSheriff.com

Ron Hain, Sheriff                                    Amy Johnson, Undersheriff

In response to your Freedom of Information Act Request, the Kane County Sheriff's Office believes this information is responsive you your request

You have the right to have the denial of your request reviewed by the Public Access Counselor (PAC) at the Office of the Attorney General. 5 ILCS 140/9.5(a).

Public Access Counselor

Office of the Attorney General

500 South 2nd Street

Springfield, IL 62706

PAC Hotline: 877-299-3642

E-mail: publicaccess@ilag.gov

You also have the right to seek judicial review of your denial by filing a lawsuit in the State Circuit Court. 5 ILCS 140/11.

If you choose to file a Request for Review with the PAC, you must do so within 60 calendar days of the date of this denial letter. 5 ILCS 140/9.5(a). Please note that you must include a copy of your original FOIA request and this denial letter when filing a Request for Review with the PAC.

Sincerely,

Ashley Hain

Chief FOIA Officer

Kane County Sheriff's Office



# KANE COUNTY SHERIFF'S OFFICE

### CASE REPORT

37W755 IL Rte. 38, Ste. A
St. Charles, IL 60175

CASE# **2024-00010808**

BWC:

| EVENT | | | |
|---|---|---|---|
| REPORTED DATE/TIME 3/14/2024 15:18 | OCCURRED INCIDENT TYPE Trespass | | CASE STATUS AT TIME OF REPORT ACTIVITY COMPLETED |
| OCCURRED FROM DATE/TIME 03/14/2024 15:18 | OCCURRED THRU DATE/TIME 03/14/2024 15:18 | LOCATION OF OCCURRENCE 900 KIRK RD Batavia, IL | |

## OFFENSES

| | STATUTE/DESCRIPTION | COUNTS | ATTEMPT/COMMIT |
|---|---|---|---|
| 01 | 720 ILCS 5/21-5(a) CRIMINAL TRESPASS TO STATE SUPPORTED LAND Enters/remains after notice | 2 | Commit |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| JACKET/SUBJECT TYPE | | NAME (LAST, FIRST, MIDDLE SUFFIX) | | | | |
|---|---|---|---|---|---|---|
| Adult | Arrestee | DOLEK, FURKAN | | | | |
| | AGE or AGE RANGE 35 | ADDRESS (STREET, CITY, STATE, ZIP) 200 HOUNDSCHASE LN   BLACKSBURG, VA 24060 | | | | |
| | | SEX Male | HEIGHT or RANGE 5'10" 5'10" | WEIGHT or RANGE 220  230 | HAIR Black | EYE Brown |
| VA | | PRIMARY PHONE | PHONE #2 | | LEADS # | |

| REPORTING OFFICER | DATE | REVIEWED BY | |
|---|---|---|---|
| 138 Hernandez | 3/14/2024 | Monaghan, Ryan J | 03/20/2024 10:34 |



## ADDITIONAL SUBJECTS

| SUBJECT | JACKET/SUBJECT TYPE | NAME (LAST, FIRST, MIDDLE SUFFIX) | | | | | |
|---|---|---|---|---|---|---|---|
| | DOB — AGE or AGE RANGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | | | |
| | RACE | SEX | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | | EYE |
| | DL NUMBER/STATE | PRIMARY PHONE | | PHONE #2 | | LEADS # | |

| SUBJECT | JACKET/SUBJECT TYPE | NAME (LAST, FIRST, MIDDLE SUFFIX) | | | | | |
|---|---|---|---|---|---|---|---|
| | DOB — AGE or AGE RANGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | | | |
| | RACE | SEX | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | | EYE |
| | DL NUMBER/STATE | PRIMARY PHONE | | PHONE #2 | | LEADS # | |

| SUBJECT | JACKET/SUBJECT TYPE | NAME (LAST, FIRST, MIDDLE SUFFIX) | | | | | |
|---|---|---|---|---|---|---|---|
| | DOB — AGE or AGE RANGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | | | |
| | RACE | SEX | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | | EYE |
| | DL NUMBER/STATE | PRIMARY PHONE | | PHONE #2 | | LEADS # | |

| SUBJECT | JACKET/SUBJECT TYPE | NAME (LAST, FIRST, MIDDLE SUFFIX) | | | | | |
|---|---|---|---|---|---|---|---|
| | DOB — AGE or AGE RANGE | ADDRESS (STREET, CITY, STATE, ZIP) | | | | | |
| | RACE | SEX | HEIGHT or RANGE | WEIGHT or RANGE | HAIR | | EYE |
| | DL NUMBER/STATE | PRIMARY PHONE | | PHONE #2 | | LEADS # | |

| REPORTING OFFICER | DATE | REVIEWED BY | |
|---|---|---|---|
| 138 Hernandez | 3/14/2024 | Monaghan, Ryan J | 03/20/2024 10:34 |

## NARRATIVE

On Thursday, March 14, 2024, at approximately 1541 hours, I, Deputy S. Hernandez #138, FTO Deputy Kramer #150, Deputy Alvarez #132, and Deputy Sani #108 responded to 900 S. Kirk Rd., Batavia, IL 60510 for a trespass call at Fermilab.

