**IN THE UNITED STATES DISTRIC COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DR. EMANUELA BARZI, an Individual,

Plaintiff,

v.

FERMI RESEARCH ALLIANCE, LLC, et. al

Defendants.

Case No. 25-CV-09247

Honorable Virginia M. Kendall,
District Judge

Magistrate Judge Beth W. Jantz

**REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Plaintiff Emanuela Barzi has amended several of her dismissed claims in an attempt to cure the deficiencies identified by the Court. But in doing so, Plaintiff added pages and pages of allegations and exhibits that resulted in in a meandering and confusing amended complaint. Fermilab's opening brief demonstrated how Plaintiff's new pleading warrants dismissal under Federal Rule 8 and why her revised claims still fail to plead plausible, cognizable causes of action. And as demonstrated below, Plaintiff's response brief fails to salvage her claims.

## ARGUMENT

### I. The Court Should Dismiss the Second Amended Complaint With Prejudice Under Rule 8.

As Fermilab explained in its opening brief (Dkt. 52 at 3-4), Plaintiff's second amended complaint violates Rule 8 because it in no way qualifies as "simple, concise, or direct" — nor does it offer a "short and plain statement of the claim." Instead, her pleading is comprised of 71 single-spaced pages of allegations, 343 paragraphs, 9 exhibits, and 141 pages overall. (*See* Dkt. 46.) Moreover, it contains several long, confusing sentences and repeatedly and redundantly alleges non-discernible generalities that conflate legal claims. (*See id.* at 1; ¶¶ 23, 24, 28, 29, 29A, 46A, 51, 83, 94, 136, 228, 250, 329.) Because Plaintiff's amended pleasing is "sprawling, confusing, [and] redundant," dismissal with prejudice is justified. *Fid. Nat'l Title Ins. Co. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 749 (7th Cir. 2005).

Plaintiff argues primarily that Fermilab's "own conduct confirms" that her amended pleading provided fair notice of her claims because it filed a brief that addressed each count and argued why it is deficient. (Dkt. 56 at 1-2.) But this argument misapprehends the standard. Rule 8 does not merely require that sophisticated opposing counsel be able to extract claims from a sprawling pleading; it requires that the complaint itself present allegations that are "simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). The fact that Fermilab presented a detailed and structured brief

does not establish Rule 8 compliance—it reflects counsel's diligence and considerable time and effort to discern the nature of Plaintiff's claims. Indeed, the second amended complaint's disorganized and conflated legal theories spanning 27 years of allegations force Fermilab (and the Court) to guess which facts support which claims. Moreover, if Plaintiff's position were correct, then any defendant who moves to dismiss specific claims in an unintelligible complaint would forfeit a challenge under Rule 8. That is not the law, and Plaintiff cites no case law supporting that position. And Plaintiff's acknowledgment that her pleading violates Local Rule 5.2(e)'s double-spacing requirement underscores the cavalier approach to the Court's rules that pervades this pleading.

Plaintiff also argues that "unintelligibility is distinct from length" and that mere repetitiveness or superfluousness are insufficient grounds to dismiss under Rule 8. (Dkt. 56 at 1 (citing *Kadamovas v. Stevens*, 706 F.3d 843, 844 (7th Cir. 2013) & *Davis v. Ruby Foods, Inc.*, 269 F.3d 818, 820–21 (7th Cir. 2001).) Those are unremarkable propositions, and Fermilab is not arguing otherwise. The problem with the second amended complaint is that it is patently long, redundant, superfluous, ***and*** confusing – and it is also Plaintiff's ***third*** pleading, with each iteration longer and more confusing than its predecessor. Thus, Plaintiff's amended pleading is far mor deficient than the ones at issue in her cited cases. (*See Kadamovas*, 706 F.3d at 844-45 (vacating dismissal of first amended complaint under Rule 8 that was neither too long (28 pages) nor unintelligible (noting complaint "is not only entirely intelligible; it is clear")); *Davis*, 269 F.3d at 820–21 (reversing dismissal of initial complaint under Rule 8 that was only 20 pages (double spaced, with 14-point font) that stated plausible claims despite other repetitious irrelevant matter).)

