**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| EMANUELA BARZI, | ) | |
| *Plaintiff*, | ) | |
| v. | ) | No. 25 C 9247<br>Chief Judge Virginia M. Kendall |
| FERMI RESEARCH ALLIANCE, LLC, et al., | ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff Emanuela Barzi brings this multi-count employment discrimination claim against Fermi Research Alliance, LLC ("FRA"), Fermi Forward Discovery Group, LLC ("FermiForward"), and several employees of FRA, including Lia Merminga, Bonnie Fleming, Sam Posen, Stephen Gourlay, George Velev, Alexander Romanenko, and Beth Fancsali (collectively, the "Individual Defendants"). The Defendants now move to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Dkt. 51). For the reasons stated below, the Court grants in part and denies in part the Defendants' Motion to Dismiss [51].

## BACKGROUND

The Court presumes the parties' familiarity with the facts and only includes those relevant to the Defendants' Motion to Dismiss. The Court accepts the following facts as true for purposes of the Motion to Dismiss.

Barzi, a 57-year-old Italian woman, graduated from college in Italy and obtained academic and scientific credentials from Italian universities. (*Id.* ¶ 114). Barzi has international recognition

as a scientist in superconducting materials and magnet technology; she has over 270 peer-reviewed publications, multiple awards, and contributed to scientific development at Fermi National Accelerator Laboratory ("Fermilab") and other national labs. (*Id.* ¶ 26).

## I. Barzi's Employment at Fermilab

Barzi worked at Fermilab for twenty-seven years. (Dkt. 46 ¶ 29). Until 2025, the University of Chicago and the Universities Research Association INC. formed the FRA, which served as the management-and-operations contractor for Fermilab and operated it through a contract with the United States Department of Energy ("DOE"). (*Id.*) In 2025, FermiForward took over as the management-and-operations contractor. (*Id.* ¶ 3). Merminga, Fleming, Posen, Gourlay, Velev, Romaneko, and Fancsali all worked at Fermilab during Barzi's time of employment. (*Id.* ¶¶ 5-11). Barzi presents a decades-long pattern of harassment and discrimination in her *pro se* Second Amended Complaint. Starting as far back as 1997, Barzi experienced discrimination and retaliatory actions at Fermilab including that the company paid her less than her peers, denied her promotions, excluded her from projects, and subjected her to unjust treatment. (*Id.* ¶ 29A). For example, when Fermilab hired Barzi in 1997 as a guest engineer, the company hired her male counterparts into scientific-track roles, a position she did not obtain for twenty more years despite her qualifications. (*Id.* ¶ 30).

Barzi also experienced various instances of sexual harassment while at Fermilab from 1997 to 2016. Between 1997 and 1999, male employees at Fermilab stalked and sexually harassed Barzi; one employee subjected Barzi to unwanted physical contact and another married male co-worker stalked her. (*Id.* ¶¶ 31-32). In 2008, a male colleague sexually assaulted Barzi in her office. (*Id.* ¶ 33). Between 2008 and 2013, a male colleague sent her over 300 "lewd emails." (*Id.*) In 2016, a

Physics Nobel Laureate groped Barzi at Fermilab. (*Id.*) Barzi continued to experience unwanted sexual advances with male colleagues when traveling for work during her time at Fermilab. (*Id.*)

In addition to alleged instances of sexual harassment and assault, Fermilab denied Barzi leadership roles, research funding, and failed give her the recognition that she deserved for her work. (*Id.* ¶ 35). In 2003, Fermilab made Barzi a group leader of a research group that she had formed through independent funding only after its previous leader, a younger male, resigned. (*Id.*) In 2007, male colleagues and other laboratories received credit for scientific breakthroughs, whereas Barzi received "little recognition" for her own scientific development. (*Id.* ¶ 36). In 2010, after Barzi received the Japanese Superconductor Science and Technology prize, she asked Fermilab to reclassify her to the scientific track; the department head denied this request, in part, because they allegedly discredited her foreign academic credentials. (*Id.* ¶ 37). In 2011, Barzi and her team broke a Fermilab record, but a younger male group member received credit. (*Id.* ¶ 38). Fermilab then transferred Barzi and her team to a newly created department. (*Id.*) The department head showed no interest in Barzi's laboratory and belittled her credentials. (*Id.* ¶¶ 38-39).

Starting in 2014, Fermilab excluded Barzi from Laboratory Directed Research and Development ("LDRD") while providing her male counterparts or younger peers with support. (*Id.* ¶ 42). In 2015, the new division head suppressed the development of Barzi's scientific technique, impeding her ability to advance her own work. (*Id.* ¶ 44). From 2015 onward, Barzi's colleagues made a conscious effort to keep her from obtaining external executive roles by withholding titles from her. (*Id.* ¶ 46).