Upon my arrival, I drove through the Fermilab security gate, located on Pine St., and observed a posted security sign. The posted sign advised that permission to remain on property can be revoked at any time. The posted sign also stated that anyone on property is subject to a search. I was escorted by security personnel to speak with Physical Security Manager,

I spoke with ꞁ outside door 3 on the northwest side of the Wilson Hall. ꞁ explained they have a contractor employee, identified as Furkan Dolek, who refused to leave the property after given verbal notice by security personnel. ꞁ advised that Furkan was currently in his office with the Security Captain, ꞁ, and was refusing to leave the property.

ꞁ explained the following to me in summary. Furkan rents a room on property and works at Fermilab. As part of a periodic inspection conducted by the fire department on Fermilab property, cannabis was found in Furkan's room during the inspection conducted on March 13, 2024. stated this was a violation of Fermilab policy which does not allow cannabis on Fermilab grounds. Furkan was notified of the policy violation and was escorted to the 2nd floor of the Fermilab building. Security escorted Furkan to office # 2-West for a meeting in regards to Furkan's termination from Fermilab.

Upon entry to the building, Furkan refused to go to the meeting and instead took the elevator to his office space on the 12th floor where he worked. ꞁ stated Furkan entered his office and sat down with his feet up on the desk. ꞁ said ꞁ gave Furkan a verbal notice to leave the property. Furkan refused and did not comply with ꞁ verbal notice to leave. ꞁ wished to have Furkan trespassed, removed from the property and charged.

ꞁ escorted deputies to the 12th floor to Furkan's office. Upon arrival onto the 12th floor, I stepped out of the elevator and observed Furkan at a printer as he collected papers. ꞁ stood next to him at the printer. Furkan had printed resources from Wikipedia in regards to the Fourth Amendment and the U.S. Constitution. I approached Furkan and told him he needed to leave the property. I explained to Furkan he was given a verbal notice by ꞁ to leave the property and we would escort him out. Furkan asked why and I explained Fermilab staff gave him verbal notice to leave due to his termination from Fermilab. Furkan asked me to present papers explaining why he had to leave. I explained to Furkan that he would receive a notice to appear for criminal trespass. I explained to Furkan he will be provided court date and at this court date, he can contest the issue further. Furkan stated he would not leave. I explained to Furkan that failure to

| REPORTING OFFICER | DATE | REVIEWED BY | |
|---|---|---|---|
| 138 Hernandez | 3/14/2024 | Monaghan, Ryan J | 03/20/2024 10:34 |

## NARRATIVE (continuation)

comply with us would result in arrest and deputies will physically remove him from the property.

Furkan responded and asked me to present an arrest warrant. Deputy Kramer explained to Furkan that this is an in-progress call and an arrest warrant was not required. I asked Furkan several times to leave on his own. After given multiple opputunites to leave the property willingly, Furkan continued to refuse. I told Furkan if he refused again he would be arrested and taken to jail. Furkan refused my command to leave the property and he was placed under arrest without incident.

I arrested Furkan and placed him into handcuffs. I checked the handcuffs for proper fit and double locked them. Furkan verbally refused to give up his Fermilab work ID and it was taken off of him.          asked Furkan to turn over his key to the Fermilab property but Furkan did not respond.

I exited the building through door 3 with Furkan and towards my squad car. I searched Furkan and no contraband was found. Deputy Sani placed Furkan into the arrestee compartment of my squad.          asked us if we could search Furkan's car for the Fermilab key they wanted to recover from Furkan. Deputy Kramer explained to          that we could not enter Furkan's car without a search warrant.          was advised to follow Fermilab's policy regarding searches and recovering their property.

Security Supervior,                    , looked into Furkan's car and saw the key they were looking for. Per their policy,          and          open6ed Furkan's car with the key fob and retrived the key. I observed          video record the recovery of the key via a cellphone.

advised they would make arrangements to remove Furkan's vehicle from the property.          explained that Furkan can call Femrilab dispatch and obtain the location of his vehicle.          advised Deputy Kramer and I that Furkan is not allowed on property.          stated Furkan's belongings will be gathered and mailed to his residence in Virginia.