## II. The Court Should Dismiss With Prejudice Plaintiff's Unamended and Abandoned Claims.

The Court should dismiss with prejudice two claims that Plaintiff failed to address or amend: (i) national origin discrimination under Title VII and the IHRA (Count III); and (ii) any claim under the Fair Pay Act. Plaintiff claims bizarrely and without authority that the Court should

not dismiss these claims with prejudice – even though she abandoned them in her amended pleading – because the Court only dismissed them without prejudice. (Dkt. 56 at 2.) Of course, this is nonsense. Dismissing a claim without prejudice – as opposed to with prejudice – affords the plaintiff the opportunity to amend and cure the deficiencies identified by the court. *Ryder v. Hyles*, 27 F.4th 1253, 1258 (7th Cir. 2022). But if the plaintiff fails to correct those deficiencies – or abandons the claim altogether – the Court must dismiss those claims with prejudice. *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (noting that a court may dismiss a case with prejudice, at the pleading stage, where a plaintiff "effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss"); *Jackson v. AppleOne, Inc.*, 2025 WL 1141160, at *3 (N.D. Ill. Apr. 16, 2025) (granting dismissal with prejudice and without leave to amend "given that Plaintiff has already had a chance to amend her complaint to cure the defects Defendant has identified").

## III. The Court Should Dismiss Plaintiff's Disability Discrimination Claim (Count V).

The Court should dismiss Plaintiff's disability discrimination claim because the second amended complaint fails to allege sufficient facts to plausibly demonstrate that Fermilab discriminated against her based on her PTSD. (*See* Dkt. 52 at 4-6.) The Court's prior order was clear: Plaintiff failed to "plead a disability discrimination claim" because her allegations were "conclusory" and did not connect her disability to the adverse actions. (Dkt. 41 at 31.) Plaintiff's second amended complaint does not cure that deficiency, as nowhere does it allege any concrete ***fact*** connecting her disability and the decision to terminate her (the only timely claim alleged in the second amended complaint). Moreover, her reliance on the September LITWG 2024 committee agenda also proves nothing, as it makes no mention of anything related to Plaintiff's disability or to her claim.

Plaintiff's response does not overcome this deficiency. Plaintiff argues the following "concrete facts" support causation: (i) that on information and belief, Velev described her as "crazy multiple times," which reinforced "a disability stigmatizing narrative connected to Plaintiff's PTSD";

(ii) that negative statements were made about her before termination; (iii) and that managers used terms like "disruptive" and "unprofessional." (Dkt. 56 at 3–4.) But these allegations, even accepted as true, do not plausibly establish that Plaintiff was terminated ***because of*** her disability. Indeed, calling someone "crazy" is unprofessional but is not, without more, evidence that a subsequent RIF selection was motivated by disability bias – and Plaintiff cites no authority holding otherwise. The same is true of characterizing an employee as "disruptive" or "unprofessional" in the context of workplace performance: these are not disability-related insults but commonplace, facially disability-neutral workplace descriptors. Although the opposition baldly characterizes these terms as "disability-stigmatizing labels," the second amended complaint does not allege that any manager explicitly connected these terms to Plaintiff's PTSD.

Plaintiff also points to her allegation that multiple RIF-selected employees had disabilities. (Dkt. 56 at 4 (citing Dkt. 46 ¶ 83(c).) But this does not cure the deficiency, either, as Plaintiff does not allege that all or even most employees with disabilities were selected, that non-disabled employees were retained under comparable circumstances, or any facts suggesting that disability was a criterion in the RIF process.

Finally, Plaintiff concedes that the LITWG agenda—an exhibit she attaches for "corroborative context"—does not plausibly suggest that her disability was discussed. (*Id.* (citing Dkt. 46 ¶ 202).) This acknowledgment that the exhibit proves nothing further underscores the claim's insufficiency.

## IV. The Court Should Dismiss Plaintiff's Aiding and Abetting Claims (Count VII).

The Court should dismiss this claims for two reasons.