In 2016, Velev, a department head, started a campaign of defamation, harassment, and professional isolation against Barzi. (*Id.* ¶ 51). Velev accused Barzi of plagiarism and dishonesty, undermined her authorship, and spread rumors about her mental health. (*Id.* ¶ 51). In 2018 and

2019, Barzi reported bullying, discrimination, and retaliation to individuals at Fermilab, but they failed to remedy the situation. (*Id.* ¶ 52). Instead, Barzi faced increased defamation and exclusion. (*Id.*) In 2019, a physician diagnosed Barzi with Post-Traumatic Stress Disorder (PTSD). (*Id.* ¶ 62). Barzi informed HR at Fermilab of her PTSD and requested that they keep it confidential. (*Id.*) Velev, however, did not respect her request and disclosed Barzi's PTSD to other employees at Fermilab who later relied on it to undermine her credentials. (*Id.*)

In 2020, a Fermilab director selected Romanenko over Barzi for a senior technical leadership role even though Barzi had superior qualifications. (*Id.* ¶ 53). In November of 2021, Barzi filed an EEOC charge asserting that she experienced discrimination and retaliation from January 11, 2021, through November 7, 2021. (*Id.* ¶ 16). Barzi's EEOC charge caused her to experience an increase in harassment at work. (*Id.* ¶ 55). In March of 2022, Barzi expressed concerns about potential misconduct during a meeting for a DOE Program to which a Fermilab manager responded by accusing her of defamation. (*Id.* ¶ 56). In October of 2022, Barzi published an article that addressed discrimination in the scientific workplace which caused Fermilab to retaliate against her by banning her from participating in DOE grant proposals and prohibiting her from giving important talks. (*Id.* ¶ 58).

## II. Barzi's Termination at Fermilab

In July 2024, Barzi and her colleagues released an anonymous independent whistleblower report that addressed, among other things, gender discrimination and retaliation. (*Id.* ¶ 69). Senior leadership at Fermilab recognized the significance of this whistleblower report and publicly responded to it. (*Id.* ¶ 70). As a result of the publication of the report, Barzi experienced an increase in adverse actions. (*Id.*) For example, Gourlay excluded Barzi from presenting her research at a DOE review even though she worked as the principal investigator on the project. (*Id.* ¶ 71).

On July 31, 2024, Barzi joined a Zoom meeting for an inter-laboratory DOE program. (*Id.* ¶ 73). During the meeting, a senior colleague made inaccurate statements about Barzi and her team members. (*Id.*) During another meeting on August 5, 2024, Velev "publicly demeaned" Barzi after she provided proper critiques of Gourlay's slides. (*Id.* ¶ 74). On August 8, 2024, Barzi's supervisor informed her that a scheduled meeting would take place on August 13 to discuss her "misconduct" at the July 31 meeting. (*Id.* ¶ 75). Barzi emailed Merminga, a director at the time, to report continued harassment and requested Merminga intervene, but Barzi received no response. (*Id.* ¶ 76). Barzi also informed Gourlay and Posen that she opposed her unfair treatment and that she viewed the scheduled August 13 meeting as an act of retaliation. (*Id.*)

On August 13, 2024, Barzi met with Gourlay and the HR senior manager. (*Id.* ¶ 77). They questioned Barzi about her alleged inappropriate conduct at the July 31 meeting. (*Id.*) On September 10, 2024, an internal investigation took place regarding Barzi's actions at Fermilab and she received a final warning regarding "inappropriate verbal communication and behavior toward a colleague." (*Id.* ¶ 79). Barzi contested the warning she received that same day. (*Id.*) Shortly thereafter, the HR senior manager sent Barzi an email that FRA accepted her resignation. (*Id.*) Barzi denied ever resigning and HR responded by correcting the "record." (*Id.*)

On November 12, 2024, FRA terminated Barzi's employment along with 53 other employees in a laboratory-wide Reduction in Force ("RIF"). (*Id.* ¶ 81). Barzi asserts that Merminga, Fleming, Posen, Gourlay, Velev, and Fancsali all caused or approved of the adverse employment actions she experienced. (*Id.* ¶ 92). Fermilab informed Barzi that the company had eliminated her position because of "mission priorities and budget realities." (*Id.*) Barzi, however, alleges that her position continued after her termination, Fermilab just redistributed her duties to other employees. (*Id.* ¶ 82). Fermilab did not identify any objective selection criteria to explain

why Barzi's position was eliminated instead of other senior scientists. (*Id.* ¶ 81). As such, Fermilab failed to follow the specific policies and procedures it had enacted for terminating scientists during a RIF. (*Id.*)

The day Barzi was terminated, she was working virtually. (*Id.* ¶ 89). During the RIF, Fermilab had requested and paid two DuPage County deputies to provide security detail at the Fermilab building from 9:00am to 5:30pm. (*Id.* ¶ 85). The law enforcement officers helped to enforce access control and removal decisions following the RIF. (*Id.* ¶ 87). Even though Barzi worked virtually the day of the RIF, Fermilab used the same access control system to terminate her employment, rescind her badge and electronic access, cut off her work email, and exclude her from Fermilab property and resources. (*Id.* ¶ 89).