I transported Furkan to the Kane County Jail without incident. While at the jail, Deputy Kramer advised Furkan that he was not allowed to return to Fermilab property per the request of Furkan was turned over to jail deputies for processing.

Furkan is being charged with 2 counts of Criminal Trespass to State Supported Land. Furkan was given an NTA of April 17, 2024 at 0900 hours at the Kane Branch Court for the initial instance of remaining after being given notice to leave.

Request for a conditions of pretrial release hearing due to Furkan refusing to leave which required him to be physically removed from the premises.

| REPORTING OFFICER | DATE | REVIEWED BY | |
|---|---|---|---|
| 138 Hernandez | 3/14/2024 | Monaghan, Ryan J | 03/20/2024 10:34 |

## NARRATIVE (continuation)

A search of Fermilab's website states Femrilab is managed by the Fermi Research Alliance LLC. for the U.S. Department of Energy.

Nothing further at this time.

| REPORTING OFFICER | DATE | REVIEWED BY | |
|---|---|---|---|
| 138 Hernandez | 3/14/2024 | Monaghan, Ryan J | 03/20/2024 10:34 |

# KANE COUNTY SHERIFF'S OFFICE

**ARREST INFORMATION SHEET**  CASE#**2024-00010808**

37W755 IL Rte. 38, Ste. A
St. Charles, IL 60175

## DETAILS

| ARREST DATE/TIME | ARREST TYPE | ARRESTING OFFICER |
|---|---|---|
| 03/14/2024  16:00 | On-View | 138 Hernandez |

LOCATION OF ARREST
900 KIRK RD
Batavia, IL

## ARRESTEE

NAME (JACKET TYPE/LAST, FIRST, MIDDLE SUFFIX)
**DOLEK, FURKAN**

| DOB | AGE | ADDRESS (STREET, CITY, STATE, ZIP) |
|---|---|---|
|  | 35 | 200 HOUNDSCHASE LN   BLACKSBURG, VA 24060 |

| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYE |
|---|---|---|---|---|---|
|  | Male | 5'10" | 220 | Black | Brown |

| DL NUMBER/STATE | PRIMARY PHONE | PHONE #2 | PHONE #3 |
|---|---|---|---|
| / IL | | | |

## CHARGES

| STATUTE / DESCRIPTION | COUNTS | ATTEMPT/COMMIT |
|---|---|---|
| 720 ILCS 5/21-5(a)<br>CRIMINAL TRESPASS TO STATE SUPPORTED LAND Enters/remains after notice | 2 | Commit |

## NARRATIVE

See original report.

| REPORTING OFFICER | DATE | REVIEWED BY | |
|---|---|---|---|
| 138 Hernandez | 03/14/2024 | Widlarz, Michael J | 03/17/2024  05:52 |

03/19/2024 : 15:59:49 0012197 Narrative: SUPP 24-11585
03/15/2024 : 16:56:01 0012055 Narrative: Furkan was terminated by Fermilab and refused to leave his office. Security Captain      gave Furkan verbal notice to leave the property and Furkan refused and sat at his desk refusing to leave. Deputies arrived to issue an NTA to Furkan and escort him out. Furkan refused to leave after being asked several times by deputies. After further refusals to leave by Furkan, he was arrested and charged with 2 counts of Criminal Trespass to State Supported Land. Furkan was removed from Fermilab and transported to post 2. Fermilab security will remove Furkan's car from the property. Furkan is to contact (Fermilab Dispatch) for the location of his vehicle. Furkan is no allowed on Fermilab property.
03/14/2024 : 16:22:40 0012141 Narrative: 138 10-6
03/14/2024 : 16:00:48 0012141 Narrative: 138- 1 IN CUSTODY
03/14/2024 : 15:46:07 0012141 Narrative: 132 10-6
03/14/2024 : 15:26:10 0012182 Narrative: use pine street entrance**
03/14/2024 : 15:21:10 0012141 Narrative: 618 10-4
03/14/2024 : 15:21:02 0012141 Narrative: CALL PEND
03/14/2024 : 15:19:29 0012182 Narrative: NW SIDE BUILDING
03/14/2024 : 15:19:19 0012182 Narrative: WILL MEET AT DOOR 3 IN WILSON HALL*
03/14/2024 : 15:19:01 0012182 Narrative: WITH SECURITY.
03/14/2024 : 15:18:45 0012182 Narrative: FEDERAL TRESPASS

# Exhibit H

**Kane County/Fermilab 2025-2026 MOU and Law Enforcement Coordination Materials Produced in response to FOIA**

# Kane County Sheriff's Office



37W755 IL Rt 38  •  St Charles, IL 60175
Tel: (630) 232-6840  •  Fax: (630) 513-6984
www.KaneSheriff.com

Ron Hain, Sheriff                                    Amy Johnson, Undersheriff

May 11, 2026

Ms. Emanuela Barzi
Emanuela.barzi@yahoo.com

Dear Ms. Barzi,
Subject: FOIA

Thank you for writing to the Kane County Sheriff's Office with your request for information pursuant to the Illinois Freedom of Information Act, 5 ILCS 140/1 et seq.