***First***, the Court should dismiss this claim with prejudice because the Individual Defendants are alleged to have acted solely in their official capacities as Fermilab personnel. But the Illinois Human Rights Commission has held repeatedly that company employees or officials are not proper

respondents to charges of "aiding and abetting" or "retaliation" when the challenged conduct occurred in their capacity as agents of the employer. *In the Matter of the Request For Review By: Penney Washington, Petitioner*, 2023 WL 8192639, at *2 (Ill. Human Rights Comm'n Nov. 21, 2023). And here, the second amended complaint's own allegations confirm that each Individual Defendant acted solely in an official managerial capacity as an FRA employee, and not a single allegation describes conduct by any Individual Defendant that falls outside the scope of their official FRA duties. (*See* Dkt. 52 at 6-7.) Notably, Plaintiff does not dispute that each Individual Defendant's alleged conduct was performed in an official managerial capacity.

Instead, Plaintiff argues that there is no categorical bar under § 6-101(B) merely because the alleged aider was a Fermilab employee. (Dkt. 56 at 5 (citing *Anderson v. Modern Metal Prods.*, 305 Ill. App. 3d 91, 101-02 (2d Dist. 1999); *Watkins v. Office of the State Appellate Defender*, 2012 IL App (1st) 111756, ¶¶ 37–38; & *Santiago v. Pivotal Home Sols., LLC,* 2026 WL 1786208 (N.D. Ill. June 22, 2026).) But none of the cases cited by Plaintiff is relevant or help her position. Indeed, they all involved claims of direct discrimination or retaliation under § 6-101(A) of the IHRA—not the separate aiding-and-abetting prohibition in § 6-101(B). Moreover, each of those cases dismissed or affirmed dismissal against individual employees who were acting in their official capacity and within the scope of their employment, a point that Plaintiff does not dispute as to the Individual Defendants here. *See Anderson*, 305 Ill. App. 3d at 101-02; *Watkins*, 2012 IL App (1st) 111756, at ¶¶ 37–38; *Santiago*, 2026 WL 1786208, at *4.

Thus, Plaintiff cannot refute that under the Commission's controlling authority, the individual employees who carried out the employer's decisions in their official capacities cannot be sued for those actions. And because the second amended complaint does not and cannot cure this structural defect, the Court should dismiss the claim with prejudice.

***Second***, the second amended complaint does not plead individualized acts by the Individual Defendants of knowing and substantial assistance to a discrete IHRA violation. Although Plaintiff purports to include Defendant-specific allegations (Dkt. ¶¶ 222-31) that were absent from the prior pleading, each allegation deploys a boilerplate disjunctive verb list, including, "knowingly approved," "permitted," "facilitated," "encouraged," "influenced ratified," "escalated," "implemented," "concealed," or "substantially assisted." (*See id.*) This repetitive formula is applied interchangeably to each Individual Defendant without any specifics or nuance regarding their distinct roles, knowledge, or conduct.

Plaintiff disagrees, contending she sufficiently alleged individual participation. (Dkt. 56 at 5-6. (citing Dkt. 46 ¶¶ 72, 76, 144, 147, 222 (Merminga); ¶¶ 66, 148, 223 (Fleming); ¶¶ 76, 133–134, 224 (Posen); ¶¶ 71, 79, 90, 225 (Gourlay); ¶¶ 74, 95–97, 99, 226 (Velev); ¶¶ 65, 93, 227 (Fancsali).) But a close reading of these paragraphs Plaintiff cites—and the underlying factual allegations they incorporate—only underscores Plaintiff's failure to link each Individual Defendant's conduct to knowing and substantial assistance in a discrete IHRA violation. Instead, these allegations merely describe Individual Defendants doing their own jobs within Fermilab's management hierarchy, with ***no*** allegation that any one of them affirmatively and knowingly participated in a discrete discriminatory act. Thus, unlike the aider in *M.U.*, who made an independent, affirmative decision to exclude the plaintiff for an expressly discriminatory reason, no Individual Defendant here is alleged to have stepped outside Fermilab's managerial hierarchy to independently facilitate a discriminatory act, to have made any statement reflecting discriminatory animus, or to have possessed actual knowledge that the specific action he or she carried out constituted an IHRA violation. *M.U. v. Team Ill. Hockey Club, Inc.*, 2022 IL App (2d) 210568, ¶ 46.