In response to Barzi's alleged improper treatment by the Defendants while employed at Fermilab, she filed this multi-count lawsuit in federal court. (Dkt. 1). The Defendants have, for the second time, moved to dismiss Barzi's entire complaint. (Dkt. 51).

## LEGAL STANDARD

"To survive a Federal Rule of Civil Procedure Rule 12(b)(6) motion, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *G.T. by & through Hanlon v. Samsung Elecs. Am., Inc.*, 186 F.4th 470, 474 (7th Cir. 2026) (quoting *Bell Alt. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is plausible on its face when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 881 (7th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

To determine the plausibility of a plaintiff's claim, "the court may consider 'documents . . . attached to the complaint, documents . . . central to the complaint and . . . referred to in it, and

information that is properly subject to judicial notice.'" *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 n.2 (7th Cir. 2017) (quoting *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013)). For purposes of a Rule 12(b)(6) motion, the Court accepts all well-plead facts as true and draws all inferences in favor of the non-moving party. *Id.* Because Barzi filed her Second Amended Complaint as a *pro se* litigant, the Court construes her pleadings liberally. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (cleaned up) ("A document filed *pro se* is to be liberally construed and *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.").

## DISCUSSION

Barzi filed a twelve-count Second Amended Complaint against the Defendants spanning an unwieldy 70 pages. (Dkt. 46). The Defendants have filed a Rule 12(b)(6) motion to dismiss Barzi's entire complaint. (Dkt. 51). The Court grants in part and denies in part the Defendants' Motion to Dismiss. For the claims the Court dismisses, it does so with prejudice.

### I. Federal Rule of Civil Procedure 8

Barzi filed a seventy page, single spaced Second Amended Complaint. (Dkt. 46). The Defendants, under Rule 12(b)(6), move to dismiss the entire Second Amended Complaint with prejudice on the grounds that it violated Federal Rule of Civil Procedure 8(a). (Dkt. 52).

Under Rule 8, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Court, under Rule 12(b)(6), can dismiss a complaint with prejudice "for failure to provide the defendants adequate notice of the claims against them and failure to state a claim upon which relief could be granted." *Luffman v. Collinsville Cmty. Unit Sch. Dist. #10*, 2026 WL 1815364, at *1 (7th Cir. June 24, 2026) (district court properly dismissed amended complaint with prejudice when it "spanned nearly 300 pages,"

and contained "conclusory allegations" that alleged essentially no facts). Barzi's Second Amended Complaint consists of seventy, single spaced pages, and included seventy additional pages of exhibits. Although coherent, the complaint fails to be concise and is drowning in extraneous details. While the Court, at this stage, does not dismiss the entire Second Amended Complaint based on Rule 8, it warns Barzi that even as a *pro se* litigant she is required to follow the law and Federal and Local Rules.

The Court previously dismissed, among others, Counts III, V (intentional discrimination claims), VII, IX, X, XI, and XII without prejudice. Barzi amended her complaint, but once more, failed to plausibly state claims upon which the Court could grant relief. *Agee v. Hickenbottom*, 182 F.4th 598, 602 (7th Cir. 2026) (quoting *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519 (7th Cir. 2015)) ("'Ordinarily ... a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed. We have said this repeatedly.'"). Because Barzi failed to resolve her defects in her Second Amended Complaint, the Court now dismisses Counts III, V, VII, IX, X (discrimination claim), XI, XI-A, and XII with prejudice and Count X (retaliation claim) without prejudice for the reasons discussed below. *Knowlton v. City of Wauwatosa*, 119 F.4th 507, 520 (7th Cir. 2024) ("A district court does not abuse its discretion when it had explained what was wrong with the initial complaint and had already provided one opportunity to amend.").

## II. National Origin Discrimination Title VII and the Illinois Human Rights Act ("IHRA") (Count III)

In Barzi's Second Amended Complaint, she intentionally did not replead her national origin discrimination claim. (Dkt. 46 at 37). The Defendants argue that the Court should dismiss this claim with prejudice because Barzi did not replead or amend her allegations. The Court provided

Barzi the opportunity to replead her national origin discrimination claim under Title VII and the IHRA. (Dkt. 41); *Fannon v. Guidant Corp.*, 583 F.3d 995, 1002 (7th Cir. 2009) (upholding district court's dismissal with prejudice because plaintiffs had "as a practical matter, a number of opportunities to craft a complaint that complied with the standards" required for their claims and failed to do so). Because Barzi chose not to replead this claim, Count III is dismissed with prejudice.[1]