On May 11, 2026 you requested the following:

A copy of any prior versions of the MOU between the Kane County Sheriff's Office and Fermilab from 2010 through 2025 for your records.

**A copy of the prior MOU is attached.**

Redactions have been made under the following exemption:

**5 ILCS 140/7(1)(b) – Private information** such as, unique identifiers, including social security numbers, driver's license, telephone numbers, employee identification number, biometric identifiers, personnel financial information, medical information, graphic photos, race. Passwords or other access codes, home address, signatures and personal license plates.

In response to your Freedom of Information Act Request, the Kane County Sheriff's Office believes this information is responsive you your request

You have the right to have the denial of your request reviewed by the Public Access Counselor (PAC) at the Office of the Attorney General. 5 ILCS 140/9.5(a).

# Kane County Sheriff's Office



37W755 IL Rt 38 • St Charles, IL 60175
Tel: (630) 232-6840 • Fax: (630) 513-6984
www.KaneSheriff.com

Ron Hain, Sheriff                    Amy Johnson, Undersheriff

Public Access Counselor
Office of the Attorney General
500 South 2nd Street
Springfield, IL 62701
PAC Hotline 877-299-3642
E-mail: public.access@ilag.gov

You also have the right to seek judicial review of your denial by filing a lawsuit in the State Circuit Court. 5 ILCS 140/11.

If you choose to file a Request for Review with the PAC, you must do so within 60 calendar days of the date of this denial letter. 5 ILCS 140/9.5(a). Please note that you must include a copy of your original FOIA request and this denial letter when filing a Request for Review with the PAC.

Sincerely,
Ashley Hain
Chief FOIA Officer
Kane County Sheriff's Office




Young-Kee Kim
Interim Laboratory Director

**Office of the Director**
P.O. Box 500, MS 105
Kirk Road and Pine Street
Batavia, Illinois 60510-5011
USA
Office: 630.840.3211
Ykkim@fnal.gov

28 February 2025

Ron Hain
Sheriff
Kane County Sheriff's Office
37W755 Rt. 38
St. Charles, Illinois 60175
USA

SUBJECT:     MEMORANDUM OF UNDERSTANDING (MOU) with KANE COUNTY SHERIFF'S OFFICE

Dear Sheriff Hain,

Approval and signature is requested for the attached Memorandum of Understanding (MOU) and Exhibit A regarding the working relationship between the Kane County Sheriff's Office and the management and operating contractor for the Fermi National Accelerator Laboratory (under prime contract with the United States Department of Energy).

Fermi National Accelerator Laboratory's working relationship with the Kane County Sheriff's Office is subject to Department of Energy (DOE) Order 473.2 A, which states in Attachment 1, Chapter I – Contractors Only, at paragraph 2e that: if "local, State, or Federal or other agencies support the implementation of this Order, sites must establish cooperative agreements, e.g., Memorandums of Understanding (MOUs) outlining the specific support to be provided and how the external support will be integrated into" Contractor Protective Force operations.

For additional questions regarding this correspondence, please contact Donna Iraci at 630-840-4182 or Iraci@fnal.gov.

Sincerely,

Digitally signed by Young-
Kee Kim
Date: 2025.02.28
17:06:14 -06'00'

Young-Kee Kim
Interim Laboratory Director


cc:

   R. Snyder, w/o enclosed
   G. Stephens, w/o enclosed
   G. Lopez, w/o enclosed


MEMORANDUM OF UNDERSTANDING

Whereas, the United States Department of Energy Order DOE O 473.2A "Protective Force Operations" is applicable to the operations at the Fermi National Accelerator Laboratory, parts of which are located in unincorporated Kane County, Illinois; and,

Whereas, the management and operating contractor (under prime contract with the United States Department of Energy) for the Fermi National Accelerator Laboratory, and the Kane County Sheriff's Office have a long and established history of working together; and,

Whereas, the management and operating contractor (under prime contract with the United States Department of Energy) for the Fermi National Accelerator Laboratory has relied on the services of Kane County Sheriff's Office in law enforcement operations and investigations over the past years; and,