## V. The Court Should Dismiss Count IX.

Plaintiff alleges that Individual Defendants Merminga, Fleming, Posen, Gourlay, Velev, and Fancsali retaliated against her for engaging in protected speech in violation of the First Amendment under 42 U.S.C. § 1983. The Court should dismiss this clam for two reasons.

***No State Acton.*** The Court dismissed this claim previously because Plaintiff failed to plausibly allege that the Individual Defendants acted under color of state law. (Dkt. 41 at 41-42.) The Court emphasized that Plaintiff was working remotely when she was terminated, that she was not escorted by any deputies, and that "[t]here are no allegations that any deputies or other state employees were involved with the adverse employment actions [she] claims the Individual Defendants took against her." (*Id.*) In its opening brief, Fermilab demonstrated that Plaintiff's addition of four categories of new allegations fails to salvage that deficiency. (Dkt. 52 at 9-10.) This is especially true because Plaintiff continues to allege that she "was working remotely on the date of her termination." (Dkt. 46 ¶ 89.) She therefore does not allege that she was escorted from Fermilab, physically removed from the site, threatened with arrest, or subjected to any direct law-enforcement action on November 12, 2024. Thus, even accepting Plaintiff's new allegations as true, the second amended complaint still does not plausibly allege that any deputy participated in a deprivation directed at Plaintiff herself.

Plaintiff's opposition first attempts to reframe her theory, arguing that Count IX is based on "law-enforcement-backed exclusion and access restrictions." (Dkt. 56 at 7-8.) But reframing the alleged deprivation does not change the fundamental problem: her pleading still alleges only that deputies existed, not that any state actor participated in the alleged constitutional deprivation. *See L.P. v. Marian Cath. High Sch.*, 852 F.3d 690, 697 (7th Cir. 2017) (no state action where there were no allegations that the state "ha[d] anything to do with" the alleged unconstitutional conduct); *Motykie v.*

*Motykie*, 2025 WL 2160719, at *5 (N.D. Ill. July 30, 2025) ("Private actors do not act under the color of law merely by requesting the assistance of the law.") (citation modified)).

Plaintiff then recounts the four categories of new allegations (Dkt. 56 at 7) but none constitute state action for the reasons set forth in Fermilab's opening brief (Dkt. 52 at 10). The DuPage County MOU and paid deputy detail describe a private employer arranging building security during a large-scale personnel event; the March 2024 Kane County trespass incident involved a different individual, in a different context, months before Plaintiff's termination; the additional MOU materials memorialize an ongoing law-enforcement relationship for routine security purposes; and the LITWG agenda simply reflects coordination among internal Fermilab personnel. None of these allegations plausibly suggest that any state actor participated in, directed, or influenced the decisions to exclude Plaintiff from leadership opportunities, discipline her, evaluate her performance, or terminate her employment.

***Failure to State a Claim.*** Plaintiff's claim also fails for two other reasons: (i) Plaintiff is not a public employee and is suing private actors; and (ii) she fails to plead personal involvement by any Individual Defendant in any alleged constitutional deprivation. (*See* Dkt. 52 at 10-11.)

On the first point, Plaintiff is not a public employee who is entitled to First Amendment protection. Plaintiff argues that First Amendment retaliation is not limited to public employees, relying on *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 585 (7th Cir. 2021). (Dkt. 56 at 8.) But *FKFJ* does not support Plaintiff's argument. *FKFJ* involved ***government actors*** allegedly retaliating against a private business for protected speech. *Id.* at 578-79, 585. The question there was whether municipal officials committed a retaliatory deprivation, not whether private employment decisions could be transformed into state action. *Id.* at 585-87. *FKFJ* therefore addresses what qualifies as a retaliatory deprivation once state action exists. It does not eliminate the threshold requirement that Plaintiff plausibly allege state action in the first place.