### III. Disability Discrimination American Disability Act, the Rehabilitation Act, and IHRA (Count V)

Barzi filed a disability discrimination claim under the ADA, the Rehabilitation Act, and the IHRA in her Second Amended Complaint. (Dkt. 46, ¶¶ 191-206). Barzi argues that FRA violated these statutes when it discriminated against her based on her disability (PTSD), disclosed her PTSD diagnosis to third parties without her consent, and failed to provide her with a reasonable accommodation.[2] Courts use the same standard to analyze disability discrimination claims under these three statutes. *Tate v. Dart*, 51 F.4th 789, 793 (7th Cir. 2022) ("Illinois courts analyze IHRA claims under a framework that is practically indistinguishable from the ADA framework"); *Vargas v. DeJoy*, 980 F.3d 1184, 1188 n.4 (7th Cir. 2020) ("we resolve Rehabilitation Act claims by looking to the same standards and provisions that govern the Americans with Disabilities Act."). To establish disability discrimination, the plaintiff must show that "(1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) his disability caused the adverse employment action." *Jezior v. City of*

[1] Barzi did not replead or plead a claim under the Fair Pay Act. To the extent Barzi contends that her Second Amended Complaint contains any claim under the Fair Pay Act, the Court dismisses it with prejudice as the Court previously dismissed it without prejudice, and Barzi chose not to replead. (Dkt. 41).

[2] The Court does not address Barzi's Rehabilitation Act failure to accommodate claim because the Defendants do not dispute it.

*Chicago*, 179 F.4th 569, 576 (7th Cir. 2026) (quoting *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 961 (7th Cir. 2021)).

The Defendants argue that Barzi failed to allege sufficient facts to demonstrate that FRA discriminated against her because of her PTSD. (Dkt. 52 at 4-5). While the parties do not dispute that Barzi suffers from a disability (PTSD), the Defendants argue that she failed to show "'a genuine issue of material fact exists regarding whether his disability was the but for reason for the adverse action.'" *Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020) (quoting *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017)). A plaintiff must connect the adverse action that took place with her disability. *Id.* ("It is essential for the plaintiff to link the adverse action with his disability.").

Barzi attempts to connect the discrimination she faced because of her PTSD by stating that management knew of her PTSD and relied on it to portray Barzi in a negative light. (Dkt. 46 ¶ 96-97, 99-101, 201). These allegations do not indicate how Barzi's disability played a role in adverse employment actions. Barzi cannot rely on conclusory allegations to support her disability discrimination claim. *Roberts v. City of Chicago*, 817 F.3d 561, 565 (7th Cir. 2016) ("In order to establish causation at this stage, plaintiffs must plead sufficient facts supporting an inference that the City discriminated against them 'on the basis of disability.'"). Barzi additionally points to the September 10, 2024, LITWGA agenda to support the causal connection between her disability and adverse employment actions. (Dkt. 46 ¶¶ 201-02). The LITWGA agenda, however, does not mention Barzi's disability or provide any information relevant to her disability discrimination claim. (Dkt. 46 Ex. I). Because Barzi again relies on irrelevant and conclusory allegations to support her disability discrimination claim, Barzi cannot sufficiently plead this claim. Count V is dismissed with prejudice.

## IV. Aiding and Abetting Discrimination and Retaliation (IHRA) (Count VII)

Barzi also filed an aiding and abetting discrimination and retaliation claim in violation of the IHRA against the Individual Defendants. (Dkt. 46 ¶ 218). More specifically, Barzi argues that the Individual Defendants knowingly facilitated one or more of FRA's underlying IHRA violations as alleged in Counts I, II, IV, V, and VI. (*Id.* ¶ 219).

An individual cannot aid, abet, compel, or coerce another individual to violate any provision of the IHRA. 775 ILCS 5/6-101. "A plaintiff adequately pleads that a defendant aided or abetted an unlawful act by alleging the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be regularly aware of his or her role as part of the overall or tortious activity at the time he or she provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *M.U. by & Through Kelly U. v. Team Illinois Hockey Club, Inc.*, 2022 IL App (2d) 210568, ¶ 46, 215 N.E.3d 286, 301, *aff'd,* 2024 IL 128935, 240 N.E.3d 446.

The Individual Defendants argue that Barzi failed to state a claim for aiding and abetting because: (1) Barzi cannot bring aiding and abetting claims against the Individual Defendants for acting in their official capacity; and (2) Barzi did not sufficiently plead an aiding and abetting claim. The Court need only address the latter argument, as it is dispositive of Barzi's aiding and abetting claim. Barzi fails to provide the Court with sufficient allegations indicating the Individual Defendants knowingly and substantially assisted with the principal violation. Rather, Barzi continues to state that the Individual Defendants "knowingly implemented, encouraged, ratified, or substantially assisted FRA's discriminatory and retaliatory conduct," or that the Individual Defendants assisted with "FRA's IHRA violations." (Dkt. 41 ¶¶ 216-231). It is difficult to discern from the complaint what Barzi alleges as the principal violation or how the Individual Defendants

substantially assisted with the violations that took place. *Gibson v. Hum. Rts. Comm'n*, 2025 IL App (4th) 240955-U, ¶ 56, *appeal denied,* 273 N.E.3d 814 (Ill. 2025) (dismissing complaint for failure to state a claim when plaintiff did not point to what provision of the IHRA the defendant had violated).