Whereas, the Kane County Sheriff's Office has a dedicated radio frequency they monitor 24/7/365 in their communications center on behalf of the Fermi National Accelerator Laboratory; and,

Whereas, the Kane County Sheriff's Office is a nationally-accredited law enforcement agency; and,

Whereas, the Kane County Sheriff's Office has full authority and jurisdiction to enter onto the Fermi National Accelerator Laboratory site property; and,

Whereas, the management and operating contractor (under prime contract with the United States Department of Energy) for the Fermi National Accelerator Laboratory does not currently have the resources or authority to conduct law enforcement operations and investigations; and,

Whereas, the Kane County Sheriff's Office has, in the past, conducted law enforcement operations and investigations on the Fermi National Accelerator Laboratory site, including those outlined in Exhibit 'A', which is attached hereto and incorporated into this Memorandum of Understanding; and

Whereas, the Kane County Sheriff's Office has expressed an interest in continuing to conduct law enforcement operations and investigations as outlined in Exhibit 'A' at the Fermi National Accelerator Laboratory; and,

Whereas, the Sheriff's Office currently has the resources to conduct law enforcement operations and investigations as outlined in Exhibit 'A' at the Fermi National Accelerator Laboratory;

Therefore, the management and operating contractor for the Fermi National Accelerator Laboratory requests and the Kane County Sheriff's Office agrees to continue to conduct law enforcement operations and investigations as outlined in Exhibit 'A' as required at the Fermi National Accelerator Laboratory; and,

Furthermore, the Kane County Sheriff's Office requests and the management and operating contractor for the Fermi National Accelerator Laboratory agrees to continue to provide the assistance

of its security staff in working with the Kane County Sheriff's Office staff in order to conduct such law enforcement operations and investigations as outlined in Exhibit 'A'.

Fermi Research Alliance, LLC (FRA) is the current management and operating contractor for the Fermi National Accelerator Laboratory. FRA may assign or transfer this Memorandum of Understanding, including Exhibit A, to a successor management and operating contractor for the Fermi National Accelerator Laboratory. This Memorandum of Understanding, including Exhibit A, will continue upon that assignment or transfer.

Approved by the management and operating contractor for the Fermi National Accelerator Laboratory, by Laboratory Interim Director Young-Kee Kim and the Kane County Sheriff Ron Hain, this____ day of _____, 2025.

| Fermi Forward Discovery Group, LLC as manager and operator of the Fermi National Accelerator Laboratory | Kane County Sheriff's Office |
|---|---|
| Digitally signed by Young-Kee Kim 'ate: 2025.02.28 8:21:53 -06'00' | **Ron Hain** Digitally signed by Ron Hain Date: 2025.03.03 13:07:43 -06'00' |
| Young-Kee Kim, Interim Laboratory Director Date: _____ | Sheriff of Kane County, Ron Hain Date: 3/3/25 |


## EXHIBIT 'A'

The Kane County Sheriff's Office Law Enforcement Bureau provides various functions and services in Kane County which includes the Fermi National Accelerator Laboratory. These functions and services include, but are not limited to:

- Providing preventive patrols utilizing marked and unmarked patrol units, bicycle, and foot patrols;
- Monitoring the Kane County Sheriff's Office radio system for a dedicated Fermi National Accelerator Laboratory radio frequency being: Fermilab Fire Department and Fermilab Security Department;
- Responding to calls for service;
- Traffic enforcement and education;
- Accident investigations;
- Security checks;
- Community relations programs to include development of relations between citizens and the Kane County Sheriff's Office;
- Apprehending and arresting offenders, and the transportation of said offenders to the Kane County Jail, or when required, to other agency jurisdictions;
- Evidence preservation and collection;
- Law enforcement;
- General assistance to the public;
- Maintenance of public order;
- Emergency services;
- Reporting of information to appropriate office components;
- Responding to situations involving hazardous agents (radiological/biological/chemical);
- Participating in and providing training programs for:
    - a.) Violence in the Workplace;
    - b.) Active Shooter situations;
    - c.) Hostage situations.

The Kane County Sheriff's Office maintains a division within the Law Enforcement Bureau which is responsible for conducting criminal investigations. This Criminal Investigation Division's functions include, but are not limited to:

- Investigation of reported and suspected crimes;
- Apprehension of criminals;
- Recovery of property;

The Kane County Sheriff's Office maintains a unit within the Law Enforcement Bureau with special operations capabilities in order to engage in and bring critical incidents to a successful conclusion. This Special Operations Unit functions include, but are not limited to:

- Hostage situations
- Barricaded subject situations



- Terrorist situations
- VIP protection and security
- Other special tactical situations
- High risk arrest situations or execution of warrants
- Providing assistance to other divisions/units of the Kane County Sheriff's Office in situations requiring their specialized training and tactics.