On the second point, Plaintiff still fails to allege that any Individual Defendant personally directed, agreed with, or coordinated with law enforcement to violate her rights. Plaintiff argues she sufficiently alleges a "concerted effort" or "mutual understanding" between a state actor and the private defendants under *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019). (Dkt. 56 at 7.) In *Spiegel*, the court actually ***affirmed dismissal*** of a Section 1983 claim where the plaintiff failed to allege sufficient facts establishing a conspiracy between police officers and private actors to facilitate a false arrest. *Id.* The same result is warranted here: Plaintiff identifies no communication, agreement, directive, coordinated decision, or other interaction between any deputy and any Individual Defendant regarding Plaintiff. There is no allegation that any deputy participated in the decisions to exclude Plaintiff from leadership opportunities, block speaking engagements, discipline her, evaluate her performance, select her for the RIF, terminate her employment, deactivate her badge, revoke her email access, restrict her computing access, or bar her from the site. This deficiency also dooms Plaintiff's claim.

***Equal Protection***. Plaintiff's opposition does not meaningfully distinguish the Equal Protection claim from her First Amendment theory. Both theories depend on the same alleged law-enforcement coordination. Because the second amended pleading fails to plausibly allege that state actors participated in the challenged conduct, both claims fail as a matter of law.

**VI. The Court Should Dismiss Plaintiff's § 1981 Claim With Prejudice (Count X).**

***Plaintiff Pleaded Herself Out of Court on Causation.*** This Court dismissed the § 1981 claim alleged in the first amended pleading because Plaintiff "assert[ed] not one but five causes of Defendants' alleged misconduct—sex discrimination, national origin discrimination, age discrimination, disability discrimination, ethnicity-based discrimination," and failed to plead that her Italian ethnicity was the but-for cause of the adverse actions. (Dkt. 41 at 44.) The Court noted that Plaintiff "does not properly plead in the alternative—she claims that she was discriminated against

because of her sex, age, national origin, ethnicity, and disability." (*Id.* at 44 n.6 (citing *Arora v. NAV Consulting*, 2022 WL 7426211, at *3 (N.D. Ill. Oct 13, 2022); *Hill v. Target Corp.*, 2025 WL 919614, at *5 n.9 (N.D. Ill. Mar. 26, 2025).) On this front, Plaintiff's amended pleading merely adds a single sentence: "Plaintiff pleads this § 1981 theory in the alternative to her sex, age, disability, retaliation, and other claims and does not seek double recovery." (Dkt. 41 ¶ 268.) This cursory addition does not salvage her claim.

Plaintiff argues that Rule 8(d)(2)–(3) permits her alternative pleading, relying on *United Fire & Cas. Co. v. Prate Roofing & Installations, LLC*, 7 F.4th 573, 584 (7th Cir. 2021) and *EEOC v. Sis-Bro Inc.*, 2025 WL 213992 (S.D. Ill. Jan. 16, 2025). (Dkt. 56 at 9.) Neither case alters the analysis here. *United Fire* addressed alternative theories of contract liability—not the heightened but-for causation standard unique to § 1981. And *Sis-Bro* actually supports dismissal here. There, the court dismissed the plaintiff's § 1981 claim because "the facts alleged simply do not plausibly suggest her race or ethnicity was the 'but-for' cause of her constructive discharge." *Id.* at *3. The court's observation that alternative pleading "may" be permitted on repleading underscores that the plaintiff had failed to plead properly in the first instance—the very deficiency Plaintiff has replicated here. *Id.* at *4. At bottom, this Court's own recent decision in *Ibarra* is directly on point: when a plaintiff alleges that multiple characteristics were but-for causes of the same adverse actions, "[r]ace-or-ethnicity-based discrimination must have been the ***determinative*** reason" for the mistreatment, and alleging additional, non-protected causes defeats that requirement. *Ibarra v. Northwestern Univ.*, 2026 WL 1662227, at *6 (N.D. Ill. June 9, 2026) (emphasis added).