The Court will not scour Barzi's seventy-page, single-spaced Second Amended Complaint to ascertain what specific IHRA violations she alleges that each Individual Defendant assisted with. Nor will the Court do this to determine how the Individual Defendants specifically and knowingly assisted in those violations. See *Nat'l Fid. Life Ins. Co. v. Karaganis*, 811 F.2d 357, 360 (7th Cir. 1987) (noting that a trial judge is "not obligated to conduct a search for other issues which may lurk in the pleadings"). Count VII is dismissed with prejudice.

## V. First Amendment Retaliation and Equal Protection (42 U.S.C. § 1983) (Count IX)

Barzi next brings a First Amendment retaliation and Equal Protection claim under 42 U.S.C. § 1983 against the Individual Defendants. (Dkt. 41).

### a. First Amendment Retaliation

Barzi asserts that the Individual Defendants retaliated against her in violation of the First Amendment when they took adverse actions against her after she exercised her First Amendment rights. (Dkt. 41). More specifically, she claims that they retaliated by excluding her from leadership roles and speaking opportunities, downgrading her performance evaluation, selecting her for termination, and excluding her access to Fermilab after terminating her. (*Id.* ¶ 246).

"Section 1983 authorizes suits against police officers and others who violate federal constitutional or statutory rights while acting under the color of state law." *Washington v. City of Chicago*, 98 F.4th 860, 868 (7th Cir. 2024). The "under state law" requirement "means that § 1983

does not permit suits based on private conduct, 'no matter how discriminatory or wrongful.'" *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50, (1999)). A private entity or person, however, can qualify as a state actor under § 1983 in limited circumstances; "(i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." *Manhattan Comm. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019) (citations omitted).

Because the Individual Defendants work for a private corporation as private employees, Barzi relies on the joint action theory to argue that the Individual Defendants acted under the color of state law. (Dkt. 46 ¶ 248). To support a claim for joint action, the plaintiff must provide "'evidence of a *concerted effort* between a state actor and that individual.'" *L.P. v. Marian Cath. High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017) (quoting *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998)). This means the plaintiff "must point to more than 'mere allegations of joint action or a conspiracy' to demonstrate that the defendants acted under color of state law." *Scott v. Univ. of Chicago Med. Ctr.*, 107 F.4th 752, 758 (7th Cir. 2024) (quoting *Fries*, 146 F.3d at 458). Barzi has failed to provide sufficient evidence of joint action between the Individual Defendants and state actors.

To overcome the Court's prior dismissal of her First Amendment retaliation claim, Barzi asserts that FRA used law-enforcement to revoke her access to Fermilab and to prevent her from obtaining her personal belongings and records. (Dkt. 41 ¶ 248). Barzi points out that Fermilab paid two DuPage County deputies to work as security detail for Fermilab. (*Id.* ¶ 121). Additionally, Barzi cited a prior instance with Fermilab and police officers at the Kane County Sheriff's Office where Fermilab Security requested police officers help to escort an employee from their property.

(*Id.* ¶ 125). Barzi, finally, included a memorandum of understanding between the Kane's County Sheriff's Office and the management at Fermilab. (*Id.* ¶ 126). None of this additional information cures Barzi's inability to prove joint action between the Individual Defendants and state actors. *Arlotta v. Bradley Ctr.*, 349 F.3d 517, 524 (7th Cir. 2003) (no joint action when private company sought police help); *Scott*, 107 F.4th at 758 ("We stress that there must have been a real agreement—explicit or implicit—between the parties. Merely working in parallel toward a common goal is not the same as conspiring together.").

Barzi did not include any allegations that state employees or deputies had direct involvement in the adverse employment action the Individual Defendants took against her; the factual allegations do not show that the Individual Defendants and police officers "had a meeting of the minds and thus reached an understanding to deny her a constitutional right." *Scott v. Univ. of Chicago Med. Ctr.*, 107 F.4th 752, 758 (7th Cir. 2024) (cleaned up). Count IX is dismissed with prejudice with respect to Barzi's First Amendment retaliation claim under § 1983.

**b. Equal Protection**

In Count IX, Barzi also brings an Equal Protection claim under § 1983. This claim fails for the same reasons that her First Amendment claim does; she does not sufficiently allege state action. *Gonzales v. Madigan*, 990 F.3d 561, 563 (7th Cir. 2021) ("Section 1983 is limited to actions under color of state law" including for alleged Equal Protection violations). Count IX is dismissed with prejudice with respect to Barzi's § 1983 Equal Protection claim.

**VI. Discrimination and Retaliation (42 U.S.C. § 1981) (Count X)**

Barzi filed a discrimination and retaliation claim based on her Italian ethnicity and ancestry in violation of 42 U.S.C. § 1981. (Dkt. 41). Section 1981 prohibits racial discrimination and

retaliation against employees when a contractual relationship exists between the employer and employee. *Nehan v. Tootsie Roll Indus., Inc.*, 621 F. App'x 847, 850 (7th Cir. 2015).