The Kane County Sheriff's Office maintains a unit with the Law Enforcement Bureau with experience and expertise in responding to hazardous device and explosives. This Hazardous Devices and Explosives Unit's functions include, but are not limited to:

- Responding to and investigating incidents involving explosions, bombings, bomb threats and hazardous devices or explosives; and
- Bomb and other hazardous device disposal.

The Kane County Sheriff's Office maintains a unit within the Law Enforcement Bureau comprised of canine teams. This Canine Unit's functions include, but are not limited to:

- Tracking persons;
- Detecting narcotics evidence;
- Locating human remains; and
- Responding to bomb threats/suspicious devices.

# Kane County Sheriff's Office



37W755 IL Rt 38 • St Charles, IL 60175
Tel: (630) 232-6840 • Fax: (630) 513-6984
www.KaneSheriff.com

Ron Hain, Sheriff                     Amy Johnson, Undersheriff

May 08, 2026

Ms. Emanuela Barzi
emanuela.barzi@yahoo.com

Dear Ms. Barzi,
Subject: FOIA

Thank you for writing to the Kane County Sheriff's Office with your request for information pursuant to the Illinois Freedom of Information Act, 5 ILCS 140/1 et seq.

On May 04, 2026 you requested the following:

Request copies of any public records reflecting agreements, memoranda of understanding (MOUs), liaison protocols or standing coordination arrangements between Kane County Sheriff's Office and Fermi National Accelerator Laboratory / Fermi Research Alliance (FRA) and/or Fermilab security, including records relating to onsite law-enforcement coordination and access-control enforcement.

. **MOUs or interagency agreements – see attached**

. **liaison/coordination protocols – see attached**

. **written procedures for responding onsite at Fermilab – see attached**

. **contact list or designated liaison roles – Sheriff Ron Hain**

In response to your Freedom of Information Act Request, the Kane County Sheriff's Office believes this information is responsive you your request

You have the right to have the denial of your request reviewed by the Public Access Counselor (PAC) at the Office of the Attorney General. 5 ILCS 140/9.5(a).

# Kane County Sheriff's Office



37W755 IL Rt 38  •  St Charles, IL 60175
Tel: (630) 232-6840  •  Fax: (630) 513-6984
www.KaneSheriff.com

Ron Hain, Sheriff                          Amy Johnson, Undersheriff

Public Access Counselor
Office of the Attorney General
500 South 2nd Street
Springfield, IL 62701
PAC Hotline 877-299-3642
E-mail: public.access@ilag.gov

You also have the right to seek judicial review of your denial by filing a lawsuit in the State Circuit Court. 5 ILCS 140/11.

If you choose to file a Request for Review with the PAC, you must do so within 60 calendar days of the date of this denial letter. 5 ILCS 140/9.5(a). Please note that you must include a copy of your original FOIA request and this denial letter when filing a Request for Review with the PAC.

Sincerely,

Ashley Hain

Chief FOIA Officer

Kane County Sheriff's Office


Norbert Holtkamp
Laboratory Director

**Office of the Director**
P.O. Box 500, MS 105
Kirk Road and Pine Street
Batavia, Illinois 60510-5011
USA
Office: 630.840.4147
Holtkamp@fnal.gov

5 February 2026

Ron Hain
Sheriff
Kane County Sheriff's Office
37W755 Rt. 38
St. Charles, Illinois 60175
USA

SUBJECT: MEMORANDUM OF UNDERSTANDING (MOU) with KANE COUNTY SHERIFF'S OFFICE

Dear Sheriff Hain,

Approval and signature is requested for the attached Memorandum of Understanding (MOU) and Exhibit A regarding the working relationship between the Kane County Sheriff's Office and the management and operating contractor for the Fermi National Accelerator Laboratory (under prime contract with the United States Department of Energy).

Fermi National Accelerator Laboratory's working relationship with the Kane County Sheriff's Office is subject to Department of Energy (DOE) Order 473.2 A, which states in Attachment 1, Chapter I – Contractors Only, at paragraph 2e that: if "local, State, or Federal or other agencies support the implementation of this Order, sites must establish cooperative agreements, e.g., Memorandums of Understanding (MOUs) outlining the specific support to be provided and how the external support will be integrated into" Contractor Protective Force operations.

For additional questions regarding this correspondence, please contact Donna Iraci at 630-840-4182 or Iraci@fnal.gov.