***Plaintiff Conflates National Origin and Ancestry.*** Even where the second amended complaint attempts to articulate a distinct ethnicity theory, several key allegations sound in national-origin discrimination and other unprotected characteristics, which Section 1981 does not cover. (*See* Dkt. 52 at 14-15.) Plaintiff's attempt to characterize her claim as one of "ancestry and ethnicity"

cognizable under § 1981 cannot mask the reality that her core allegations sound in national-origin discrimination. She expressly alleges discrimination based on "Italian accent, Italian degree, Italian-trained background, and Italian scientific identity." (Dkt 56 at 9.) These are quintessential national-origin characteristics—markers of where Plaintiff was educated and trained, not of her racial or ethnic identity. While this Court previously recognized that "Italian ancestry and ethnicity" may be cognizable under § 1981 in the abstract, the actual allegations here focus on foreign credentials and foreign training—precisely the type of national-origin claims that § 1981 does not reach.

***Improper Group Pleading.*** The allegations against the Individual Defendants in Count X suffer from the same grouped-pleading deficiency identified in Count VII. Plaintiff argues that Count X incorporates prior factual allegations and that requiring individualized facts improperly treats direct evidence of animus as a pleading requirement. (Dkt. 56 at 10.) But this mischaracterizes the plausibility threshold. Indeed, the second amended complaint applies identical boilerplate language to each Individual Defendant without identifying what facts connect Italian ethnicity—as distinguished from sex, age, or protected activity—to any decisionmaker's animus. (Dkt. 46 ¶¶ 271–77.) Without such individualized allegations, the § 1981 claim as to the Individual Defendants fails.

***Retaliation.*** This claims suffers from the same co-mingling issue as her discrimination clams and also relies on inadequate legal conclusions. (*See* Dkt. 52 at 16-17.) Plaintiff does not seriously take issue with dismissal of this claim on these bases, arguing only that the "SAC pleads such a theory in ¶¶ 269–270." (Dkt. 56 at 10.) The Court should dismiss this claim with prejudice because those paragraphs exemplify the deficiencies identified by Fermilab in its opening brief.

## VII. The Court Should Dismiss Plaintiff's Claim for Breach of Implied Contract (Count XI).

The Court dismissed Plaintiff's implied contract claim the first time because the RIF Termination Procedure relied upon by Plaintiff disclaims expressly the creation of contractual rights. (Dkt. 41 at 46.) Plaintiff now alleges that the implied contract arose not from the RIF

Termination Procedure alone, but from a broader "Senior Scientist appointment framework" encompassing her appointment status, Fermilab's Scientific Appointments Policy[1], FCSA governance, "institutional practice," and FRA's "consistent treatment of Senior Scientist appointments as requiring scientific-review protections." (Dkt. 46 ¶ 287.) Fermilab demonstrated in its opening brief why this novel institutional "framework" theory fails as a matter of law for several reasons: (i) an employee cannot avoid an express disclaimer by relying on surrounding policies, procedures, or institutional practices to create contractual obligations where the operative document itself disclaims any intent to be bound; (ii) the additional materials Plaintiff cites are general institutional customs that do not create enforceable contractual promises; and (iii) the FCSA Secretary's objection that the planned RIF violated the scientific-staff RIF policy does not in any way transform the disclaimer into a binding promise. (Dkt. 52 at 19-22.)

Plaintiff's opposition does not coherently or squarely address Fermilab's specific arguments. Instead, it essentially recites the allegations in the second amended complaint that describe this supposed framework and then states in conclusory fashion that they sufficiently create a contractual obligation. (*See* Dkt. 56 at 11 ("The SAC addresses that deficiency by pleading a broader Senior Scientist appointment framework consisting of appointment status, scientific-appointment policies, FCSA governance, institutional practice, and Director- and committee-level procedures."); at 12 ("These allegations support the pleaded inference that the Scientist-review framework remained operative."); at 12-13 ("The different question presented by the SAC is whether the broader Senior Scientist framework independently created enforceable procedural expectations, with the Procedure

[1] Plaintiff points out that the disclaimer language cited by Fermilab in its opening brief "referenced post-transition Scientific Appointments Policy referring repeatedly to "FermiForward," which Plaintiff claims "does not establish the terms governing Plaintiff's FRA employment." (Dkt. 56 at 13 (citing Dkt. 52 at 17 n.2).) The quoted language was present in the FRA Policy on Progressive Discipline in 2023 and applied to Plaintiff and her employment, carrying forward from FRA to FermiForward through the transition of the Prime Contract.

serving as evidence of implementation"); at 13 ("these provisions instead support the allegation that DOE-compliant or Prime-Contract-implemented personnel procedures formed part of FRA's operative Scientist-reduction framework.").) Because Plaintiff has not and cannot refute the legal failings identified by Fermilab in its opening brief, the Court should dismiss this claim with prejudice for the reasons set forth by Fermilab. (Dkt. 52 at 19-22.)