**a. Discrimination**

Barzi claims the Individual Defendants and FRA violated § 1981 when they discounted her Italian academic credentials and training causing them to interfere with her contractual employment rights. (Dkt. 46 ¶¶ 261-270). The Defendants argue that Barzi's § 1981 claim fails because she did not sufficiently allege that the Defendants discriminated against her because of her race and she fails to establish causation. (Dkt. 52 at 13-14). The Court only addresses the latter argument as it is dispositive of this claim.

Section 1981 "protects 'the equal right . . . to make and enforce contracts without respect to race.'" *Miao v. United Airlines, Inc.*, 164 F.4th 622, 625 (7th Cir.), *cert. denied,* 146 S. Ct. 2709 (2026) (quoting *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006)). To state a claim for discrimination under § 1981, the plaintiff must show that "(1) he is a member of a racial minority; (2) the defendants had the intent to discriminate on the basis of race; and (3) the discrimination concerned the making or enforcing of a contract." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006), *as amended on denial of reh'g* (May 25, 2006). Section 1981 requires the plaintiff plead that "but for his race [or ethnicity], he would not have suffered the loss of a legally protected right to make and enforce a contract." *Id.*; *see Singmuongthong v. Bowen*, 77 F.4th 503, 507 (7th Cir. 2023) ("In order to succeed on a § 1981 claim . . . a plaintiff has the burden of showing that race was a but-for cause of the injury."); *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020) (in § 1981 claims, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right.").

Barzi fails to sufficiently plead causation. Barzi's discrimination claim in her Second Amended Complaint focuses on the alleged discrimination she faced when Fermilab discounted, among other things, her Italian education. (Dkt. 46 ¶ 264). Viewing certain institutions as more "prestigious" than others, however, does not constitute racial or ethnic discrimination. Because a "plaintiff cannot allege multiple discrimination theories as the but-for causes of their mistreatment" and mistreatment due to educational training does not fall within ethnic or racial discrimination, Barzi has plead herself out of Court. *See e.g. Ibarra v. Nw. Univ.*, 2026 WL 1662227, at *5 (N.D. Ill. June 9, 2026); *Comcast Corp.*, 589 U.S. at 341 (to succeed on a § 1981 claim, "a plaintiff must initially plead and ultimately prove that, but for race [or ethnicity], it would not have suffered the loss of a legally protected right."). Count X is dismissed as to Barzi's § 1981 discrimination claim with prejudice.

**b. Retaliation**

Barzi also brought a retaliation claim under § 1981 against FRA and the Individual Defendants. *Shott v. Katz*, 829 F.3d 494, 497 (7th Cir. 2016) (quoting *Carter v. Chicago State Univ*., 778 F.3d 651, 657 (7th Cir. 2015)) ("Individual employees can be held liable under Section 1981 if they 'participated' in the retaliatory conduct."). To state a claim for retaliation under § 1981, Barzi must allege that she "engaged in protected activity, suffered a materially adverse action, and that there is a causal connection between the two." *Onyango v. Nick & Howard, LLC*, 607 F. App'x 552, 555 (7th Cir. 2015); *Johnson v. Accenture LLP*, 142 F.4th 536, 542 (7th Cir. 2025). The Defendants argue that Barzi failed to allege a retaliation claim under § 1981 because she "co-mingled" her retaliation allegations with other retaliation claims in her Second Amended Complaint. (Dkt. 52 at 16). The Defendants also assert that Barzi relies on inadequate legal conclusions to support her retaliation claim. (*Id.* at 16-17).

It is difficult to discern which actions Barzi alleges were retaliated against due to the wordy complaint; yet in the interest of construing the allegations in the light most favorable to Barzi, the Court interprets that she alleges that she was retaliated against for two reasons: (1) filing an EEOC complaint alleging discrimination; and (2) publishing a whistleblower article alleging that Fermilab discriminates against women in the workplace by not paying them the same, not promoting them the same as men, and harassing them in the workplace. (Dkt. 46 ¶¶ 209-210); *Shott v. Katz*, 829 F.3d 494, 497 (7th Cir. 2016) (quoting *Burlington Northern and Santa Fe. R.R. Co. v. White*, 548 U.S. 53, 57 (2006)) (Section 1981 "forbids *any* retaliatory actions that are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination,' and those retaliatory actions need not be directly 'related to employment or occur in the workplace' except that their harm must have been caused by contract– or employment-related events."). These allegations would sufficiently state a claim. Therefore, Barzi is given leave to replead her § 1981 retaliation claim.

## VII. Breach of Implied Contract and Promissory Estoppel (Count XI)

In Count XI, Barzi alleges FRA breached an implied contract when it terminated her in the RIF. (Dkt. 41 ¶¶ 282-299). Barzi brings a promissory estoppel claim in the alternative. (*Id.* ¶¶ 300-310). The Court dismisses both with prejudice.