Sincerely,

Norbert Holtkamp
Laboratory Director

cc:

W. Begner, w/o enclosed
S. Wallace, w/o enclosed
G. Stephens, w/o enclosed
G. Lopez, w/o enclosed



**Fermi National Accelerator Laboratory**

# MEMORANDUM OF UNDERSTANDING

Whereas, the United States Department of Energy Order DOE O 473.2A "Protective Force Operations" is applicable to the operations at the Fermi National Accelerator Laboratory, parts of which are located in unincorporated Kane County, Illinois; and,

Whereas, the management and operating contractor (under prime contract with the United States Department of Energy) for the Fermi National Accelerator Laboratory, and the Kane County Sheriff's Office have a long and established history of working together; and,

Whereas, the management and operating contractor (under prime contract with the United States Department of Energy) for the Fermi National Accelerator Laboratory has relied on the services of Kane County Sheriff's Office in law enforcement operations and investigations over the past years; and,

Whereas, the Kane County Sheriff's Office has a dedicated radio frequency they monitor 24/7/365 in their communications center on behalf of the Fermi National Accelerator Laboratory; and,

Whereas, the Kane County Sheriff's Office is a nationally-accredited law enforcement agency; and,

Whereas, the Kane County Sheriff's Office has full authority and jurisdiction to enter onto the Fermi National Accelerator Laboratory site property; and,

Whereas, the management and operating contractor (under prime contract with the United States Department of Energy) for the Fermi National Accelerator Laboratory does not currently have the resources or authority to conduct law enforcement operations and investigations; and,

Whereas, the Kane County Sheriff's Office has, in the past, conducted law enforcement operations and investigations on the Fermi National Accelerator Laboratory site, including those outlined in Exhibit 'A', which is attached hereto and incorporated into this Memorandum of Understanding; and

Whereas, the Kane County Sheriff's Office has expressed an interest in continuing to conduct law enforcement operations and investigations as outlined in Exhibit 'A' at the Fermi National Accelerator Laboratory; and,

Whereas, the Sheriff's Office currently has the resources to conduct law enforcement operations and investigations as outlined in Exhibit 'A' at the Fermi National Accelerator Laboratory;

Therefore, the management and operating contractor for the Fermi National Accelerator Laboratory requests and the Kane County Sheriff's Office agrees to continue to conduct law enforcement operations and investigations as outlined in Exhibit 'A' as required at the Fermi National Accelerator Laboratory; and,

Furthermore, the Kane County Sheriff's Office requests and the management and operating contractor for the Fermi National Accelerator Laboratory agrees to continue to provide the assistance



of its security staff in working with the Kane County Sheriff's Office staff in order to conduct such law enforcement operations and investigations as outlined in Exhibit 'A'.

Fermi Forward Discovery Group, LLC (FFDG) is the current management and operating contractor for the Fermi National Accelerator Laboratory. FFDG may assign or transfer this Memorandum of Understanding, including Exhibit A, to a successor management and operating contractor for the Fermi National Accelerator Laboratory. This Memorandum of Understanding, including Exhibit A, will continue upon that assignment or transfer.

Approved by the management and operating contractor for the Fermi National Accelerator Laboratory, by Laboratory Interim Director Young-Kee Kim and the Kane County Sheriff Ron Hain, this____ day of _____, 2026.

| Fermi Forward Discovery Group, LLC as manager and operator of the Fermi National Accelerator Laboratory | Kane County Sheriff's Office |
|---|---|
| Norbert Holtkamp, Laboratory Director<br>Date: _____ | Sheriff of Kane County, Ron Hain<br>Date: |

## EXHIBIT 'A'

The Kane County Sheriff's Office Law Enforcement Bureau provides various functions and services in Kane County which includes the Fermi National Accelerator Laboratory. These functions and services include, but are not limited to:

- Providing preventive patrols utilizing marked and unmarked patrol units, bicycle, and foot patrols;
- Monitoring the Kane County Sheriff's Office radio system for a dedicated Fermi National Accelerator Laboratory radio frequency being: Fermilab Fire Department and Fermilab Security Department;
- Responding to calls for service;
- Traffic enforcement and education;
- Accident investigations;
- Security checks;
- Community relations programs to include development of relations between citizens and the Kane County Sheriff's Office;
- Apprehending and arresting offenders, and the transportation of said offenders to the Kane County Jail, or when required, to other agency jurisdictions;
- Evidence preservation and collection;
- Law enforcement;
- General assistance to the public;
- Maintenance of public order;
- Emergency services;
- Reporting of information to appropriate office components;
- Responding to situations involving hazardous agents (radiological/biological/chemical);
- Participating in and providing training programs for:
    - a.) Violence in the Workplace;
    - b.) Active Shooter situations;
    - c.) Hostage situations.