### VIII. The Court Should Dismiss Plaintiff's Promissory Estoppel Claim (Count XI-A).

Plaintiff's promissory-estoppel claim fails for the same reason as Count XI: the second amended complaint still does not identify the requisite unambiguous promise. *See Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill. 2d 46, 51 (2009). Rather than identify such a promise, Plaintiff simply repackages the same "Senior Scientist appointment framework" theory underlying Count XI and asks the Court to treat it as promissory estoppel claim if it fails to create a contract. (*See* Dkt. 46 ¶¶ 286–99, 302–09; Dkt. 56 at 14.)

But even accepting Plaintiff's characterization of a unified "Senior Scientist appointment framework," the framework still does not contain an unambiguous promise. The same disclaimers that defeat Count XI defeat Count XI-A because the Scientific RIF Termination Procedure states that it is "not a contract or guarantee of any kind and is not intended to create any obligations on the Laboratory." (Dkt. 35 at 82; Dkt. 41 at 46.) As the Court previously recognized, "a disclaimer that is effective against a breach of contract is also effective against a claim of promissory estoppel." (Dkt. 41 at 47 (quoting *Workman v. United Parcel Serv., Inc.*, 234 F.3d 998, 1001 (7th Cir. 2000)).) And language reserving an employer's discretion to revise or terminate a policy means that the policy does not contain the kind of definite promise necessary to support promissory estoppel. *See Ruiz v. Lab'y Corp. of Am.*, 2024 WL 4825777, at *4 (N.D. Ill. Nov. 19, 2024).

Plaintiff's reliance on *Boswell v. City of Chicago*, 2016 IL App (1st) 150871, ¶ 34 (Dkt. 56 at 14) does not alter that conclusion. *Boswell* merely addresses whether contract and promissory-estoppel

theories may proceed simultaneously. It does not eliminate the requirement that Plaintiff identify an unambiguous promise capable of supporting a promissory-estoppel claim. Promissory estoppel is not "a doctrine designed to give a party a second bite at the apple . . . in the event that it fails to prove a breach of contract." *Dumas v. Infinity Broad. Corp.*, 416 F.3d 671, 677 (7th Cir. 2005).

## IX. The Court Should Dismiss Plaintiff's Retaliatory Discharge Claim (Count XII).

The Court previously dismissed Count XII because Plaintiff failed to identify a clearly mandated public policy sufficient to support the narrow tort of retaliatory discharge. (Dkt. 41 at 51–53.) The Court specifically held that the IWA contains its own remedial mechanism that cannot supply the requisite public policy, and that Plaintiff's cited authorities "do not embody the specific public policy she claims." (*Id.*) Although Plaintiff now invokes additional federal regulations, DOE policies, and whistleblower protections, it still does not identify the specific public policy implicated by the conduct she allegedly reported or the specific violation she allegedly disclosed.

To start, the IHRA cannot supply the public-policy predicate. The Court previously held that the IWA does not constitute a clearly mandated public policy because it "contains its own deterrent mechanism." (Dkt. 41 at 52 (citing *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 508 (1991)).) The same reasoning forecloses Plaintiff's new reliance on the IHRA, which likewise contains a comprehensive remedial scheme. *See Fellhauer*, 142 Ill. 2d at 508. Notably, Plaintiff essentially concedes that neither statute can be the source of an actionable public policy. (*See* Dkt. 56 at 14 (admitting her claim "does not depend on either statute as the independent public-policy predicate for the tort.").)