### a. Breach of Implied Contract

To state a claim for a breach of contract under Illinois law, a plaintiff must plead: "(1) the contract existed, (2) the plaintiff performed the conditions precedent required by the contract, (3) the defendant breached the contract, and (4) damages." *Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 861 (7th Cir. 2020) (citing *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 626 (7th Cir. 2013)). "In Illinois, contracts of indefinite duration are presumptively terminable 'at

the will of the parties.'" *Thompson Corrugated Sys., Inc. v. Engico, S.R.L.*, 111 F.4th 747, 752 (7th Cir. 2024) (quoting *Jespersen v. Minn. Mining & Mfg. Co.*, 700 N.E.2d 1014, 1015 (1998)). An employee, however, can overcome this presumption by relying on the language in an employment manual or a policy statement. *Miller v. Ford Motor Co.*, 105 F. App'x 84, 88 (7th Cir. 2004). "[T]o rebut the presumption of at-will employment with language in an employment manual or other policy statement, a plaintiff must demonstrate: (1) the language of the policy contained a promise clear enough that the employee reasonably believed that an offer was made; (2) the statement was disseminated to him in such a manner that he was aware of its contents and reasonably believed it to be an offer; and (3) he accepted the offer by commencing or continuing to work after learning of the policy statement." *Id.* at 87-88.

Barzi asserts the implied contract came from the "total Senior Scientist appointment framework," which includes official policies, manuals, performance evaluation criteria, and long-standing institutional practices. (Dkt. 41 ¶ 287). Barzi, however, does not indicate that any of the materials she relies on contain "a promise clear enough that the employee reasonably believed that an offer was made." *Miller*, 105 F. App'x at 88; *Doe v. First Nat. Bank of Chicago*, 865 F.2d 864, 872 (7th Cir. 1989) (recognizing "an employee handbook or similar document creates enforceable contractual rights only when specific procedures have been prescribed by positive and mandatory language."); *see Ferkel v. Bd. of Educ. of City of Chicago*, 45 F. Supp. 3d 824, 838 (N.D. Ill. 2014) ("employer policy statements may create contractual rights only if the language of the policy contained a clear and definite promise."). Because Barzi did not point to any language indicating FRA made a clear promise to Barzi, she has failed to sufficiently plead an implied contract existed. Accordingly, the Court dismisses Barzi's implied breach of contract claim with prejudice.

**b. Promissory Estoppel (Count XI-A)**

In the alternative, Barzi brings a promissory estoppel claim against FRA. (Dkt. 41, ¶ 300-310). "To establish a claim for promissory estoppel under Illinois law, a plaintiff must show that (1) the defendant made an unambiguous promise to the plaintiff; (2) the plaintiff relied on that promise; (3) the plaintiff's reliance was expected and foreseeable by the defendant; and (4) the plaintiff relied on the promise to its detriment." *Yash Venture Holdings, LLC v. Moca Fin., Inc.*, 116 F.4th 651, 659-60 (7th Cir. 2024). The Court will only allow for relief under a theory of promissory estoppel "where a promise has been made that was relied upon by the promisee to his detriment such that it would be a fraud or injustice not to enforce the promise." *Anderson v. Cath. Bishop of Chicago*, 759 F.3d 645, 651 (7th Cir. 2014).

Barzi asserts FRA made the following promises: institutional scientific-review protections would govern senior scientist appointments, senior scientists proposed for RIF would receive individualized assessments and FCSA review, senior scientists in similar situations would experience similar evaluations, and RIF or termination decisions would comply with scientific-appointment and DOE-complaint procedures. (Dkt. 46 ¶ 303); *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 566 (7th Cir. 2012) (promise requirement satisfied when plaintiff "asserts that [defendant] made an unambiguous promise that if she made timely payments and accurate representations during the trial period, she would receive an offer for a permanent loan modification calculated using the required HAMP methodology."); *see Caterpillar, Inc. v. Usinor Industeel*, 393 F. Supp. 2d 659, 680 (N.D. Ill. 2005) (citing *Derby Meadows Utility Co. v. Inter–Continental Real Estate,* 559 N.E.2d 986, 995 (1990)) ("A promise for purposes of promissory estoppel typically involves a declaration that one will do or refrain from doing something specified."). To the extent Barzi continues to rely on the RIF Termination Procedure Policy, the

Court previously held and reiterates once more that "this policy does not constitute an unambiguous promise because it contains a clear disclaimer." (Dkt. 41 at 48).

The Court does not address the validity of the other "unambiguous promises" as Barzi does not sufficiently allege how enforcing these promises, all of which had to do with protections available to senior scientists during termination procedures, provide her with the only way to avoid injustice. *See Jackson v. Bank of New York*, 62 F. Supp. 3d 802, 820 (N.D. Ill. 2014) (citing *Kulins v. Malco, a Microdot Co., Inc.,* 459 N.E.2d 1038, 1045 (1984)) ("the doctrine is applied when a promise must be "enforced in order to avoid injustice."). Barzi, therefore, has not sufficiently alleged a claim of promissory estoppel. The Court dismisses Count XI-A prejudice.