The Kane County Sheriff's Office maintains a division within the Law Enforcement Bureau which is responsible for conducting criminal investigations. This Criminal Investigation Division's functions include, but are not limited to:

- Investigation of reported and suspected crimes;
- Apprehension of criminals;
- Recovery of property;

The Kane County Sheriff's Office maintains a unit within the Law Enforcement Bureau with special operations capabilities in order to engage in and bring critical incidents to a successful conclusion. This Special Operations Unit functions include, but are not limited to:

- Hostage situations
- Barricaded subject situations


- Terrorist situations
- VIP protection and security
- Other special tactical situations
- High risk arrest situations or execution of warrants
- Providing assistance to other divisions/units of the Kane County Sheriff's Office in situations requiring their specialized training and tactics.

The Kane County Sheriff's Office maintains a unit with the Law Enforcement Bureau with experience and expertise in responding to hazardous device and explosives. This Hazardous Devices and Explosives Unit's functions include, but are not limited to:

- Responding to and investigating incidents involving explosions, bombings, bomb threats and hazardous devices or explosives; and
- Bomb and other hazardous device disposal.

The Kane County Sheriff's Office maintains a unit within the Law Enforcement Bureau comprised of canine teams. This Canine Unit's functions include, but are not limited to:

- Tracking persons;
- Detecting narcotics evidence;
- Locating human remains; and
- Responding to bomb threats/suspicious devices.

# Exhibit I

**September 10, 2024 Local Insider Threat Working Group ("LITWG) Agenda**


## Local Insider Threat Working Group (LITWG) AGENDA

September 10, 2024
Agenda

**Greg Stephens, Fermilab Chief Operating Officer**
**Marc Clay, Fermilab Deputy Chief Operating Officer**
Fermilab Safeguards & Security Program

### Scope

LITWG members from each discipline:
- Work together to monitor, analyze, report, and respond to insider threat matters.
- Proactively identify anomalous behavior that may indicate insiders with elevated risk.
- Deploys mitigation responses to reduce risk to the organization while protecting the privacy and civil liberties of the individual.
- Shares relevant information from each discipline with organizational leadership to facilitate timely, informed decision-making and reports information outside the organization, as policy or regulation requires.
- Focus on rehabilitative options that address the at-risk individual's behavior and divert them to more positive outcomes.

### Agenda

**10:00am- 11:00am**

#### Updates from COO
- LOMO Aug 26 and Sept 2 issues of concern
- Contract transition issues of concern

#### Update from Prime Contract Transition
- Contract transition issues of concern

#### Update from HR Head and HR Partner
- Employee Assistance Program (EAP) increase in services and case category trends, disciplinary actions.
- Status of employee concerning behaviors: disciplinary issues, conflicts of interest; financial problems; disgruntlement; and issues with the employee's supervisor

**Update from Fermilab Occupational Medical Office**

- Medical cases of interest or concern

**Update from Office of Communication**

- Social media tracking/concerns/ posts of concern or awareness

**Update from OGC**

- Recent OOC issues/ concerns related to LITWG

**Update from Security**

- Increase of Security assistance, reports on concern
- Increase in requests for standby during terminations

**Update from Finance-Travel**

- Information related to urgent local and foreign travel request(s), or last minute "mission essential" requests
- Travel request concerns or issues of interest – countries of interest

**Action Items and next meeting:**

## Contact

David Esterquest, Emergency Manager
Phone: 630-840-4604 | email: desterqu@fnal.gov

## Participants

| Name | Email |
| --- | --- |
| Marc Clay | mclay@fnal.gov |
| Kelly Dombrowski | dombrow@fnal.gov |
| Paul Ellison | paule@fnal.gov |
| David Esterquest | desterqu@fnal.gov |
| Beth Fancsali | fancsali@fnal.gov |
| Ivy Gibson | igibson@fnal.gov |
| Matthew Glowacky | glowacky@fnal.gov |
| Jennifer Gondorchin | jgondo@fnal.gov |
| Velma Gordon | vgordon@fnal.gov |



**Fermi National Accelerator Laboratory**

| | |
|---|---|
| Chief Steve Hernandez | steveh@fnal.gov |
| Matt Kwiatkowski | mattk@fnal.gov |
| Griselda Lopez | griselda@fnal.gov |
| Rae Moss | raemoss@fnal.gov |
| Corey Mulryan | cmulryan@fnal.gov |
| Melissa Ormond | mormond@fnal.gov |
| Beatriz Rodriguez | beatrizr@fnal.gov |
| Joe Rogers | jrogers@fnal.gov |
| Deb Sebastian | debseb@fnal.gov |
| Brian Sherin | bsherin@fnal.gov |
| Greg Stephens | gstephen@fnal.gov |