10 C.F.R. Part 708 also does not supply the missing public policy. Plaintiff characterizes her disclosures as involving "waste or misuse of public funds, safety, institutional noncompliance, and other suspected wrongdoing" covered by this regulation. (Dkt. 46 ¶¶ 324-26.) But this is precisely the level of generality the Court previously found insufficient. Indeed, such generic labels do not identify the specific law allegedly violated, the particular safety danger allegedly presented, the funds

allegedly wasted, or the regulatory obligation that Fermilab supposedly flouted. Section 708.5(a) identifies categories of disclosures protected through Part 708's administrative process; it does not relieve Plaintiff of her obligation to identify the specific public policy allegedly violated for purposes of Illinois's narrow common-law tort. *See Palmateer v. Int'l Harvester Co.*, 85 Ill. 2d 124, 130 (1981).

Plaintiff also argues that Part 708's non-discrimination disclosures under § 708.5(a) support her claim, independent of her discrimination complaints. (Dkt. 56 at 16.) But Plaintiff still does not identify what specific violation she reported, what funds were wasted, what safety regulation was breached, or what institutional noncompliance she disclosed. A retaliatory discharge claim demands more than a label; it demands a close connection between the employee's actual conduct and a specific, clearly mandated public policy. *See Palmateer*, 85 Ill. 2d at 130. Moreover, Part 708.4(a) itself excludes from its coverage complaints based on "race, color, religion, sex, age, national origin, disability, or reprisal." And here, many of Plaintiff's June and July 2024 disclosures to DOE concerned hiring irregularities and discrimination. (Dkt. 46 ¶¶ 106–10, 324–26.) Thus, to the extent those disclosures substantially overlap with her discrimination and retaliation theories, Plaintiff cannot invoke Part 708 to transform them into a standalone retaliatory-discharge claim.[2]

## CONCLUSION

Accordingly, the Court should dismiss Plaintiff's second amended complaint with prejudice.

---

[2] Plaintiff cites several cases for the proposition that federal law may inform Illinois public policy. (Dkt. 56 at 14-16 (citing cases).) Fermilab has never contended otherwise. The problem with Plaintiff's claim is that it does not identify a specific public policy implicated by her conduct. And each of those cases involved a specific regulatory violation, safety concern, or other concrete public-policy violation tied to the employee's conduct. *See Wheeler v. Caterpillar Tractor Co.*, 108 Ill. 2d 502, 510–11 (1985) (nuclear-safety regulations); *Stebbings v. Unive. of Chi.*, 312 Ill. App. 3d 360, 367–73 (1st Dist. 2000) (radiation exposure and informed-consent requirements); *Bradish v. Aperion Care Marseilles, LLC*, 2025 IL App (3d) 240108, ¶¶ 1, 16 (patient-safety concern). And *Roberts v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, merely recognized that federal law may inform Illinois public policy; it did not eliminate the requirement that a plaintiff identify a specific public policy implicated by conduct. 2019 IL 123594, ¶ 24. Unlike those cases, Plaintiff identifies no specific safety violation, misuse of funds, regulatory breach, or other clearly mandated public policy implicated by the conduct she allegedly reported.

Dated: September 8, 2026

Respectfully submitted,

By: /s/ *Daniel A. Kaufman*
Michael Best & Friedrich LLP
Daniel A. Kaufman
444 West Lake Street, Suite 3200
Chicago, IL 60606
Telephone: (312) 222 0800
Fax: 312 222 0818
Email: dakaufman@michaelbest.com

Katarina Dana Stockton
227 West Trade Street, Suite 1500
Charlotte, NC 28202
Email: kdstockton@michaelbest.com

Malin Ann Ehrsam
790 N Water Street, Suite 2500
Milwaukee, WI 53202
Email: malin.ehrsam@michaelbest.com

*Attorneys for Defendants*

# CERTIFICATE OF SERVICE

The undersigned certifies that on September 8, 2025, he filed the foregoing with the Clerk of the Court using the CM/ECF NextGen system, which will send notice of such filing to the following *pro se* party:

**Emanuela Barzi**
889 Napa Lane
Aurora, IL 60502
Emanuela.barzi@yahoo.com
(603) 519-5765

/s/ Daniel A. Kaufman
*Attorneys for Defendants*
Michael Best & Friedrich LLP
444 West Lake Street, Suite 3200
Chicago, Illinois 60606