## VIII. Illinois Retaliatory Discharge (Public Policy) (Count XII)

Barzi, finally, brings a retaliatory discharge claim against FRA. (Dkt. 46 ¶ 331). Barzi claims FRA violated public policy when it terminated her position of employment after she reported illegal or improper conduct that affected the public welfare. (*Id.* ¶ 322). Under Illinois law, to succeed on a claim of retaliatory discharge, a plaintiff must show "'(1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy.'" *Perez v. Staples Cont. & Com. LLC*, 31 F.4th 560, 571 (7th Cir. 2022) (quoting *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (2009)). Clearly mandated public policy "is one that strikes at the heart of a citizen's social rights, duties, and responsibilities. It implies that the policy will be recognizable simply because it is clear." *Perez v. Staples Cont. & Com. LLC*, 31 F.4th 560, 574 (7th Cir. 2022) (quoting *Palmateer v. Int'l Harvester Co.*, 85 Ill. 2d 124, 130 (1981)) (cleaned up). The Illinois Supreme Court has recognized that "public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be

found in the State's constitution and statutes and, when they are silent, in its judicial decisions." *Palmateer*, 85 Ill. 2d at 130.

Barzi relies on the following statutes, case law, and federal regulations and polices as support for the alleged public policy FRA violated: the Illinois Whistleblower Act ("IWA"), the IHRA, *Palmateer* and *Jacobson*, and DOE contractor-employee regulations. (Dkt. 46, ¶¶ 322-23). First, neither the IWA nor the IHRA can serve as the basis for Barzi's retaliatory discharge claim. As previously recognized by the Court, statutes with their own deterrent mechanisms do not constitute clearly mandated public policy in retaliatory discharge claims. (Dkt. 41 at 52); *see Brown v. Biomat USA, Inc.*, 2021 WL 3187599, at *3 (N.D. Ill. July 28, 2021) ("The Illinois Supreme Court has implied that where the underlying law contains its own deterrent mechanism, the tort of retaliatory discharge is unlikely to be an appropriate remedy."). Because both the IWA and the IHRA have their own deterrent mechanisms, Barzi cannot rely on them. *See Brown*, 2021 WL 3187599, at *3 ("if the IWA constituted a clearly mandated public policy for purposes of the tort of retaliatory discharge then the tort remedy and the statutory remedy would be coextensive."); *see Marron v. Eby-Brown Co., LLC*, 2012 WL 182234, at *3 (N.D. Ill. Jan. 23, 2012) (citing *Stoecklein v. Ill. Tool Works, Inc.,* 589 F.Supp. 139, 145 (N.D. Ill. 1984)) (no "independent cause of action for public-policy retaliatory discharge based on employee's termination due to refusal to accept discriminatory demotion because the public policy was embodied in IHRA.").

Second, the cases Barzi cites do not embody the specific public policy she claims FRA violated. According to Barzi, FRA violated public policy by retaliating against her "for reporting suspected illegal or improper conduct affecting public welfare." (Dkt. 46 ¶ 321); *Palmateer*, 85 Ill.2d at 132 (recognizing a public policy of protecting individuals who report violations of criminal law to local law enforcement agencies); *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 178

(1978) (dealing with retaliation claim after an individual filed a workmen's compensation claim); *Jacobson v. Knepper & Moga, P.C.*, 185 Ill. 2d 372, 378 (1998) (licensed attorney "cannot maintain a cause of action for retaliatory discharge because the ethical obligations imposed by the Rules of Professional Conduct provide adequate safeguards to the public policy implicated in this case.").

Third, Barzi relies on the DOE contractor-employee regulations to support her claim, including 10 C.F.R. Part 708, 10 C.F.R. Part 733, and other DOE policies. What counts as clearly mandated public policy "has been narrowly construed in Illinois to include only discharges in retaliation for certain activities, such as reporting an employer's criminal violations, or violations of health and safety standards." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 628-29 (7th Cir. 2009) (cleaned up). "The Illinois Supreme Court has defined "public policy" only within these limited bounds[.]" *Id.*; *Palmateer*, 85 Ill.2d at 130 ("There is no precise definition of the term. In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions."). As such, Barzi's reliance on DOE provisions does not fall within the narrow definition of public policy. Because Barzi failed to plead a clear public policy mandate, the Court dismisses Count XII with prejudice.

## **CONCLUSION**

For the reasons above, the Court grants the Defendants' Motion to Dismiss in part. The Court grants the Motion as to Counts III, V, VII, IX, X (discrimination claim), XI-A, and XII, dismissing these claims with prejudice. The Court dismisses Count X (retaliation claim) without prejudice. The Court denies the Motion as to Counts I, II, IV, VI, and VIII.

Virginia M. Kendall
United States District Judge

Date: November 6, 2026